# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| ALDRICH PUMP LLC, *et al.*,[1] | : | No. 20-30608 (JCW) |
| | : | |
| Debtors, | : | (Jointly Administered) |
| | : | |
| | : | |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | No. [] |
| | : | |
| v. | : | |
| | : | |
| ALDRICH PUMP LLC, MURRAY BOILER LLC, TRANE TECHNOLOGIES COMPANY LLC, and TRANE U.S. INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |

# COMPLAINT FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS' ESTATES WITH CERTAIN NONDEBTOR AFFILIATES OR, ALTERNATIVELY, TO REALLOCATE DEBTORS' ASBESTOS LIABILITIES TO THOSE AFFILIATES

Dated:  October 18, 2021

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Aldrich Pump LLC (2290) and Murray Boiler LLC (0679).  The Debtors' address is 800-E Beaty Street, Davidson, North Carolina 28036.

Plaintiff, the Official Committee of Asbestos Personal Injury Claimants ("**Committee**"), by and through its undersigned counsel, hereby submits this complaint seeking entry of an order substantively consolidating (1) the bankruptcy estate of Defendant Aldrich Pump LLC ("**Aldrich**") with Defendant Trane Technologies Company LLC ("**TTC**"), and (2) the bankruptcy estate of Defendant Murray Boiler LLC ("**Murray**") with Defendant Trane U.S. Inc. ("**Trane**"), in each case *nunc pro tunc* to June 18, 2020 ("**Petition Date**").   The Committee also seeks, in the alternative, entry of a declaratory judgment reallocating the asbestos liabilities of Aldrich to TTC and the asbestos liabilities of Murray to Trane.[2]   The grounds supporting the requested relief are as follows:

## <u>INTRODUCTION</u>

1.     Within a matter of hours on May 1, 2020, the Debtors' predecessors, TTC, as successor to Ingersoll-Rand Company, a former New Jersey corporation ("**Ingersoll-Rand**"), and Trane engineered their divisional mergers under Texas law.   In connection therewith, TTC purported to divide itself into two companies, TTC and Aldrich, and Trane similarly purported to divide itself into two companies, "new" Trane and Murray.   TTC received 99% of Ingersoll-Rand's assets, with the remaining 1% allocated to Aldrich.   "New" Trane received 98% of "old" Trane's assets, with the remaining 2% going to Murray.   Significantly, all legacy asbestos liabilities of Ingersoll-Rand and "old" Trane were dumped into Aldrich and Murray, respectively.   Forty-nine days later, on June 18, 2020, Aldrich and Murray filed the chapter 11 cases now pending before this Court.

2.     Through this stratagem, the Debtors and Nondebtor Affiliates have sought to isolate their asbestos liabilities from profitable operating businesses and to single out asbestos victims for

---

[2]     TTC and Trane are hereinafter referred to, collectively, as the "**Nondebtor Affiliates**."

unfair and discriminatory treatment by essentially breaking TTC and Trane into separate corporate entities that Plaintiff now seeks to consolidate. Because their claims are stayed, asbestos victims are unable to obtain compensation in the civil justice system for the harm inflicted on them by Ingersoll-Rand and Trane. And, even though more than 15 months have passed since the Petition Date, these chapter 11 cases are no closer to the finish line than they were on the Petition Date. The Debtors have not reached agreement with the Committee on a consensual plan. No global settlement between the Debtors and the claimants' representatives has been reached. Instead, the Debtors are channeling their energies and resources into abusive and improper claimant questionnaires and other discovery—which they presumably intend to use in a contested estimation proceeding that the Court has not authorized—and pursuing an unlawful cramdown 524(g) plan supported by the future claimants' representative. All the while, sick and dying asbestos victims and their families remain uncompensated and unable to vindicate their state-law rights.

3.      In contrast, the Nondebtor Affiliates are outside of bankruptcy and are paying their (non-asbestos) unsecured creditors in the ordinary course of business. The Nondebtor Affiliates are also free to pay—and are potentially paying to the tune of hundreds of millions of dollars— their equity holders ahead of asbestos claimants. Through the divisional mergers and chapter 11 filings, asbestos claimants have been structurally subordinated to other unsecured creditors and equity holders.

4.      Under these circumstances, this Court should order the substantive consolidation of Aldrich and TTC, and of Murray and Trane. The purpose of substantive consolidation is to ensure the equitable treatment of all creditors. Substantive consolidation will rescind the structural subordination of asbestos creditors that the Debtors and their cohorts have put in place through the Corporate Restructuring, thus ensuring that asbestos creditors will once again be *pari passu* with

other unsecured creditors and have priority over equity holders, as the Bankruptcy Code provides. Substantive consolidation will ensure that Ingersoll-Rand's and Trane's assets will once again be available to asbestos claimants as they are to other unsecured creditors and will be housed within the same entities holding the Ingersoll-Rand and Trane asbestos liabilities. And substantive consolidation will put a stop to TTC and Trane's upstreaming of cash to their parent companies. Simply put, substantive consolidation is an equitable cure for TTC and Trane's abuse of the Texas divisional merger law and the resulting injustice inflicted on Ingersoll-Rand's and Trane's asbestos claimants.

5.      In addition, this Court should order substantive consolidation *nunc pro tunc* to the Petition Date. Such retroactive relief will allow these chapter 11 cases to move forward from where they should have started: with all the assets and liabilities housed in single entities—the original tortfeasors—on the Petition Date. Such relief will also enable the consolidated estates to recover, as unauthorized postpetition transfers, any cash that has been loaned or upstreamed from TTC and Trane to the parent companies since the Petition Date.

6.      Alternatively, the Court should declare that the assignment to and acceptance by the Debtors of the asbestos liabilities are void as unconscionable, and as such should be disregarded. Aldrich and Murray had no meaningful choice in the preparation and execution of various intercompany agreements that arose from the Corporate Restructuring, and they had no choice in being saddled with the obligations forced on them as part of the Corporate Restructuring. There was no real and voluntary meeting of the minds associated with the execution, assignment, and assumption of the asbestos liabilities, nor in connection with the intercompany agreements manufactured to provide Aldrich and Murray with a thin basis with which to assert the legitimacy of the Corporate Restructuring.

7.    Concurrently with the filing of this Complaint, Plaintiff has filed a motion ("**Motion**") seeking the same relief requested in this Complaint and setting forth in more detail the legal grounds supporting the relief requested herein.[3]

8.    For all the reasons set forth herein, the Court should grant the relief requested.[4]

## JURISDICTION AND VENUE

9.    In accordance with Federal Rule of Bankruptcy Procedure 7008(a), this adversary proceeding relates to the cases commenced by Aldrich and Murray on the Petition Date under chapter 11 of the Bankruptcy Code, which are jointly administered under the caption *In re Aldrich Pump LLC*, Case No. 20-bk-30608, and are pending before this Court.

10.    The United States District Court for the Western District of North Carolina (the "**District Court**") has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), as this proceeding arises under the Bankruptcy Code, or arises in or is related to a case under the Bankruptcy Code.  This Court exercises such jurisdiction under 28 U.S.C. § 157(a) and the standing order of the District Court referring bankruptcy cases to bankruptcy judges in this district.

11.    This matter is a core proceeding under 28 U.S.C. § 157(b).  The Committee consents to entry of a final order or judgment by this Court in the above-titled proceeding.

12.    Venue in this district is proper under 28 U.S.C. § 1409.

## PREDICATES FOR RELIEF

13.    The statutory predicate for the relief requested herein is 11 U.S.C. § 105(a).

---

[3]    Plaintiff incorporates the arguments and authority contained in the Motion as if fully set forth herein.

[4]    In an abundance of caution, concurrently with this Complaint and the Motion, Plaintiff has filed an application in the base case to conduct a Rule 2004 examination of current TTC and Trane for the limited purpose of obtaining the identities and mailing addresses of TTC and Trane's creditors, so that notice of this Complaint and the Motion may be provided to those creditors.

14.     The Committee has commenced this adversary proceeding in accordance with Rule

7001(1) and (7) of the Federal Rules of Bankruptcy Procedure.

15.     Plaintiff has made no prior request for the relief requested herein to this or any other

court.

### THE PARTIES

16.     Plaintiff Official Committee of Asbestos Personal Injury Claimants is a statutory

committee of creditors appointed by order of this Court dated July 7, 2020, in accordance with 11

U.S.C. § 1102(a).[5]  The Committee's members are individuals who assert present or pending

claims against the Debtors for personal injury or wrongful death arising from, or attributable to,

exposure to asbestos or asbestos-containing products.

17.     Defendant Aldrich Pump LLC is a limited liability company organized and existing

under the laws of the State of North Carolina, with its executive offices located at 800-E Beaty

Street, Davidson, North Carolina 28036.

18.     Defendant Murray Boiler LLC is a limited liability company organized and existing

under the laws of the State of North Carolina, with its executive offices located at 800-E Beaty

Street, Davidson, North Carolina 28036.

19.     Defendant Trane Technologies Company LLC is a limited liability company

organized and existing under the laws of the State of Delaware, with its executive offices located

at 800-E Beaty Street, Davidson, North Carolina 28036.

20.     Defendant Trane U.S. Inc. is a corporation organized and existing under the laws

of the State of Delaware, with its executive offices located at 800-E Beaty Street, Davidson, North

Carolina 28036.

---

[5]     *See* Order Appointing the Official Committee of Asbestos Personal Injury Claimants, 20-bk-30608, ECF No. 147.

## THE FACTS

### I.    ASBESTOS LAWSUITS AGAINST INGERSOLL-RAND AND TRANE

21.    The predecessors of Aldrich and Murray—Ingersoll-Rand and old Trane, respectively—spent decades in the tort system, defending against lawsuits seeking compensation for personal injury or wrongful death caused by exposure to asbestos or asbestos-containing products.[6]  According to the Debtors, Ingersoll-Rand and old Trane were the subject of roughly 100,000 asbestos-related lawsuits filed throughout the United States.[7]  The Debtors' predecessors historically paid approximately $95 million a year for asbestos-related settlements and defense costs.[8]

22.    If any asbestos lawsuits could not be dismissed quickly, Ingersoll-Rand and Trane sought to settle them.[9]  The Debtors described this overall settlement strategy as "the most cost-effective approach."[10]  Ingersoll-Rand and Trane settled "approximately 900 mesothelioma claims each year."[11]  The "remaining indemnity payments" were "used to settle the mass of other [asbestos] claims" against Ingersoll-Rand and Trane, "of which there also [were] thousands, with the majority of these payments made to claimants alleging lung cancer."[12]

23.    While defending against asbestos suits in the tort system, Ingersoll-Rand and Trane used insurance receivables, including those received under settlements or certain "coverage-in-

---

[6]    Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting in Part Denying in Part the Motion to Compel ¶¶ 30-36, 3:20-ap-03041, ECF No. 308 ("**Court's Findings and Conclusions**").

[7]    Motion of the Debtors for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) Declaring That the Automatic Stay Applies to Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing, at 18, 3:20-ap-03041, ECF No. 2 ("**PI Motion**").

[8]    Informational Brief of Aldrich Pump LLC and Murray Boiler LLC, at 31, 3:20-bk-30608, ECF No. 5.

[9]    *Id.* at 31.

[10]    *Id.*

[11]    *Id.* at 31-32.

[12]    *Id.* at 32.

place" agreements, to fund or offset the defense and indemnity costs of their asbestos liabilities.[13]

But these coverage-in-place agreements do not provide Ingersoll-Rand and Trane with "dollar-for-dollar" coverage for asbestos claims,[14] thus requiring Ingersoll-Rand and Trane to dip into their own pockets for cash.  By the end of 2019, Ingersoll-Rand's and Trane's ultimate parent holding company, Ingersoll-Rand plc (now Trane Technologies plc ("**Trane plc**")), projected that current and future asbestos liabilities would surpass their total projected insurance recoveries by almost $240 million.[15]  It was in this context that Ingersoll-Rand and Trane planned and implemented the Texas divisional mergers, collectively known as the "**Corporate Restructuring**."

## II.    PROJECT OMEGA

24.    The Corporate Restructuring was the result of months of secret and meticulous planning involving a select group of Ingersoll-Rand employees, as well as in-house and outside counsel, which bore the codename "Project Omega."  Project Omega was conducted under a veil of secrecy,[16] not simply as a matter of company protocol but also in recognition that "[p]laintiffs [*sic*] lawyers" were "the most at-risk group as it relates to the transaction."[17]  Project Omega was not disclosed to asbestos claimants or their attorneys prior to the Corporate Restructuring.[18]

25.    As time progressed, meetings among Project Omega team members took place with increasing frequency and included weekly "all hands" team meetings chaired by Ingersoll-Rand's general counsel.[19]  At all of these meetings—or at least the significant ones—both in-house lawyers

---

[13]    ACC Ex. 271, at F-46, attached hereto as **Exhibit 1**.

[14]    PI Motion at 18.

[15]    Court's Findings and Conclusions ¶ 39; ACC Ex. 271, at F-46 (showing "total asbestos related liabilities" of $547 million and "total asset[s] for probable asbestos-related insurance recoveries" of $304 million).

[16]    Debtors 30(b)(6) Dep. 214:3-25, Apr. 12, 2021 (Tananbaum), attached hereto as **Exhibit 2**; *see also* Court's Findings and Conclusions ¶ 45 ("Project Omega was . . . a secret endeavor.").

[17]    ACC Ex. 192, at TRANE_00014949, attached hereto as **Exhibit 3**.

[18]    Debtors 30(b)(6) Dep. 217:18-22 (Tananbaum).

[19]    Court's Findings and Conclusions ¶ 46; Tananbaum Dep. 149:7-151:6, attached hereto as **Exhibit 4**.

and outside counsel were present.[20]   The close and almost ubiquitous involvement of attorneys in

Project Omega underscores how Project Omega was driven not by business people, but by lawyers.

As this Court noted in its recent preliminary injunction ruling, "Project Omega was an attorney-

created and implemented strategy."[21]

26.     Since its inception, the sole objective of Project Omega was the commencement of

a § 524(g) bankruptcy case.[22]   For example, an internal document entitled "OMEGA Comms plan"

states as of March 5, 2020:  "We will isolate the Asbestos liabilities into stand alone entities *and

will take the entities bankrupt*."[23]   In addition, Manlio Valdes, a member of the boards of Aldrich

and Murray, admitted in deposition that he thought it was "a probability" that Aldrich and Murray

would end up paying less to asbestos claimants in bankruptcy than in the tort system.[24]

## III.   IMPLEMENTING THE CORPORATE RESTRUCTURING

27.     On April 30, 2020, TTC was formed as a Texas limited liability company.[25]   The

next day, May 1, 2020, Ingersoll-Rand was merged into TTC, leaving TTC as the surviving

company.[26]   TTC then utilized the Texas divisional merger law to effectively divide itself into two

companies:   TTC and Aldrich.[27]   TTC received 99% of Ingersoll-Rand's assets, while the

remaining 1% of the assets were allocated to Aldrich.[28]   Specifically, Aldrich received about $26.2

---

[20]   Court's Findings and Conclusions ¶ 46; Tananbaum Dep. 149:7-151:6.

[21]   Court's Findings and Conclusions ¶ 44.

[22]   *See id*. ¶ 50 ("The weight of the evidence . . . reflects that a bankruptcy filing . . . was the sole objective of Project Omega.").

[23]   ACC Ex. 192, at TRANE_00014949 (emphasis added).

[24]   Valdes Dep. 264:21-265:7, Mar. 1, 2021, attached hereto as **Exhibit 5**; ACC Ex. 33, attached hereto as **Exhibit 6**.

[25]   ACC Ex. 189 ¶ 8, attached hereto as **Exhibit 7**.

[26]   *Id.*; ACC Ex. 280, at DEBTORS_00001708, attached hereto as **Exhibit 8**.

[27]   ACC Ex. 25 ("**Aldrich Plan of Divisional Merger**"), attached hereto as **Exhibit 9**; ACC Ex. 189 ¶ 9; ACC Ex. 281, at DEBTORS_00002410, attached hereto as **Exhibit 10**.

[28]   Court's Findings and Conclusions ¶ 55; Hr'g Tr. 396:11-18, May 6, 2021 (Diaz Direct).

million in cash, a 100% equity interest in a relatively small operating subsidiary known as 200 Park, Inc. ("**200 Park**"), and rights to Ingersoll-Rand's asbestos-related insurance coverage.[29] Apart from the 200 Park subsidiary, Aldrich received no operating business.[30]

28.    Also, on May 1, 2020, Trane converted from a Delaware corporation to a Texas corporation.[31]    Trane then utilized the Texas divisional merger law to effectively divide itself into two companies:  "new" Trane and Murray.[32]  "New" Trane received **98%** of "old" Trane's assets, while the remaining **2%** of the assets were allocated to Murray.[33]  Specifically, Murray received about $16 million in cash, a 100% equity interest in a relatively small laboratory services business known as ClimateLabs LLC ("**ClimateLabs**"), and rights to Trane's asbestos-related insurance coverage.[34]  Apart from its ClimateLabs subsidiary, Murray received no operating business.[35]

29.    As part of the divisional mergers, all the legacy asbestos liabilities of Ingersoll-Rand and "old" Trane were purportedly allocated to Aldrich and Murray, respectively.[36]  In addition, Aldrich became purportedly obligated to indemnify TTC, "new" Trane, and all of their other affiliates for liabilities arising from Ingersoll-Rand's asbestos torts.[37]  Similarly, Murray became purportedly obligated to indemnify TTC, "new" Trane, and all of their other affiliates for liabilities arising from Trane's asbestos torts.[38]

---

[29]    Court's Findings and Conclusions ¶ 55; ACC Ex. 147 (Pittard Decl.), ¶ 16, attached hereto as **Exhibit 11**.

[30]    Court's Findings and Conclusions ¶ 55; ACC Ex. 147 (Pittard Decl.), ¶ 16; Roeder Dep. 45:16-19, Mar. 16, 2021, attached hereto as **Exhibit 12**.

[31]    ACC Ex. 286, at DEBTORS_00000411, attached hereto as **Exhibit 13**; ACC Ex. 287, at DEBTORS_00000419, attached hereto as **Exhibit 14**.

[32]    ACC Ex. 286, at DEBTORS_00000411; ACC Ex. 287, at DEBTORS_00000419.

[33]    Court's Findings and Conclusions ¶ 59; Hr'g Tr. 394:1-3, May 6, 2021 (Diaz Direct).

[34]    Court's Findings and Conclusions ¶ 59; ACC Ex. 147 (Pittard Decl.), ¶ 16.

[35]    Court's Findings and Conclusions ¶ 59; ACC Ex. 147 (Pittard Decl.), ¶ 16; Tananbaum Dep. 237:23-239:9.

[36]    ACC Ex. 25, ¶ 5; ACC Ex. 26, ¶ 5 ("**Murray Plan of Divisional Merger**"), attached hereto as **Exhibit 15**.

[37]    ACC Ex. 25, ¶ 9(b); ACC Ex. 77, § 3 ("**Aldrich Support Agreement**"), attached hereto as **Exhibit 16**.

[38]    ACC Ex. 26, ¶ 9(b); ACC Ex. 211, § 3 ("**Murray Support Agreement**"), attached hereto as **Exhibit 17**.

30.     Once the divisional mergers were completed, TTC and new Trane were promptly converted to Delaware entities,[39] and Aldrich and Murray were promptly converted to North Carolina LLCs.[40]  All told, Aldrich and Murray were Texas entities for less than 24 hours.[41]  Seven weeks later, on June 18, 2020, Aldrich and Murray filed their chapter 11 petitions with this Court.

31.     Since the completion of the Corporate Restructuring, new Trane has continued making acquisitions to augment its commercial and residential HVAC businesses.[42]  TTC, Trane, and their operating subsidiaries are also timely paying their creditors in the ordinary course of business.[43]

32.     From the standpoint of non-asbestos creditors, shareholders, employees, suppliers, vendors, and other stakeholders, it has been "business as usual," even after the Corporate Restructuring and the chapter 11 filings.[44]

## IV.    INTERCOMPANY AGREEMENTS

33.     As part of the Corporate Restructuring, the Debtors, TTC, Trane, and certain nondebtor affiliates entered into several agreements dated "as of" May 1, 2020, the day of the

---

[39]    ACC Ex. 282, at DEBTORS_00003133, attached hereto as **Exhibit 18**; ACC Ex. 283, at DEBTORS_00003137, attached hereto as **Exhibit 19**; ACC Ex. 290, at DEBTORS_00001493, attached hereto as **Exhibit 20**; ACC Ex. 291, at DEBTORS_00001497, attached hereto as **Exhibit 21**.

[40]    ACC Ex. 284, at DEBTORS_00002969, attached hereto as **Exhibit 22**; ACC Ex. 285, at DEBTORS_00002973; ACC Ex. 289, at DEBTORS_00001340, attached hereto as **Exhibit 23**; ACC Ex. 292, at DEBTORS_00001344, attached hereto as **Exhibit 24**.

[41]    ACC Ex. 38, at DEBTORS_00050589-93 (showing the times for incorporating and reincorporating the entities in the Corporate Restructuring), attached hereto as **Exhibit 25**; ACC Ex. 43, at DEBTORS_0050597-50603 (showing the times of incorporation and reincorporation of entities involved in the Corporate Restructuring), attached hereto as **Exhibit 26**; ACC Ex. 189 ¶¶ 10, 13.

[42]    Hr'g Tr. 491:3-16, May 7, 2021 (Kuehn Cross-Exam); Nondebtor Affiliates 30(b)(6) Dep. 99:2-21; 103:6-10, Apr. 9, 2021 (Kuehn), attached hereto as **Exhibit 27**.

[43]    Hr'g Tr. 394:19-395:15; 402:19-23, May 6, 2021 (Diaz Direct); Nondebtor Affiliates 30(b)(6) Dep. 59:25-60:16 (Kuehn); Kuehn Dep. 237:9-13, Mar. 19, 2021; ACC Ex. 218, attached hereto as **Exhibit 28**; ACC Ex. 220, attached hereto as **Exhibit 29**.

[44]    *See, e.g.*, ACC Ex. 18 (emails dated December 2019 describing TTC and Trane's operations post-Corporate Restructuring as "business as usual"), attached hereto as **Exhibit 30**.  *See also* Hr'g Tr. 402:19-23, May 6, 2021 (Diaz Direct); Kuehn Dep. 235:11-236:8; 237:3-13, attached hereto as **Exhibit 31**; Nondebtor Affiliates 30(b)(6) Dep. 59:25-60:16 (Kuehn).

Texas divisional mergers.  As these agreements were between affiliated companies, there was no

arm's length negotiation over their terms.[45]  "Like the Divisional Merger, their legal enforceability

vis a vis third parties is seriously in doubt."[46]

### A.   Funding Agreements

34.    The most pertinent of the intercompany agreements are the two "Funding

Agreements":  (1) the funding agreement between TTC as payor and Aldrich as payee;[47] and (2)

the funding agreement between Trane as payor and Murray as payee.[48]  The Funding Agreements

are essential to the Debtors' assertion that each of them "has the same ability to resolve and pay

valid current and future asbestos-related claims and other liabilities as [Ingersoll-Rand] and Old

Trane had before the restructurings."[49]  The Funding Agreements provide that TTC and Trane will

transfer funds to the Debtors to pay any "Permitted Funding Use."[50]  The term "Permitted Funding

Use" includes (a) the costs of administering the Debtors' chapter 11 cases, (b) amounts necessary

to satisfy each Debtor's "Asbestos Related Liabilities" in connection with funding a § 524(g) trust,

and (c) the Debtors' indemnification obligations to TTC, Trane, and the other nondebtor affiliates

under any agreement provided in the plans of divisional mergers.[51]

---

[45]   Court's Findings and Conclusions ¶¶ 66, 68; Hr'g Tr. 159:5-160:11; 160:22-161:13, May 5, 2021 (Tananbaum Cross-Exam); Tananbaum Dep. 209:16-24; *see also* Daudelin Dep. 253:18-21, Mar. 9, 2021, attached hereto as **Exhibit 32**.  In fact, those who authorized the execution of and/or signed the key agreements arising from the Corporate Restructuring had no understanding at the time of signing what they were signing or what the purpose was. *See id.* at 190:19-191:7; 234:11-237:3; 238:19-246:15; 248:19-254:2; *see also* Kuehn Dep. 223:4-13 (failing to recall authorizing the execution of a secondment agreement and a services agreement).

[46]   Court's Findings and Conclusions ¶ 68 (footnote omitted).

[47]   ACC Ex. 13 ("**Aldrich Funding Agreement**"), attached hereto as **Exhibit 33**.

[48]   ACC Ex. 86 ("**Murray Funding Agreement**"), attached hereto as **Exhibit 34**.

[49]   ACC Ex. 147 (Pittard Decl.) ¶ 17.

[50]   Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003821-22 (definition of "Permitted Funding Use"); Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101 (definition of "Permitted Funding Use").

[51]   Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003821-22; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101-02; ACC Ex. 25; ACC Ex. 26.

35.     Under the Funding Agreements, TTC and Trane are obligated to pay the chapter 11 administrative expenses and the Debtors' indemnification obligations only if the cash distributions from 200 Park (in the case of Aldrich) or ClimateLabs (in the case of Murray) are insufficient to pay those expenses and obligations in full.[52]  In addition, TTC and Trane are each obligated to fund a § 524(g) trust only if their respective Debtor's "other assets are insufficient to fund amounts necessary or appropriate to satisfy . . . Asbestos Related Liabilities in connection with the funding of such trust."[53]  According to the Debtors' own metrics, the Debtors' assets (without the Funding Agreements) are already insufficient, as they are less than their asbestos liabilities.[54]

36.     The Funding Agreements have numerous deeply troubling features.  For example, TTC's and Trane's obligations under their respective Funding Agreements are unsecured and not guaranteed by any of the Nondebtor Affiliates or other entities.[55]  Nothing in the Funding Agreements prevent TTC and Trane from layering on debt that would be senior in priority to their obligations under their respective Funding Agreements.[56]  Nothing in the Funding Agreements requires TTC and Trane to provide financial statements to the Debtors that are audited or contain information at a level that provides details on account balances and material transactions (*e.g.*, footnotes to financial statements).[57]  TTC and Trane do not have to provide payments that "exceed

---

[52]   Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102.

[53]   Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102.

[54]   Court's Findings and Conclusions ¶ 63 (observing that, "disregarding the Funding Agreement[s] . . . , Aldrich/Murray's assets were not then, and are not now, sufficient to satisfy their liabilities" (footnote omitted)); Hr'g Tr. 397:18-23, May 6, 2021 (Diaz Direct) ("[T]he Aldrich liabilities as disclosed -- and as discussed, this is just the debtors' numbers, not my point of view -- is $315 million of asbestos liabilities, plus $3 million of operating liabilities. So that's $318 million of liabilities and their assets are $210 million."); *id.* at 398:20-23 ("Similar to Aldrich, the assets of Murray, $127 million, if you exclude the funding agreement, are less than the total liabilities of . . . $194 million.").

[55]   Court's Findings and Conclusions ¶ 80; Debtors' 30(b)(6) Dep. 111:15-21; 112:6-15 (Tananbaum).

[56]   Court's Findings and Conclusions ¶ 80; *see also* Debtors' 30(b)(6) Dep. 113:4-8 (Tananbaum).

[57]   Court's Findings and Conclusions ¶ 80.

the aggregate amount necessary" for the Debtors to fund all "Permitted Funding Uses,"[58] thus giving TTC and Trane leeway to determine what is "necessary" and the ability to reduce payments if either disagrees with the use of funds.[59]  And there is no dispute resolution mechanism if a funding request by a Debtor is denied.[60]  The Funding Agreements do not prevent TTC and Trane from engaging in additional divisional mergers, and they explicitly allow the Nondebtor Affiliates to engage in consolidations and mergers, and to transfer "all or substantially all" of their assets.[61] There are no mechanisms in the Funding Agreements to ensure that TTC and Trane will have sufficient assets to perform under them.[62]  And nothing in the Funding Agreements limits or prohibits dividends, or other distributions of value, by TTC or Trane to equity holders, potentially including their full value.[63]

37.    In addition, "the Debtors' rights and obligations under [their respective Funding Agreements] may not be assigned without the prior written consent of New TTC or New Trane."[64] Thus, "arguably a Creditor's Plan could not be funded unless New TTC and/or New Trane favor that Plan."[65]  Moreover, "the Funding Agreements require, as a precondition to funding a § 524(g)

---

[58]    Aldrich Funding Agreement (ACC Ex. 13) § 2(a); Murray Funding Agreement (ACC Ex. 86) § 2(a).

[59]    Court's Findings and Conclusions ¶ 80.

[60]    *Id.*; Hr'g Tr. 400:15-17, May 6, 2021 (Diaz Direct).

[61]    Aldrich Funding Agreement (ACC Ex. 13) § 4(b)(i); Murray Funding Agreement (ACC Ex. 86) § 4(b)(i); *see also* Court's Findings and Conclusions ¶ 80.

[62]    *See* Tananbaum Dep. 224:13-18 ("Q.  Are you aware of any mechanisms in the funding agreements to ensure that the payors have sufficient assets to perform under the funding agreements?  A.  No, I'm not aware of any specific mechanisms.").

[63]    Court's Findings and Conclusions ¶ 80; *see also* Tananbaum Dep. 223:2-24 ("Q.  Are you aware of any limitations in the funding agreement that prevents New Trane Technologies from sending cash payments to its parent Trane Technologies Holdco Inc.?  A.  So am I correct that your question refers to this Aldrich funding agreement that we're looking at here?  Q.  Yes, sir.  A.  No, I'm not aware of any such limitation . . . .  Q.  Same answer with the Murray funding agreement, there's no limitations that you're aware of on New Trane US Inc.?  A.  That's correct, because as I testified, the purpose of the funding agreement was to give these new entities the same ability to fund that the predecessor entities had, but not to give them enhanced ability to fund, just the same ability to fund.").

[64]    Court's Findings and Conclusions ¶ 74 (footnote omitted).

[65]    *Id.*

trust, that a confirmed chapter 11 plan provide New TTC or New Trane, as applicable, 'with all the protections of section 524(g) of the Bankruptcy Code.'"[66]  Further, "the Funding Agreements have 'Automatic Termination' provisions whereby New TTC's and Trane's respective funding obligations automatically cease 'on the effective date of a Section 524(g) Plan.'"[67]  As a result, "the Funding Agreements could never serve as post-effective date 'evergreen' sources of funding that § 524(g) contemplates."[68]  Moreover, "once exclusivity has ended, these provisions of the Funding Agreements will . . . impair, if not disable, the ability and right of other parties-in-interest to propose a competing 524(g) plan."[69]

38.    "In sum, the Funding Agreements are not unconditional promises to pay the Aldrich/Murray Asbestos Liabilities.  They are instead conditional agreements dependent on New TTC/New Trane's approval of any reorganization plan and upon New TTC/New Trane's continued good financial health."[70]

## B.    Support Agreements

39.    Two "**Support Agreements**" are relevant here:  (1) the Divisional Merger Support Agreement between TTC and Aldrich;[71] and (2) the Divisional Merger Support Agreement between Trane and Murray.[72]  Among other things, the Aldrich Support Agreement requires Aldrich to "indemnify and hold harmless TTC and each of its affiliates (each of which is an express third party beneficiary . . .) from and against" any "Losses" and "Proceedings" to which TTC and

---

[66]  *Id.* ¶ 76 (footnote omitted).

[67]  *Id.* ¶ 77 (footnote omitted).

[68]  *Id.*

[69]  *Id.* ¶ 78.

[70]  Court's Findings and Conclusions ¶ 81.

[71]  Aldrich Support Agreement (ACC Ex. 77).

[72]  Murray Support Agreement (ACC Ex. 211).

its affiliates "may become subject."[73]  The Murray Support Agreement has a nearly identical provision requiring it to indemnify and hold harmless Trane "and each of its affiliates" from and against any "Losses" and "Proceedings."[74]  Nevertheless, if the cash distributions from 200 Park are insufficient to allow Aldrich to pay its indemnification obligations to TTC and its affiliates under the Aldrich Support Agreement, the Aldrich Funding Agreement provides that TTC will provide the funds to Aldrich so that Aldrich, in turn, may indemnify TTC or any other affiliate.[75] A substantially similar provision appears in the Murray Funding Agreement that enables Murray, in the event of insufficient cash distributions from ClimateLabs, to receive funding from Trane so that Murray may, in turn, indemnify Trane or any other affiliate.[76]

40.     As this Court found, the "Support Agreements' indemnity provisions, when coupled with the Funding Agreements, create a potential circular transfer of funds between the Debtors and New TTC/New Trane.  Thus, the Support Agreements are unorthodox transactions with no apparent business purpose (apart from aiding this bankruptcy case and securing injunctive relief . . . .)."[77]

41.     The Support Agreements differ from the previous iterations seen in *Bestwall* and *DBMP* insofar as the indemnification obligations run not only to the sister affiliates of the Debtors—here, TTC and new Trane—but also to their other affiliates.

---

[73]   Aldrich Support Agreement (ACC Ex. 77) § 3.

[74]   Murray Support Agreement (ACC Ex. 211) § 3.

[75]   Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822 (clause (f) in the definition of "Permitted Funding Use").

[76]   Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102 (clause (f) in the definition of "Permitted Funding Use"); *see also* Kuehn Dep. 308:14-309:5 (acknowledging the "circularity" of the Funding Agreements: ·"Q. [I]f Trane Technologies Company LLC is the entity being sued for an asbestos claim, it will seek indemnification from Aldrich Pump, who, if it does not have sufficient funds, will go right back to Trane Technologies Company LLC for that payment, is that correct? . . .  A. Yes, that's my understanding."); Tananbaum Dep. 217:20-219:12 (stating that clause (f) includes "a permitted funding use for the debtor seeking funding from its sister affiliate . . .  for the debtor to satisfy an indemnification obligation that it owes to said affiliate" if the debtors' funds are insufficient to cover its indemnification obligations).

[77]   Court's Findings and Conclusions ¶ 85.

### C.    Secondment Agreement and Services Agreements

42.    The Court's Findings and Conclusions stated:  "Creating two companies with no employees [*i.e.*, Aldrich and Murray] evidences the fact that Aldrich and Murray were simply inert vessels designed to carry their predecessors' asbestos liabilities into bankruptcy."[78]

43.    With no operating business and employees of their own, Aldrich and Murray entered into a secondment agreement with TTC, whereby three in-house lawyers were seconded to them.[79]  With the retirement of one of the lawyers, the number of seconded employees was reduced to two:  Allan Tananbaum, the Debtors' chief legal officer, and Robert H. Sands, an in-house attorney.[80]

44.    In further support of these non-operating Debtors, TTC entered into separate services agreements with Aldrich and Murray, whereby TTC provides strategic administration, finance, tax, and legal services to them.[81]

## V.    SHARED OFFICERS AND BOARD MEMBERS

45.    In addition to the two seconded lawyers, the Debtors each have officers who are employees within the Trane plc enterprise group and a board of managers composed of current and former employees of the Debtors' affiliates:[82]

a.    Manlio Valdes, who serves as president of the Debtors, is also Vice President Product Management, The Americas, Trane Commercial HVAC, at TTC.

b.    Ray Pittard, who serves as vice president of the Debtors, is also the Transformation Office Leader at Trane plc.

---

[78]    *Id.* ¶ 87.

[79]    ACC Ex. 105, attached hereto as **Exhibit 35**.

[80]    ACC Ex. 107, at 2, attached hereto as **Exhibit 36**; Hr'g Tr. 89:2-5, May 5, 2021 (Tananbaum Direct).

[81]    *See* ACC Ex. 61, at DEBTORS_00003282, attached hereto as **Exhibit 37**; ACC Ex. 101, at DEBTORS_00003669, attached hereto as **Exhibit 38**.

[82]    ACC Ex. 107, at 3; Turtz Dep. 157:11-158:7, Apr. 5, 2021, attached hereto as **Exhibit 39**.

       c.     Amy Roeder, who serves as chief financial officer and treasurer of the Debtors, is also Finance Director–Information Technology & Legal at TTC.

       d.     Allan Tananbaum, who is the Debtors' chief legal officer and secretary, also serves as Deputy General Counsel–Product Litigation at TTC.[83]

46.     Mr. Valdes and Ms. Roeder also serve on each Debtor's three-person board of managers.[84]  The remaining member of the Aldrich board, Robert Zafari, and the remaining member of the Murray board, Marc DuFour, were employees within the Trane organization before their retirements.[85]

## VI.    UPSTREAMING OF CASH BY NONDEBTOR AFFILIATES

47.



---

[83]   ACC Ex. 107, at 3.

[84]   *Id.*

[85]   *Id.*; Turtz Dep. 157:11-158:7.

[86]   Nondebtor Affiliates 30(b)(6) Dep. 74:11-17 (Kuehn).

[87]   *Id.* at 74:17-19; Hr'g Tr. 533:20-534:2, May 7, 2021 (Kuehn Cross-Exam).

[88]   Nondebtor Affiliates 30(b)(6) Dep. 134:8-18 (Kuehn); Hr'g Tr. 534:10-20, May 7, 2021 (Kuehn Cross-Exam).

[89]   Nondebtor Affiliates 30(b)(6) Dep. 134:19-25 (Kuehn).



48.     The distributions made as part of Trane plc's "cash management strategy and other
company initiatives" have been substantial.[93]  In December 2017, former Trane made a distribution
to its then-direct parent, Trane Inc., in the amount of $586.9 million.[94]  Similarly, in December
2018 and December 2019, former Trane made distributions to Trane Inc. in the amounts of $1.1
billion and $740.7 million, respectively.[95]  In April 2020, within a matter of days or weeks before
the Corporate Restructuring, former Trane made a distribution to Trane Inc. in the amount of $2.3
billion.[96]  Also in April 2020, within a matter of days or weeks before the Corporate Restructuring,
Ingersoll-Rand (now TTC) made a distribution to its then-direct parent, Trane Technologies Global
Holding Company, in the amount of $4.1 billion.[97]

49.     There is no evidence to suggest that such distributions have stopped while the
Debtors have been in chapter 11.  Indeed, there is evidence to the contrary:  Richard Daudelin, the
Nondebtor Affiliates' treasurer, testified at the preliminary injunction proceeding that Trane plc
paid quarterly dividends to its shareholders for each quarter of 2020.[98]  Similarly, according to a
February 4, 2021 press release, Trane plc's board of directors authorized an 11% increase to its

---

[90]   *Id.* at 135:2-10; *see also* Hr'g Tr. 534:25-535:5, May 7, 2021 (Kuehn Cross-Exam).

[91]   Nondebtor Affiliates 30(b)(6) Dep. 135:11-14 (Kuehn).

[92]   *Id.* at 135:15-20.

[93]   ACC Ex. 224, attached hereto as **Exhibit 40**.

[94]   *Id.*

[95]   *Id.*

[96]   *Id.*

[97]   *Id.*

[98]   Daudelin Dep. 91:23-94:19; 95:6-11.

quarterly dividend payable on March 31, 2021, and "Trane [plc] has paid consecutive quarterly dividends on its common shares *since 1919* and annual dividends *since 1910*."[99]  In a recent 10-Q filing, dated May 5, 2021 (the first day of the preliminary injunction hearing), Trane plc stated that it expects "to pay a competitive *and growing* dividend" and that the quarterly dividend has been increased from $0.53 to $0.59 per ordinary share, or $2.36 per share annualized.[100]  With 239,147,507 ordinary shares outstanding as of April 23, 2021,[101] that annualized sum of $2.36 per share translates to 2021 quarterly dividends totaling approximately $564,388,117.  In addition, the quarterly dividend announced in February of this year was "paid in March 2021 and the second quarter dividend was declared in April 2021 and will be paid in June 2021."[102]

<u>COUNT I:</u>

<u>SUBSTANTIVE CONSOLIDATION
NUNC PRO TUNC AS OF THE PETITION DATE UNDER 11 U.S.C. § 105(a)</u>

50.    Plaintiff incorporates by reference paragraphs 1 through 49 above as if fully set forth herein.

51.    Before the Corporate Restructuring, which occurred only 49 days before the Petition Date, Aldrich and TTC were one legal entity—namely, Ingersoll-Rand.  And Murray and "new" Trane were also one entity:  "old" Trane.  Neither Aldrich nor Murray existed.

52.    Following the Corporate Restructuring, the Debtors and Nondebtor Affiliates remain a part of the same enterprise group.  In addition, TTC is an indirect parent of Trane and

---

[99]    *Trane Technologies Increases Dividend 11% and Authorizes New $2 Billion Share Repurchase Program*, TRANE TECHNOLOGIES PLC (Feb. 4, 2021) (emphasis added), https://investors.tranetechnologies.com/news-and-events/news-releases/news-release-details/2021/Trane-Technologies-Increases-Dividend-11-and-Authorizes-New-2-Billion-Share-Repurchase-Program/default.aspx.

[100]    Trane Technologies plc 10-Q for Quarterly Period Ended Mar. 31, 2021, at 33, May 5, 2021, https://sec.report/Document/0001466258-21-000088/#tt-20210331.htm (emphasis added).

[101]    *Id.* (cover page).

[102]    *Id.*

Murray.  All of the Debtors' employees are seconded from the enterprise group.  Similarly, the Debtors each have officers who are employees of the enterprise group and a board of managers composed of current and former employees of the Debtors' affiliates.[103]  The Debtors have no business operations of their own.  Rather, they are special purpose entities that were formed specifically for these bankruptcy cases, are under common ownership, and are reliant on services and financial support from the Nondebtor Affiliates.

53.    The "division" of Ingersoll-Rand into two entities and of old Trane into two entities pertains to only one class of creditors:  the asbestos claimants.  The Corporate Restructuring has disadvantaged, hindered, and delayed the recourse and recoveries of asbestos claimants.  The Corporate Restructuring and bankruptcy filings have resulted in inequitable treatment of, and therefore harm to, asbestos creditors by artificially and structurally subordinating them, not only to non-asbestos unsecured creditors but also to equity holders.

54.    Substantive consolidation will remedy the harm done to asbestos claimants by putting them once again on equal footing with non-asbestos unsecured creditors and making them senior to equity holders.  Substantive consolidation will uphold the cardinal principle of bankruptcy by bringing assets intentionally left out of bankruptcy into these chapter 11 cases. Substantive consolidation will effectively undo the Corporate Restructuring and put a stop to efforts of the Debtors and Nondebtor Affiliates to isolate their unwanted asbestos creditors in chapter 11 and single them out for unfair and discriminatory treatment in favor of the Nondebtor Affiliates' operational creditors and equity holders.

---

[103]    ACC Ex. 107, at 3; Turtz Dep 157:11-158:7.

## COUNT II:

## DECLARATORY JUDGMENT – BASED ON UNCONSCIONABILITY

55.    Plaintiff incorporates by reference paragraphs 1 through 54 above as if fully set forth herein.

56.    The Corporate Restructuring was effectuated by former Ingersoll-Rand, old Trane and their parent companies without providing Aldrich or Murray with a meaningful choice—let alone any choice—in the preparation and execution of the plans of divisional merger, the Funding Agreements, the Support Agreements, and other intercompany agreements supporting or resulting from the Corporate Restructuring.  In fact, neither Aldrich nor Murray existed until the point in time they found themselves subject to the intercompany agreements and could not have taken part in the discussions that resulted in the Corporate Restructuring.  Moreover, former Ingersoll-Rand and old Trane used their control and authority to essentially contract with themselves to assign 99% of Ingersoll-Rand's assets to TTC and 98% of old Trane's assets to new Trane.  Meanwhile, Aldrich received just 1% of Ingersoll-Rand's assets and Trane received just 2% of old Trane's assets, while each received billions of dollars in asbestos-related litigation liabilities.

57.    Mr. Valdes, Mr. Tananbaum, Mr. Pittard, and Ms. Roeder all serve as officers of Aldrich and Murray, while also serving as employees of other Trane plc enterprise group companies.  Aldrich's board of directors consists of Mr. Valdes, Ms. Roeder, and Mr. Zafari, a retired employee of the enterprise group.  Murray's board of directors consists of Mr. Valdes, Ms. Roeder, and Mr. DuFour, another retired employee of the enterprise group.

58.    Aldrich and Murray's bankruptcy counsel previously represented former Ingersoll-Rand and old Trane and is the same counsel that assisted former Ingersoll-Rand and old Trane with planning and executing the Corporate Restructuring.

59.     Plaintiff is entitled to a declaration that the Plans of Divisional Merger and supporting intercompany agreements, including the Funding Agreements, are unconscionable contracts and therefore unenforceable.

60.     Accordingly, the asbestos related liabilities allocated to Aldrich should be reallocated to TTC, and the asbestos-related liabilities allocated to Murray should be reallocated to Trane.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, the Committee requests entry of an order:

(a)     substantively consolidating the bankruptcy estate of Aldrich with nondebtor TTC, *nunc pro tunc* to the Petition Date; and

(b)     substantively consolidating the bankruptcy estate of Murray with nondebtor Trane, *nunc pro tunc* to the Petition Date; or

(c)     in the alternative, declaring that the plans of divisional merger, the Funding Agreements, the Support Agreements, and the other intercompany agreements that arose from the Corporate Restructuring are unconscionable, and reallocating the asbestos-related liabilities of Aldrich to TTC and the asbestos-related liabilities of Murray to Trane; and in all events,

(d)     granting such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

*/s/ Glenn C. Thompson*
Glenn C. Thompson (Bar No. 37221)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email:  gthompson@lawhssm.com

*Local Counsel for the Official Committee of
Asbestos Personal Injury Claimants*

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Jeffrey A. Liesemer (admitted *pro hac vice*)
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
        tphillips@capdale.com
        jliesemer@capdale.com

*Counsel to the Official Committee of Asbestos
Personal Injury Claimants*

David Neier (admitted *pro hac vice*)
Carrie V. Hardman (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
Email: dneier@winston.com
        chardman@winston.com

*Special Litigation Counsel to the Official
Committee of Asbestos Personal Injury
Claimants*

Dated:  October 18, 2021

ROBINSON & COLE LLP
Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com
        dwright@rc.com

*Counsel to the Official Committee
of Asbestos Personal Injury Claimants*