**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| ALDRICH PUMP LLC, *et al.*,[1] | : | No. 20-30608 (JCW) |
|  | : |  |
| Debtors, | : | (Jointly Administered) |
|  | : |  |
|  | : |  |
| OFFICIAL COMMITTEE OF ASBESTOS | : | Adversary Proceeding |
| PERSONAL INJURY CLAIMANTS | : |  |
|  | : |  |
| Plaintiff, | : | No. [] |
|  | : |  |
| v. | : |  |
|  | : |  |
| ALDRICH PUMP LLC, MURRAY | : |  |
| BOILER LLC, TRANE TECHNOLOGIES | : |  |
| COMPANY LLC, and TRANE U.S. INC. | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS'
ESTATES WITH CERTAIN NONDEBTOR AFFILIATES OR, ALTERNATIVELY,
TO REALLOCATE DEBTORS' ASBESTOS LIABILITIES TO THOSE AFFILIATES**

Dated:  October 18, 2021

---

1    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers
follow in parentheses): Aldrich Pump LLC (2290) and Murray Boiler LLC (0679).  The Debtors' address is 800-E
Beaty Street, Davidson, North Carolina 28036.

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................... 1

Jurisdiction and Venue .............................................................................................. 4

Factual Background ................................................................................................... 4

I.    Asbestos Lawsuits Against Ingersoll-Rand and Trane .......................................... 4

II.   Project Omega ....................................................................................................... 5

III.  Implementing the Corporate Restructuring ........................................................ 7

IV.   Intercompany Agreements .................................................................................... 9

   A.   Funding Agreements ......................................................................................... 9

   B.   Support Agreements ....................................................................................... 13

   C.   Secondment Agreement and Services Agreements ....................................... 14

V.    Shared Officers and Board Members .................................................................. 15

VI.   Upstreaming of Cash by Nondebtor Affiliates .................................................. 15

Relief Requested ..................................................................................................... 18

Argument ................................................................................................................. 18

I.    Substantive Consolidation Is a Longstanding Equitable Remedy Predating the
      Bankruptcy Code ................................................................................................ 18

II.   Substantive Consolidation Is Justified Under Any of the Leading, Circuit-Level
      Standards ............................................................................................................. 21

   A.   Substantive Consolidation Is Warranted Under the First Prong of the *Augie/Restivo*
      and *Owens Corning* Standards .................................................................... 21

   B.   Substantive Consolidation Is Warranted Under the *Auto-Train* Standard ....... 23

     1.   There is substantial identity between the Debtors and their Nondebtor Affiliates ...... 23

     2.   Consolidation is necessary to avoid inequitable treatment of asbestos creditors ........ 25

III.  Equity Supports Substantive Consolidation ....................................................... 28

IV.   This Court Should Grant *Nunc Pro Tunc* Relief ............................................... 31

V.    Alternatively, the Court Should Reallocate the Asbestos Liabilities Assigned in the
      Corporate Restructuring From Aldrich to TTC and Murray to Trane ................. 32

Conclusion ............................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ADPT DFW Holdings, LLC*,
574 B.R. 87 (Bankr. N.D. Tex. 2017) ....................................................................................25

*In re Augie/Restivo Baking Co.*,
860 F.2d 515 (2d Cir. 1988) .......................................................................................21, 22

*In re Auto-Train Corp.*,
810 F.2d 270 (D.C. Cir. 1987) .............................................................................18, 20, 23

*In re Bashas' Inc.*,
437 B.R. 874 (Bankr. D. Ariz. 2010) ...................................................................................25

*Boellner v. Dowden*,
612 F. App'x 399 (8th Cir. 2015) .......................................................................................23

*In re Bonham*,
229 F.3d 750 (9th Cir. 2000) ..........................................................................20, 22, 25, 31

*In re Brentwood Golf Club, LLC*,
329 B.R. 802 (Bankr. E.D. Mich. 2005) ..............................................................................25

*In re Clark*,
548 B.R. 246 (B.A.P. 9th Cir. 2016), *aff'd*, 692 F. App'x 946 (9th Cir. 2017) .......................20

*In re Com. Envelope Mfg. Co.*,
No. 76 B 2354, 1977 WL 182366 (S.D.N.Y. Aug. 22, 1977) ................................................20

*In re Crown Mach. & Welding, Inc.*,
100 B.R. 25 (Bankr. D. Mont. 1989) ...................................................................................21

*In re Eagle-Picher Indus., Inc.*,
192 B.R. 903 (Bankr. S.D. Ohio 1996) .................................................................................21

*Eastgroup Props. v. Southern Motel Ass'n, Ltd.*,
935 F.2d 245 (11th Cir. 1991) .....................................................................................23, 25

*FDIC v. Colonial Realty Co.*,
966 F.2d 57 (2d Cir. 1992) .......................................................................................19, 21, 25

*In re Genesis Health Ventures, Inc.*,
402 F.3d 416 (3d Cir. 2005) ..............................................................................................18

*In re Gyro-Trac (USA), Inc.*,
441 B.R. 470 (Bankr. D.S.C. 2010) ................................................................22, 28

*In re Hemingway Transp., Inc.*,
954 F.2d 1 (1st Cir. 1992) .....................................................................................23

*in Robbins v. Chase Manhattan Bank, N.A.*,
No. 93-0063-H, 1994 WL 149597 (W.D. Va. Apr. 4, 1994)...................................28

*In re LLS Am., LLC*,
No. 09-06194-PCW11, 2011 WL 4005447 (Bankr. E.D. Wash. Sept. 8, 2011),
*aff'd*, Nos. EW-11-1524-DHPa, EW-11-1550-DHPa, 09-06194-PCW11, 2012
WL 2042503 (B.A.P. 9th Cir. June 5, 2012) ........................................................19

*In re Logistics Info. Sys., Inc.*,
432 B.R. 1 (D. Mass. 2010) ..................................................................................21

*Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*,
474 U.S. 494 (1986)..............................................................................................20

*In re Munford, Inc.*,
115 B.R. 390 (Bankr. N.D. Ga. 1990) ...................................................................20

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005), *as amended* (Aug. 23, 2005), *as amended* (Sept.
2, 2005), *as amended* (Oct. 12, 2005), *as amended* (Nov. 1, 2007) ...........18, 21, 22

*In re Owner Mgmt. Serv., LLC Trustee Corps*,
530 B.R. 711 (Bankr. C.D. Cal. 2015), *aff'd sub nom. OMS, LLC v. Bank of
Am., N.A.*, No. CV 15-3876-R, 2015 WL 12712307 (C.D. Cal. Nov. 6, 2015) ....................18

*In re Petters Co.*,
506 B.R. 784 (Bankr. D. Minn. 2013) ...................................................................19

*In re S & G Fin. Servs. of S. Fla., Inc.*,
451 B.R. 573 (Bankr. S.D. Fla. 2011) ...................................................................21

*Sampsell v. Imperial Paper & Color Corp.*,
313 U.S. 215 (1941)..................................................................................19, 20, 28

*Stone v. Eacho*,
127 F.2d 284 (4th Cir. 1942) ................................................................................20

*In re Tureaud*,
59 B.R. 973 (N.D. Okla. 1986)..............................................................................21

*In re Venture Props., Inc.*,
37 B.R. 175 (Bankr. D.N.H. 1984)........................................................................27

*In re World Access, Inc.*,
   301 B.R. 217 (Bankr. N.D. Ill. 2003) ...................................................................22

**Statutes**

11 U.S.C. § 105(a) ...............................................................................................1, 4, 19

28 U.S.C. § 157(a) ............................................................................................................4

28 U.S.C. § 157(b) ...........................................................................................................4

28 U.S.C. § 1334(b) .........................................................................................................4

28 U.S.C. § 1409 ..............................................................................................................4

Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST.
   MARY'S L.J. 109 (1989)...............................................................................................30

Texas Business Organizations Code § 10.901 .............................................................30

**Other Authorities**

2 William L. Norton III, Norton Bankruptcy Law and Practice 3d § 21:3 (2021) .......................20

Cliff Ernst, *Steps to Accomplish a Divisional Merger*, 2016 WL 10610449 (Tex.
   2016) ..........................................................................................................................30

*Trane Technologies Increases Dividend 11% and Authorizes New $2 Billion
   Share Repurchase Program*,
   TRANE TECHNOLOGIES PLC (Feb. 4, 2021),
   https://investors.tranetechnologies.com/news-and-events/news-releases/news-
   release-details/2021/Trane-Technologies-Increases-Dividend-11-and-
   Authorizes-New-2-Billion-Share-Repurchase-Program/default.aspx. ...................17

Trane Technologies plc 10-Q for Quarterly Period Ended Mar. 31, 2021, May 5,
   2021, https://sec.report/Document/0001466258-21-000088/#tt-20210331.htm ....................17

The Official Committee of Asbestos Personal Injury Claimants ("**Committee**"), by and through its undersigned counsel, hereby moves under 11 U.S.C. § 105(a) for entry of an order substantively consolidating (1) the bankruptcy estate of Aldrich Pump LLC ("**Aldrich**") with nondebtor Trane Technologies Company LLC ("**TTC**"), and (2) the bankruptcy estate of Murray Boiler LLC ("**Murray**") with nondebtor Trane U.S. Inc. ("**Trane**"), in each case *nunc pro tunc* to June 18, 2020 ("**Petition Date**").  The Committee also moves, in the alternative, for entry of a declaratory judgment reallocating the asbestos liabilities of Aldrich to TTC and the asbestos liabilities of Murray to Trane.[2]  The grounds supporting this motion are as follows:

## PRELIMINARY STATEMENT

1.      Within a matter of hours on May 1, 2020, the Debtors' predecessors, TTC, as successor to Ingersoll-Rand Company, a former New Jersey corporation ("**Ingersoll-Rand**"), and Trane engineered their divisional mergers under Texas law.  In connection therewith, TTC purported to divide itself into two companies, TTC and Aldrich, and Trane similarly purported to divide itself into two companies, "new" Trane and Murray.  TTC received 99% of Ingersoll-Rand's assets, with the remaining 1% allocated to Aldrich.  "New" Trane received 98% of "old" Trane's assets, with the remaining 2% going to Murray.  Significantly, all legacy asbestos liabilities of Ingersoll-Rand and "old" Trane were dumped into Aldrich and Murray, respectively.  Forty-nine days later, on June 18, 2020, Aldrich and Murray filed the chapter 11 cases now pending before this Court.

2.      Through this stratagem, the Debtors and Nondebtor Affiliates have sought to isolate their asbestos liabilities from profitable operating businesses and to single out asbestos victims for unfair and discriminatory treatment by essentially breaking TTC and Trane into separate corporate

---

[2]    TTC and Trane are hereinafter referred to, collectively, as the "**Nondebtor Affiliates**."

entities that the Committee now seeks to consolidate. Because their claims are stayed, asbestos victims are unable to obtain compensation in the civil justice system for the harm inflicted on them by Ingersoll-Rand and Trane. And, even though more than 15 months have passed since the Petition Date, these chapter 11 cases are no closer to the finish line than they were on the Petition Date. The Debtors have not reached agreement with the Committee on a consensual plan. No global settlement between the Debtors and the claimants' representatives has been reached. Instead, the Debtors are channeling their energies and resources into abusive and improper claimant questionnaires and other discovery—which they presumably intend to use in a contested estimation proceeding that the Court has not authorized—and pursuing an unlawful cramdown 524(g) plan supported by the future claimants' representative. All the while, sick and dying asbestos victims and their families remain uncompensated and unable to vindicate their state-law rights.

3.      In contrast, the Nondebtor Affiliates are outside of bankruptcy and are paying their (non-asbestos) unsecured creditors in the ordinary course of business. Additionally, the Nondebtor Affiliates are also free to pay—and are potentially paying to the tune of hundreds of millions of dollars—their equity holders ahead of asbestos claimants. Through the divisional mergers and chapter 11 filings, asbestos claimants have been structurally subordinated to other unsecured creditors and equity holders.

4.      Under these circumstances, this Court should order the substantive consolidation of Aldrich and TTC, and of Murray and Trane. The purpose of substantive consolidation is to ensure the equitable treatment of all creditors. Substantive consolidation will rescind the structural subordination of asbestos creditors that the Debtors and their cohorts have put in place through the Corporate Restructuring, thus ensuring that asbestos creditors will once again be *pari passu* with

other unsecured creditors and have priority over equity holders, as the Bankruptcy Code provides. Substantive consolidation will ensure that Ingersoll-Rand's and Trane's assets will once again be available to asbestos claimants as they are to other unsecured creditors and will be housed within the same entities holding the Ingersoll-Rand and Trane asbestos liabilities. And substantive consolidation will put a stop to TTC and Trane's upstreaming of cash to their parent companies. Simply put, substantive consolidation is an equitable cure for TTC and Trane's abuse of the Texas divisional merger law and the resulting injustice inflicted on Ingersoll-Rand's and Trane's asbestos claimants.

5.    In addition, this Court should order substantive consolidation *nunc pro tunc* to the Petition Date. Such retroactive relief will allow these chapter 11 cases to move forward from where they should have started: with all the assets and liabilities housed in single entities—the original tortfeasors—on the Petition Date. Such relief will also enable the consolidated estates to recover, as unauthorized postpetition transfers, cash that has been loaned or upstreamed from TTC and Trane to the parent companies since the Petition Date.

6.    Alternatively, the Court should declare that the assignment to and acceptance by the Debtors of the asbestos liabilities are void as unconscionable, and as such should be disregarded. Aldrich and Murray had no meaningful choice in the preparation and execution of various intercompany agreements that arose from the Corporate Restructuring, and they had no choice in being saddled with the obligations forced on them as part of the Corporate Restructuring. There was no real and voluntary meeting of the minds associated with the execution, assignment, and assumption of the asbestos liabilities, nor in connection with the intercompany agreements manufactured to provide Aldrich and Murray with a thin basis with which to assert the legitimacy of the Corporate Restructuring.

7.      For all the reasons set forth herein, the Court should grant this motion.[3]

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this motion under 28 U.S.C. §§ 157(a) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b).

9.      Venue in this district is proper under 28 U.S.C. § 1409.

10.      The statutory predicate for the relief requested herein is 11 U.S.C. § 105(a).

## FACTUAL BACKGROUND

### I.      ASBESTOS LAWSUITS AGAINST INGERSOLL-RAND AND TRANE

11.      The predecessors of Aldrich and Murray—Ingersoll-Rand and old Trane, respectively—spent decades in the tort system, defending against lawsuits seeking compensation for personal injury or wrongful death caused by exposure to asbestos or asbestos-containing products.[4]  According to the Debtors, Ingersoll-Rand and old Trane were the subject of roughly 100,000 asbestos-related lawsuits filed throughout the United States.[5]  The Debtors' predecessors historically paid approximately $95 million a year for asbestos-related settlements and defense costs.[6]

12.      If any asbestos lawsuits could not be dismissed quickly, Ingersoll-Rand and Trane sought to settle them.[7]  The Debtors described this overall settlement strategy as "the most cost-

---

[3]    In an abundance of caution, concurrently with this motion, the Committee has filed an application in the base case to conduct a Rule 2004 examination of TTC and Trane for the limited purpose of obtaining the identities and mailing addresses of their creditors, so that notice of this motion may be provided to those creditors.

[4]    Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting in Part Denying in Part the Motion to Compel ¶¶ 30-36, 3:20-ap-03041, ECF No. 308 ("**Court's Findings and Conclusions**").

[5]    Motion of the Debtors for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) Declaring That the Automatic Stay Applies to Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing, at 18, 3:20-ap-03041, ECF No. 2 ("**PI Motion**").

[6]    Informational Brief of Aldrich Pump LLC and Murray Boiler LLC, at 31, 3:20-bk-30608, ECF No. 5.

[7]    *Id.* at 31.

effective approach."[8]  Ingersoll-Rand and Trane settled "approximately 900 mesothelioma claims each year."[9]  The "remaining indemnity payments" were "used to settle the mass of other [asbestos] claims" against Ingersoll-Rand and Trane, "of which there also [were] thousands, with the majority of these payments made to claimants alleging lung cancer."[10]

13.    While defending against asbestos suits in the tort system, Ingersoll-Rand and Trane used insurance receivables, including those received under settlements or certain "coverage-in-place" agreements, to fund or offset the defense and indemnity costs of their asbestos liabilities.[11] But these coverage-in-place agreements do not provide Ingersoll-Rand and Trane with "dollar-for-dollar" coverage for asbestos claims,[12] thus requiring Ingersoll-Rand and Trane to dip into their own pockets for cash.  By the end of 2019, Ingersoll-Rand's and Trane's ultimate parent holding company, Ingersoll-Rand plc (now Trane Technologies plc ("**Trane plc**")), projected that current and future asbestos liabilities would surpass their total projected insurance recoveries by almost $240 million.[13]  It was in this context that Ingersoll-Rand and Trane planned and implemented the Texas divisional mergers, collectively known as the "**Corporate Restructuring**."

## II.    PROJECT OMEGA

14.    The Corporate Restructuring was the result of months of secret and meticulous planning involving a select group of Ingersoll-Rand employees, as well as in-house and outside counsel, which bore the codename "Project Omega."  Project Omega was conducted under a veil

---

[8]    *Id.*

[9]    *Id.* at 31-32.

[10]    *Id.* at 32.

[11]    ACC Ex. 271, at F-46.

[12]    PI Motion at 18.

[13]    Court's Findings and Conclusions ¶ 39; ACC Ex. 271, at F-46 (showing "total asbestos related liabilities" of $547 million and "total asset[s] for probable asbestos-related insurance recoveries" of $304 million).

of secrecy,[14] not simply as a matter of company protocol but also in recognition that "[p]laintiffs [*sic*] lawyers" were "the most at-risk group as it relates to the transaction."[15]  Project Omega was not disclosed to asbestos claimants or their attorneys prior to the Corporate Restructuring.[16]

15.    As time progressed, meetings among Project Omega team members took place with increasing frequency and included weekly "all hands" team meetings chaired by Ingersoll-Rand's general counsel.[17]  At all of these meetings—or at least the significant ones—both in-house lawyers and outside counsel were present.[18]  The close and almost ubiquitous involvement of attorneys in Project Omega underscores how Project Omega was driven not by business people, but by lawyers. As this Court noted in its recent preliminary injunction ruling, "Project Omega was an attorney-created and implemented strategy."[19]

16.    Since its inception, the sole objective of Project Omega was the commencement of a § 524(g) bankruptcy case.[20]  For example, an internal document entitled "OMEGA Comms plan" states as of March 5, 2020:  "We will isolate the Asbestos liabilities into stand alone entities *and will take the entities bankrupt*."[21]  In addition, Manlio Valdes, a member of the boards of Aldrich and Murray, admitted in deposition that he thought it was "a probability" that Aldrich and Murray would end up paying less to asbestos claimants in bankruptcy than in the tort system.[22]

---

[14]    Debtors 30(b)(6) Dep. 214:3-25, Apr. 12, 2021 (Tananbaum); *see also* Court's Findings and Conclusions ¶ 45 ("Project Omega was . . . a secret endeavor.").

[15]    ACC Ex. 192, at TRANE_00014949.

[16]    Debtors 30(b)(6) Dep. 217:18-22 (Tananbaum).

[17]    Court's Findings and Conclusions ¶ 46; Tananbaum Dep. 149:7-151:6, Mar. 22, 2021.

[18]    Court's Findings and Conclusions ¶ 46; Tananbaum Dep. 149:7-151:6.

[19]    Court's Findings and Conclusions ¶ 44.

[20]    *See id.* ¶ 50 ("The weight of the evidence . . . reflects that a bankruptcy filing . . . was the sole objective of Project Omega.").

[21]    ACC Ex. 192, at TRANE_00014949 (emphasis added).

[22]    Valdes Dep. 264:21-265:7, Mar. 1, 2021; ACC Ex. 33.

## III.     IMPLEMENTING THE CORPORATE RESTRUCTURING

17.     On April 30, 2020, TTC was formed as a Texas limited liability company.[23]  The next day, May 1, 2020, Ingersoll-Rand was merged into TTC, leaving TTC as the surviving company.[24]  TTC then utilized the Texas divisional merger law to effectively divide itself into two companies:  TTC and Aldrich.[25]  TTC received 99% of Ingersoll-Rand's assets, while the remaining 1% of the assets were allocated to Aldrich.[26]  Specifically, Aldrich received about $26.2 million in cash, a 100% equity interest in a relatively small operating subsidiary known as 200 Park, Inc. ("**200 Park**"), and rights to Ingersoll-Rand's asbestos-related insurance coverage.[27] Apart from the 200 Park subsidiary, Aldrich received no operating business.[28]

18.     Also, on May 1, 2020, Trane converted from a Delaware corporation to a Texas corporation.[29]  Trane then utilized the Texas divisional merger law to effectively divide itself into two companies:  "new" Trane and Murray.[30]  "New" Trane received 98% of "old" Trane's assets, while the remaining 2% of the assets were allocated to Murray.[31]  Specifically, Murray received about $16 million in cash, a 100% equity interest in a relatively small laboratory services business known as ClimateLabs LLC ("**ClimateLabs**"), and rights to Trane's asbestos-related insurance coverage.[32]  Apart from its ClimateLabs subsidiary, Murray received no operating business.[33]

---

[23]   ACC Ex. 189 ¶ 8.

[24]   *Id.*; ACC Ex. 280, at DEBTORS_00001708.

[25]   ACC Ex. 25; ACC Ex. 189 ¶ 9; ACC Ex. 281, at DEBTORS_00002410.

[26]   Court's Findings and Conclusions ¶ 55; Hr'g Tr. 396:11-18, May 6, 2021 (Diaz Direct).

[27]   Court's Findings and Conclusions ¶ 55; ACC Ex. 147 (Pittard Decl.), ¶ 16.

[28]   Court's Findings and Conclusions ¶ 55; ACC Ex. 147 (Pittard Decl.), ¶ 16; Roeder Dep. 45:16-19, Mar. 16, 2021.

[29]   ACC Ex. 286, at DEBTORS_00000411; ACC Ex. 287, at DEBTORS_00000419.

[30]   ACC Ex. 286, at DEBTORS_00000411; ACC Ex. 287, at DEBTORS_00000419.

[31]   Court's Findings and Conclusions ¶ 59; Hr'g Tr. 394:1-3, May 6, 2021 (Diaz Direct).

[32]   Court's Findings and Conclusions ¶ 59; ACC Ex. 147 (Pittard Decl.), ¶ 16.

[33]   Court's Findings and Conclusions ¶ 59; ACC Ex. 147 (Pittard Decl.), ¶ 16; Tananbaum Dep. 237:23-239:9.

19.     As part of the divisional mergers, all the legacy asbestos liabilities of Ingersoll-Rand and "old" Trane were purportedly allocated to Aldrich and Murray, respectively.[34]   In addition, Aldrich became purportedly obligated to indemnify TTC, "new" Trane, and all of their other affiliates for liabilities arising from Ingersoll-Rand's asbestos torts.[35]   Similarly, Murray became purportedly obligated to indemnify TTC, "new" Trane, and all of their other affiliates for liabilities arising from Trane's asbestos torts.[36]

20.     Once the divisional mergers were completed, TTC and new Trane were promptly converted to Delaware entities,[37] and Aldrich and Murray were promptly converted to North Carolina LLCs.[38]   All told, Aldrich and Murray were Texas entities for less than 24 hours.[39]   Seven weeks later, on June 18, 2020, Aldrich and Murray filed their chapter 11 petitions with this Court.

21.     Since the completion of the Corporate Restructuring, new Trane has continued making acquisitions to augment its commercial and residential HVAC businesses.[40]   TTC, Trane, and their operating subsidiaries are also timely paying their creditors in the ordinary course of business.[41]

---

[34]     ACC Ex. 25, ¶ 5; ACC Ex. 26, ¶ 5.

[35]     ACC Ex. 25, ¶ 9(b); ACC Ex. 77, § 3 ("**Aldrich Support Agreement**").

[36]     ACC Ex. 26, ¶ 9(b); ACC Ex. 211, § 3 ("**Murray Support Agreement**").

[37]     ACC Ex. 282, at DEBTORS_00003133; ACC Ex. 283, at DEBTORS_00003137; ACC Ex. 290, at DEBTORS_00001493; ACC Ex. 291, at DEBTORS_00001497.

[38]     ACC Ex. 284, at DEBTORS_00002969; ACC Ex. 285, at DEBTORS_00002973; ACC Ex. 289, at DEBTORS_00001340; ACC Ex. 292, at DEBTORS_00001344.

[39]     ACC Ex. 38, at DEBTORS_00050589-93 (showing the times for incorporating and reincorporating the entities in the Corporate Restructuring); ACC Ex. 43, at DEBTORS_0050597-50603 (showing the times of incorporation and reincorporation of entities involved in the Corporate Restructuring); ACC Ex. 189 ¶¶ 10, 13.

[40]     Hr'g Tr. 491:3-16, May 7, 2021 (Kuehn Cross-Exam); Nondebtor Affiliates 30(b)(6) Dep. 99:2-21; 103:6-10, Apr. 9, 2021 (Kuehn).

[41]     Hr'g Tr. 394:19-395:15; 402:19-23, May 6, 2021 (Diaz Direct); Nondebtor Affiliates 30(b)(6) Dep. 59:25-60:16 (Kuehn); Kuehn Dep. 237:9-13, Mar. 19, 2021; ACC Ex. 218; ACC Ex. 220.

22.     From the standpoint of non-asbestos creditors, shareholders, employees, suppliers, vendors, and other stakeholders, it has been "business as usual," even after the Corporate Restructuring and the chapter 11 filings.[42]

## IV.    INTERCOMPANY AGREEMENTS

23.     As part of the Corporate Restructuring, the Debtors, TTC, Trane, and certain nondebtor affiliates entered into several agreements dated "as of" May 1, 2020, the day of the Texas divisional mergers.  As these agreements were between affiliated companies, there was no arm's length negotiation over their terms.[43]  "Like the Divisional Merger, their legal enforceability vis a vis third parties is seriously in doubt."[44]

### A.    Funding Agreements

24.     The most pertinent of the intercompany agreements are the two "**Funding Agreements**":  (1) the funding agreement between TTC as payor and Aldrich as payee;[45] and (2) the funding agreement between Trane as payor and Murray as payee.[46]  The Funding Agreements are essential to the Debtors' assertion that each of them "has the same ability to resolve and pay valid current and future asbestos-related claims and other liabilities as [Ingersoll-Rand] and Old Trane had before the restructurings."[47]  The Funding Agreements provide that TTC and Trane will

---

[42]    *See, e.g.*, ACC Ex. 18 (emails dated December 2019 describing TTC and Trane's operations post-Corporate Restructuring as "business as usual").  *See also* Hr'g Tr. 402:19-23, May 6, 2021 (Diaz Direct); Kuehn Dep. 235:11-236:8; 237:3-13; Nondebtor Affiliates 30(b)(6) Dep. 59:25-60:16 (Kuehn).

[43]    Court's Findings and Conclusions ¶¶ 66, 68; Hr'g Tr. 159:5-160:11; 160:22-161:13, May 5, 2021 (Tananbaum Cross-Exam); Tananbaum Dep. 209:16-24; *see also* Daudelin Dep. 253:18-21, Mar. 9, 2021.  In fact, those who authorized the execution of and/or signed the key agreements arising from the Corporate Restructuring had no understanding at the time of signing what they were signing or what the purpose was. *See id.* at 190:19-191:7; 234:11-237:3; 238:19-246:15; 248:19-254:2; *see also* Kuehn Dep. 223:4-13 (failing to recall authorizing the execution of a secondment agreement and a services agreement).

[44]    Court's Findings and Conclusions ¶ 68 (footnote omitted).

[45]    ACC Ex. 13 ("**Aldrich Funding Agreement**").

[46]    ACC Ex. 86 ("**Murray Funding Agreement**").

[47]    ACC Ex. 147 (Pittard Decl.) ¶ 17.

transfer funds to the Debtors to pay any "Permitted Funding Use."[48]  The term "Permitted Funding Use" includes (a) the costs of administering the Debtors' chapter 11 cases, (b) amounts necessary to satisfy each Debtor's "Asbestos Related Liabilities" in connection with funding a § 524(g) trust, and (c) the Debtors' indemnification obligations to TTC, Trane, and the other nondebtor affiliates under any agreement provided in the plans of divisional mergers.[49]

25.    Under the Funding Agreements, TTC and Trane are obligated to pay the chapter 11 administrative expenses and the Debtors' indemnification obligations only if the cash distributions from 200 Park (in the case of Aldrich) or ClimateLabs (in the case of Murray) are insufficient to pay those expenses and obligations in full.[50]  In addition, TTC and Trane are each obligated to fund a § 524(g) trust only if their respective Debtor's "other assets are insufficient to fund amounts necessary or appropriate to satisfy . . . Asbestos Related Liabilities in connection with the funding of such trust."[51]  According to the Debtors' own metrics, the Debtors' assets (without the Funding Agreements) are already insufficient, as they are less than their asbestos liabilities.[52]

26.    The Funding Agreements have numerous deeply troubling features.  For example, TTC's and Trane's obligations under their respective Funding Agreements are unsecured and not

---

[48]    Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003821-22 (definition of "Permitted Funding Use"); Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101 (definition of "Permitted Funding Use").

[49]    Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003821-22; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101-02; ACC Ex. 25 ("**Aldrich Plan of Divisional Merger**"); ACC Ex. 26 ("**Murray Plan of Divisional Merger**").

[50]    Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102.

[51]    Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102.

[52]    Court's Findings and Conclusions ¶ 63 (observing that, "disregarding the Funding Agreement[s] . . . , Aldrich/Murray's assets were not then, and are not now, sufficient to satisfy their liabilities" (footnote omitted)); Hr'g Tr. 397:18-23, May 6, 2021 (Diaz Direct) ("[T]he Aldrich liabilities as disclosed -- and as discussed, this is just the debtors' numbers, not my point of view -- is $315 million of asbestos liabilities, plus $3 million of operating liabilities. So that's $318 million of liabilities and their assets are $210 million."); *id.* at 398:20-23 ("Similar to Aldrich, the assets of Murray, $127 million, if you exclude the funding agreement, are less than the total liabilities of . . . $194 million.").

guaranteed by any of the Nondebtor Affiliates or other entities.[53]    Nothing in the Funding Agreements prevent TTC and Trane from layering on debt that would be senior in priority to their obligations under their respective Funding Agreements.[54]    Nothing in the Funding Agreements requires TTC and Trane to provide financial statements to the Debtors that are audited or contain information at a level that provides details on account balances and material transactions (*e.g.*, footnotes to financial statements).[55]    TTC and Trane do not have to provide payments that "exceed the aggregate amount necessary" for the Debtors to fund all "Permitted Funding Uses,"[56] thus giving TTC and Trane leeway to determine what is "necessary" and the ability to reduce payments if either disagrees with the use of funds.[57]    And there is no dispute resolution mechanism if a funding request by a Debtor is denied.[58]    The Funding Agreements do not prevent TTC and Trane from engaging in additional divisional mergers, and they explicitly allow the Nondebtor Affiliates to engage in consolidations and mergers, and to transfer "all or substantially all" of their assets.[59] There are no mechanisms in the Funding Agreements to ensure that TTC and Trane will have sufficient assets to perform under them.[60]    And nothing in the Funding Agreements limits or prohibits dividends, or other distributions of value, by TTC or Trane to equity holders, potentially including their full value.[61]

---

[53]    Court's Findings and Conclusions ¶ 80; Debtors' 30(b)(6) Dep. 111:15-21; 112:6-15 (Tananbaum).

[54]    Court's Findings and Conclusions ¶ 80; *see also* Debtors' 30(b)(6) Dep. 113:4-8 (Tananbaum).

[55]    Court's Findings and Conclusions ¶ 80.

[56]    Aldrich Funding Agreement (ACC Ex. 13) § 2(a); Murray Funding Agreement (ACC Ex. 86) § 2(a).

[57]    Court's Findings and Conclusions ¶ 80.

[58]    *Id.*; Hr'g Tr. 400:15-17, May 6, 2021 (Diaz Direct).

[59]    Aldrich Funding Agreement (ACC Ex. 13) § 4(b)(i); Murray Funding Agreement (ACC Ex. 86) § 4(b)(i); *see also* Court's Findings and Conclusions ¶ 80.

[60]    *See* Tananbaum Dep. 224:13-18 ("Q.  Are you aware of any mechanisms in the funding agreements to ensure that the payors have sufficient assets to perform under the funding agreements?  A.  No, I'm not aware of any specific mechanisms.").

[61]    Court's Findings and Conclusions ¶ 80; *see also* Tananbaum Dep. 223:2-24 ("Q.  Are you aware of any limitations in the funding agreement that prevents New Trane Technologies from sending cash payments to its parent Trane

27.      In addition, "the Debtors' rights and obligations under . . . [their respective Funding Agreements] may not be assigned without the prior written consent of New TTC or New Trane."[62] Thus, "arguably a Creditor's Plan could not be funded unless New TTC and/or New Trane favor that Plan."[63]  Moreover, "the Funding Agreements require, as a precondition to funding a § 524(g) trust, that a confirmed chapter 11 plan provide New TTC or New Trane, as applicable, 'with all the protections of section 524(g) of the Bankruptcy Code.'"[64]  Further, "the Funding Agreements have 'Automatic Termination' provisions whereby New TTC's and Trane's respective funding obligations automatically cease 'on the effective date of a Section 524(g) Plan.'"[65]  As a result, "the Funding Agreements could never serve as post-effective date 'evergreen' sources of funding that § 524(g) contemplates."[66]  Moreover, "once exclusivity has ended, these provisions of the Funding Agreements will . . . impair, if not disable, the ability and right of other parties-in-interest to propose a competing 524(g) plan."[67]

28.      "In sum, the Funding Agreements are not unconditional promises to pay the Aldrich/Murray Asbestos Liabilities.  They are instead conditional agreements dependent on New TTC/New Trane's approval of any reorganization plan and upon New TTC/New Trane's continued good financial health."[68]

---

Technologies Holdco Inc.?  A.  So am I correct that your question refers to this Aldrich funding agreement that we're looking at here?  Q.  Yes, sir.  A.  No, I'm not aware of any such limitation . . . .  Q.  Same answer with the Murray funding agreement, there's no limitations that you're aware of on New Trane US Inc.?  A.  That's correct, because as I testified, the purpose of the funding agreement was to give these new entities the same ability to fund that the predecessor entities had, but not to give them enhanced ability to fund, just the same ability to fund.").

[62]   Court's Findings and Conclusions ¶ 74 (footnote omitted).

[63]   *Id.*

[64]   *Id.* ¶ 76 (footnote omitted).

[65]   *Id.* ¶ 77 (footnote omitted).

[66]   *Id.*

[67]   *Id.* ¶ 78.

[68]   Court's Findings and Conclusions ¶ 81.

### B.    Support Agreements

29.    Two "**Support Agreements**" are relevant here:  (1) the Divisional Merger Support Agreement between TTC and Aldrich;[69] and (2) the Divisional Merger Support Agreement between Trane and Murray.[70]   Among other things, the Aldrich Support Agreement requires Aldrich to "indemnify and hold harmless TTC and each of its affiliates (each of which is an express third party beneficiary . . .) from and against" any "Losses" and "Proceedings" to which TTC and its affiliates "may become subject."[71]   The Murray Support Agreement has a nearly identical provision requiring it to indemnify and hold harmless Trane "and each of its affiliates" from and against any "Losses" and "Proceedings."[72]   Nevertheless, if the cash distributions from 200 Park are insufficient to allow Aldrich to pay its indemnification obligations to TTC and its affiliates under the Aldrich Support Agreement, the Aldrich Funding Agreement provides that TTC will provide the funds to Aldrich so that Aldrich, in turn, may indemnify TTC or any other affiliate.[73] A substantially similar provision appears in the Murray Funding Agreement that enables Murray, in the event of insufficient cash distributions from ClimateLabs, to receive funding from Trane so that Murray may, in turn, indemnify Trane or any other affiliate.[74]

---

[69]    Aldrich Support Agreement (ACC Ex. 77).

[70]    Murray Support Agreement (ACC Ex. 211).

[71]    Aldrich Support Agreement (ACC Ex. 77) § 3.

[72]    Murray Support Agreement (ACC Ex. 211) § 3.

[73]    Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822 (clause (f) in the definition of "Permitted Funding Use").

[74]    Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102 (clause (f) in the definition of "Permitted Funding Use"); *see also* Kuehn Dep. 308:14-309:5 (acknowledging the "circularity" of the Funding Agreements: "'Q. [I]f Trane Technologies Company LLC is the entity being sued for an asbestos claim, it will seek indemnification from Aldrich Pump, who, if it does not have sufficient funds, will go right back to Trane Technologies Company LLC for that payment, is that correct? . . .  A. Yes, that's my understanding."); Tananbaum Dep. 217:20-219:12 (stating that clause (f) includes "a permitted funding use for the debtor seeking funding from its sister affiliate . . .  for the debtor to satisfy an indemnification obligation that it owes to said affiliate" if the debtors' funds are insufficient to cover its indemnification obligations).

30.     As this Court found, the "Support Agreements' indemnity provisions, when coupled with the Funding Agreements, create a potential circular transfer of funds between the Debtors and New TTC/New Trane.  Thus, the Support Agreements are unorthodox transactions with no apparent business purpose (apart from aiding this bankruptcy case and securing injunctive relief . . . .)."[75]

31.     The Support Agreements differ from the previous iterations seen in *Bestwall* and *DBMP* insofar as the indemnification obligations run not only to the sister affiliates of the Debtors—here, TTC and new Trane—but also to their other affiliates.

### C.     Secondment Agreement and Services Agreements

32.     The Court's Findings and Conclusions stated:  "Creating two companies with no employees [*i.e.*, Aldrich and Murray] evidences the fact that Aldrich and Murray were simply inert vessels designed to carry their predecessors' asbestos liabilities into bankruptcy."[76]

33.     With no operating business and employees of their own, Aldrich and Murray entered into a secondment agreement with TTC, whereby three in-house lawyers were seconded to them.[77]  With the retirement of one of the lawyers, the number of seconded employees was reduced to two:  Allan Tananbaum, the Debtors' chief legal officer, and Robert H. Sands, an in-house attorney.[78]

34.     In further support of these non-operating Debtors, TTC entered into separate services agreements with Aldrich and Murray, whereby TTC provides strategic administration, finance, tax, and legal services to them.[79]

---

[75]   Court's Findings and Conclusions ¶ 85.

[76]   *Id.* ¶ 87.

[77]   ACC Ex. 105.

[78]   ACC Ex. 107, at 2; Hr'g Tr. 89:2-5, May 5, 2021 (Tananbaum Direct).

[79]   *See* ACC Ex. 61, at DEBTORS_00003282; ACC Ex. 101, at DEBTORS_00003669.

## V.    SHARED OFFICERS AND BOARD MEMBERS

35.    In addition to the two seconded lawyers, the Debtors each have officers who are employees within the Trane plc enterprise group and a board of managers composed of current and former employees of the Debtors' affiliates:[80]

a.    Manlio Valdes, who serves as president of the Debtors, is also Vice President Product Management, The Americas, Trane Commercial HVAC, at TTC.

b.    Ray Pittard, who serves as vice president of the Debtors, is also the Transformation Office Leader at Trane plc.

c.    Amy Roeder, who serves as chief financial officer and treasurer of the Debtors, is also Finance Director–Information Technology & Legal at TTC.

d.    Allan Tananbaum, who is the Debtors' chief legal officer and secretary, also serves as Deputy General Counsel–Product Litigation at TTC.[81]

36.    Mr. Valdes and Ms. Roeder also serve on each Debtor's three-person board of managers.[82]   The remaining member of the Aldrich board, Robert Zafari, and the remaining member of the Murray board, Marc DuFour, were employees within the Trane organization before their retirements.[83]

## VI.    UPSTREAMING OF CASH BY NONDEBTOR AFFILIATES

37.    ████████████████████████████████████████

████████   ██████████████████████████████████████

---

[80]   ACC Ex. 107, at 3; Turtz Dep. 157:11-158:7, Apr. 5, 2021.

[81]   ACC Ex. 107, at 3.

[82]   *Id.*

[83]   *Id.*; Turtz Dep. 157:11-158:7.

[84]   Nondebtor Affiliates 30(b)(6) Dep. 74:11-17 (Kuehn).



38.    The distributions made as part of Trane plc's "cash management strategy and other company initiatives" have been substantial.[91]  In December 2017, former Trane made a distribution to its then-direct parent, Trane Inc., in the amount of $586.9 million.[92]  Similarly, in December 2018 and December 2019, former Trane made distributions to Trane Inc. in the amounts of $1.1 billion and $740.7 million, respectively.[93]  In April 2020, within a matter of days or weeks before the Corporate Restructuring, former Trane made a distribution to Trane Inc. in the amount of $2.3

[85]    *Id.* at 74:17-19; Hr'g Tr. 533:20-534:2, May 7, 2021 (Kuehn Cross-Exam).

[86]    Nondebtor Affiliates 30(b)(6) Dep. 134:8-18 (Kuehn); Hr'g Tr. 534:10-20, May 7, 2021 (Kuehn Cross-Exam).

[87]    Nondebtor Affiliates 30(b)(6) Dep. 134:19-25 (Kuehn).

[88]    *Id.* at 135:2-10; *see also* Hr'g Tr. 534:25-535:5, May 7, 2021 (Kuehn Cross-Exam).

[89]    Nondebtor Affiliates 30(b)(6) Dep. 135:11-14 (Kuehn).

[90]    *Id.* at 135:15-20.

[91]    ACC Ex. 224.

[92]    *Id.*

[93]    *Id.*

billion.[94]  Also in April 2020, within a matter of days or weeks before the Corporate Restructuring,

Ingersoll-Rand (now TTC) made a distribution to its then-direct parent, Trane Technologies Global

Holding Company, in the amount of $4.1 billion.[95]

39.    There is no evidence to suggest that such distributions have stopped while the

Debtors have been in chapter 11.  Indeed, there is evidence to the contrary:  Richard Daudelin, the

Nondebtor Affiliates' treasurer, testified at the preliminary injunction proceeding that Trane plc

paid quarterly dividends to its shareholders for each quarter of 2020.[96]  Similarly, according to a

February 4, 2021 press release, Trane plc's board of directors authorized an 11% increase to its

quarterly dividend payable on March 31, 2021, and "Trane [plc] has paid consecutive quarterly

dividends on its common shares *since 1919* and annual dividends *since 1910*."[97]  In a recent 10-Q

filing, dated May 5, 2021 (the first day of the preliminary injunction hearing), Trane plc stated that

it expects "to pay a competitive *and growing* dividend" and that the quarterly dividend has been

increased from $0.53 to $0.59 per ordinary share, or $2.36 per share annualized.[98]  With

239,147,507 ordinary shares outstanding as of April 23, 2021,[99] that annualized sum of $2.36 per

share translates to 2021 quarterly dividends totaling approximately $564,388,117.  In addition, the

quarterly dividend announced in February of this year was "paid in March 2021 and the second

quarter dividend was declared in April 2021 and will be paid in June 2021."[100]

---

[94]    *Id.*

[95]    *Id.*

[96]    Daudelin Dep. 91:23-94:19; 95:6-11.

[97]    *Trane Technologies Increases Dividend 11% and Authorizes New $2 Billion Share Repurchase Program*, TRANE
TECHNOLOGIES PLC (Feb. 4, 2021) (emphasis added), https://investors.tranetechnologies.com/news-and-events/news-
releases/news-release-details/2021/Trane-Technologies-Increases-Dividend-11-and-Authorizes-New-2-Billion-
Share-Repurchase-Program/default.aspx.

[98]    Trane Technologies plc 10-Q for Quarterly Period Ended Mar. 31, 2021, at 33, May 5, 2021,
https://sec.report/Document/0001466258-21-000088/#tt-20210331.htm (emphasis added).

[99]    *Id.* (cover page).

[100]    *Id.*

**RELIEF REQUESTED**

40.     The Committee requests entry of an order substantively consolidating the bankruptcy estate of Aldrich with nondebtor TTC and the bankruptcy estate of Murray with nondebtor Trane, *nunc pro tunc* to the Petition Date or, in the alternative, a declaration that the unconscionable nature of the various intercompany agreements among the Debtors, TTC, and Trane—including, importantly, the plans of divisional merger, the Funding Agreements, and the Support Agreements—require the reallocation of the asbestos liabilities of Aldrich and Murray to TTC and Trane, respectively.

**ARGUMENT**

**I.     SUBSTANTIVE CONSOLIDATION IS A LONGSTANDING EQUITABLE REMEDY PREDATING THE BANKRUPTCY CODE**

41.     Substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005). The remedy of substantive consolidation is "a construct of federal common law" and "emanates from equity." *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005), *as amended* (Aug. 23, 2005), *as amended* (Sept. 2, 2005), *as amended* (Oct. 12, 2005), *as amended* (Nov. 1, 2007); *see also In re Auto-Train Corp.*, 810 F.2d 270, 276 (D.C. Cir. 1987) (stating that substantive consolidation is available "by virtue of the[] general equitable powers" of the federal courts); *In re Owner Mgmt. Serv., LLC Trustee Corps*, 530 B.R. 711, 723 (Bankr. C.D. Cal. 2015) ("Substantive consolidation is an independent equitable remedy that the bankruptcy court may impose under appropriate circumstances."), *aff'd sub nom. OMS, LLC v. Bank of Am., N.A.*, No. CV 15-3876-R, 2015 WL 12712307 (C.D. Cal. Nov. 6, 2015). "Courts have consistently found

the authority for substantive consolidation in the bankruptcy court's general equitable powers as set forth in 11 U.S.C. § 105(a)." *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992).

42.    "The remedy [of substantive consolidation] ha[s] its antecedents in other principles of general equity jurisprudence—piercing of the corporate veil, 'alter ego' liability, and the like." *In re Petters Co.*, 506 B.R. 784, 792 (Bankr. D. Minn. 2013) (citing *Owens Corning*, 419 F.3d at 205-06).    But, unlike those antecedents, substantive consolidation is specific to bankruptcy and "does not exist outside the context of a bankruptcy proceeding." *In re LLS Am., LLC*, No. 09-06194-PCW11, 2011 WL 4005447, at *3 (Bankr. E.D. Wash. Sept. 8, 2011), *aff'd*, Nos. EW-11-1524-DHPa, EW-11-1550-DHPa, 09-06194-PCW11, 2012 WL 2042503 (B.A.P. 9th Cir. June 5, 2012).

43.    "Although not expressly provided for in the Bankruptcy Code, . . . [substantive consolidation] has been a tool utilized by bankruptcy courts . . . [operating under] the Bankruptcy Act of 1898." *Id.*    Its origin has been traced to the Supreme Court's decision in *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941).    In *Sampsell*, an individual debtor formed a corporation and transferred substantially all of his assets to it prior to bankruptcy.    After the debtor entered bankruptcy, the trustee sought to have the nondebtor corporation's assets marshaled "for the benefit of the creditors of the bankrupt estate." *Id.* at 216.    The bankruptcy referee found that "the transfer of the property to the corporation was not in good faith but was made for the purpose of placing the property beyond the reach of . . . [the debtor's] creditors . . . and that the corporation was formed for the purpose of hindering, delaying and defrauding his creditors." *Id.* at 216-17. "The referee accordingly ordered that the property of the corporation was property of the bankrupt estate and that it be administered for the benefit of the creditors of the estate." *Id.* at 217.    Because this order "consolidating the estates" was not appealed, the Court in *Sampsell* did not have occasion

to review the order but instead addressed the relative priorities of the creditors' claims. Nevertheless, since the order consolidating the corporation and the debtor's estate "was not reversed, the doctrine of substantive consolidation was effectively born."[101]   Since that time, courts—including the Fourth Circuit—have invoked the remedy of substantive consolidation.  *See, e.g.*, *Stone v. Eacho*, 127 F.2d 284, 288 (4th Cir. 1942) (reversing lower court's denial of substantive consolidation and noting that consolidation was necessary so that "all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford").[102]

44.    *Sampsell* is significant in at least three respects.  First, the decision shows that substantive consolidation is an equitable remedy predating the Bankruptcy Code.  Because nothing in the Bankruptcy Code purports to address substantive consolidation one way or the other, the remedy remains available even though the Code does not expressly authorize it.  *See Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."  (citation omitted)).  Second, *Sampsell* shows that substantive consolidation is not confined to "alter ego" and "mere instrumentality" cases but rather may be adapted and applied to disparate situations, including those involving putative fraudulent transfers.  Third, *Sampsell* shows that the remedy is not limited to consolidating debtors but can also be invoked to consolidate debtors and nondebtor entities.  Since *Sampsell*, numerous courts have permitted substantive consolidation of debtors and nondebtors.  *See, e.g.*, *In re Clark*, 548 B.R. 246, 249 (B.A.P. 9th Cir. 2016), *aff'd*, 692 F. App'x 946 (9th Cir. 2017); *In re Bonham*, 229 F.3d 750, 765 (9th Cir. 2000); *Auto-Train Corp.*, 810 F.2d at 275; *In re Munford, Inc.*, 115 B.R.

---

[101]   2 William L. Norton III, Norton Bankruptcy Law and Practice 3d § 21:3 (2021) (footnotes omitted).

[102]   *See also In re Com. Envelope Mfg. Co.*, No. 76 B 2354, 1977 WL 182366, at *1 (S.D.N.Y. Aug. 22, 1977) (first known use of the term "substantive consolidation").

390, 395-96 (Bankr. N.D. Ga. 1990); *In re Tureaud*, 59 B.R. 973, 974, 978 (N.D. Okla. 1986).[103]

This Court should do the same here.

## II.    SUBSTANTIVE CONSOLIDATION IS JUSTIFIED UNDER ANY OF THE LEADING, CIRCUIT-LEVEL STANDARDS

45.    There are no statutorily prescribed standards for substantive consolidation, and "courts have not developed a clear legal standard governing when the doctrine is to be applied." 2 COLLIER ON BANKRUPTCY ¶ 105.09[2].  Instead, the substantive consolidation analysis is highly fact-specific:  "as to substantive consolidation, precedents are of little value, thereby making each analysis on a case-by-case basis." *In re Crown Mach. & Welding, Inc.*, 100 B.R. 25, 27-28 (Bankr. D. Mont. 1989); *see also Colonial Realty Co.*, 966 F.2d at 61 (stating that substantive consolidation analysis requires "a searching review of the record, on a case-by-case basis"); *In re Eagle-Picher Indus., Inc.*, 192 B.R. 903, 905 (Bankr. S.D. Ohio 1996) (noting that substantive consolidation cases "turn on their individual facts").  Although the Fourth Circuit has not yet weighed in with its own standard for substantive consolidation, three leading standards have emerged from other courts of appeals.  This Court may grant substantive consolidation under any of these three standards.

### A.    Substantive Consolidation Is Warranted Under the First Prong of the *Augie/ Restivo* and *Owens Corning* Standards

46.    The first and second standards are substantially similar and were articulated by the Second Circuit and the Third Circuit in *In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988) and *Owens Corning*, 419 F.3d 195, respectively.  In *Augie/Restivo*, the Second Circuit

---

[103]    *See also In re S & G Fin. Servs. of S. Fla., Inc.*, 451 B.R. 573, 582 (Bankr. S.D. Fla. 2011) (denying motion to dismiss substantive consolidation motion and holding that "it is well within this Court's equitable powers to allow substantive consolidation of entities under appropriate circumstances, whether or not all of those entities are debtors in bankruptcy"); *In re Logistics Info. Sys., Inc.*, 432 B.R. 1, 12 (D. Mass. 2010) (observing that "the great weight of cases supports the authority of bankruptcy courts to order substantive consolidation of debtors and non-debtors").

identified "two critical factors" for substantive consolidation: "(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,' or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Augie/Restivo Baking Co.*, 860 F.2d at 518 (citations omitted).[104]  In *Owens Corning*, the Third Circuit enunciated a similar set of factors:

> In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Owens Corning*, 419 F.3d at 211 (footnotes omitted).

47.    Here, substantive consolidation is justified under the first prong of the *Augie/Restivo* and *Owens Corning* tests.  Before the Corporate Restructuring, TTC and Aldrich not only were "treated" or "dealt with" as one legal entity but actually *were* one legal entity— namely, Ingersoll-Rand.  In addition, Trane and Murray were one legal entity in the form of old Trane.  Before the Corporate Restructuring, creditors could not have relied on the separate identity of Aldrich or Murray because Aldrich and Murray did not exist.  Asbestos claimants and non-asbestos creditors alike looked to Ingersoll-Rand and old Trane to satisfy the debts and obligations to them.  Asbestos claimants, in particular, named Ingersoll-Rand and old Trane as defendants in their complaints.[105]  And, because Ingersoll-Rand and old Trane pursued a settlement strategy in lawsuits that could not be quickly dismissed, Ingersoll-Rand and old Trane were parties to

---

[104]    A number of courts have adopted or utilized the *Augie/Restivo* standard, including the Ninth Circuit.  *See, e.g.*, *Bonham*, 229 F.3d 750; *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 487 (Bankr. D.S.C. 2010); *In re World Access, Inc.*, 301 B.R. 217, 272 (Bankr. N.D. Ill. 2003).

[105]    *E.g.*, DEBTORS_00009043, at DEBTORS_00009046-9049 (naming, *inter alia*, Ingersoll-Rand Company and Trane U.S., Inc. as defendants), attached hereto as **Exhibit 1**.

settlements in those lawsuits, and asbestos plaintiffs looked to them for compensation in connection with those settlements.[106]

### B.   Substantive Consolidation Is Warranted Under the *Auto-Train* Standard

48.    The third standard was articulated by the D.C. Circuit in *Auto-Train Corp.*, 810 F.2d 270.  Under *Auto-Train*, the proponent of substantive consolidation "must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit."  *Id.* at 276 (citations omitted).  The First Circuit, the Eighth Circuit, and the Eleventh Circuit each adopted a standard derived from *Auto-Train*.  *See, e.g.*, *Boellner v. Dowden*, 612 F. App'x 399, 401 (8th Cir. 2015); *In re Hemingway Transp., Inc.*, 954 F.2d 1, 11 n.15 (1st Cir. 1992); *Eastgroup Props. v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991).

*1.     There is substantial identity between the Debtors and their Nondebtor Affiliates*

49.    Prior to the Corporate Restructuring, which occurred only 49 days before the Petition Date, Aldrich and TTC were one legal entity—namely, Ingersoll-Rand.  And Murray and "new" Trane were also one entity:  "old" Trane.  Thus, the identity between the Debtors and the Nondebtor Affiliates was more than "substantial"; they were one and the same.

50.    Even after the Corporate Restructuring, the Debtors and Nondebtor Affiliates remain part of the same enterprise group and are indirect subsidiaries of the same parent holding company, Trane plc.  In addition, TTC is an indirect parent of Trane and Murray.  The Debtors' only "employees" are two in-house lawyers seconded from TTC.  What is more, the Debtors each have officers who are employees within the Trane plc enterprise group and a board of managers

---

[106]   *E.g.*, DEBTORS_00050827 (Ingersoll-Rand), attached hereto as **Exhibit 2**; DEBTORS_00051082 (Trane), attached hereto as **Exhibit 3**.

composed of current and retired employees of the Debtors' affiliates.[107]    Under the Services

Agreements, TTC provides strategic administration, finance, tax, and legal services to Aldrich and

Murray.[108]    Through the Funding Agreements, TTC and Trane are purportedly backstopping the

chapter 11 administrative expenses of the Debtors, an arrangement analogous to a related-party

guaranty.    The Funding Agreements also oblige the Nondebtor Affiliates to fund any § 524(g)

trusts established in the Debtors' bankruptcy cases if the Debtors have insufficient assets to fund

the trusts on their own.    The Debtors are required to indemnify TTC and Trane for any asbestos

liabilities allocated to the Debtors in the Corporate Restructuring.[109]    Yet, if cash distributions from

the Debtors' operating subsidiaries are insufficient to allow the Debtors to pay their

indemnification obligations to the Nondebtor Affiliates, the Funding Agreements provide that the

Nondebtor Affiliates will supply funds to the Debtors so that the Debtors may, in turn, indemnify

the Nondebtor Affiliates.

      51.    In sum, the Debtors are not standalone companies with business operations of their

own.    Rather, they are special purpose entities that were formed specifically for these bankruptcy

cases, are under common ownership, and are reliant on services and financial support from the

Nondebtor Affiliates.    Moreover, the "division" of Ingersoll-Rand into two entities and of old

Trane into two entities pertains to only one class of creditors:    the asbestos claimants.    From the

standpoint of non-asbestos creditors, shareholders, and other stakeholders, it has been "business

---

[107]    ACC Ex. 107, at 3; Turtz Dep 157:11-158:7.

[108]    *See* ACC Ex. 61, at DEBTORS_00003282; ACC Ex. 101, at DEBTORS_00003669.

[109]    In the preliminary injunction proceeding, the Debtors sought to stay asbestos lawsuits against the Nondebtor Affiliates on the basis that the Debtors' insurance rights and indemnification obligations to the Nondebtor Affiliates would make the Debtors the "real-party defendant" in those lawsuits.    PI Motion at 27.    In making this assertion, the Debtors effectively acknowledge the substantial identity between the Nondebtor Affiliates and them.

as usual," even after the Corporate Restructuring and the chapter 11 filings.[110]  But the Debtors and

Nondebtor Affiliates cannot have it both ways:  they cannot claim "corporate separateness" as to

asbestos claimants by virtue of the newly formed Aldrich and Murray, while telling the rest of the

world that there has been essentially no change.  For these reasons, substantial identity between

the Debtors and Nondebtor Affiliates persists even after the Corporate Restructuring.

> 2.    *Consolidation is necessary to avoid inequitable treatment of asbestos creditors*

52.    "The purpose of substantive consolidation is 'to insure the equitable treatment of

all creditors.'"  *Eastgroup Props.*, 935 F.2d at 248 (quoting *In re Murray Indus.*, 119 B.R. 820,

830 (Bankr. M.D. Fla. 1990)); *see also Colonial Realty Co.*, 966 F.2d at 61 (noting that the "sole

aim" of substantive consolidation is "fairness to all creditors").[111]  As set forth herein, the

Corporate Restructuring and bankruptcy filings have resulted in inequitable treatment of, and

therefore harm to, asbestos creditors by artificially and structurally subordinating them, not only

to non-asbestos unsecured creditors but also to equity holders.  Substantive consolidation can

remedy the harm done to asbestos claimants by putting them once again on equal footing with non-

asbestos unsecured creditors and making them senior to equity holders.

53.    The Corporate Restructuring and subsequent bankruptcy filings have structurally

subordinated, and undermined the recourse of, asbestos creditors.  Before the Corporate

Restructuring, asbestos claimants who prevailed in their lawsuits would have been able to fix a

---

[110]    *See, e.g.*, ACC Ex. 18 (emails dated December 2019 describing TTC and Trane's operations post-Corporate Restructuring as "business as usual").  *See also* Hr'g Tr. 402:19-23, May 6, 2021 (Diaz Direct); Kuehn Dep. 235:11-236:8; 237:3-13; Nondebtor Affiliates 30(b)(6) Dep. 59:25-60:16 (Kuehn).

[111]    *See also Bonham*, 229 F.3d at 764; *In re Bashas' Inc.*, 437 B.R. 874, 928 (Bankr. D. Ariz. 2010) (stating that "the primary purpose of substantive consolidation is to ensure the equitable treatment of creditors"); *In re Brentwood Golf Club, LLC*, 329 B.R. 802, 811 (Bankr. E.D. Mich. 2005) ("The purpose of the substantive consolidation is the equitable distribution of a debtor's property among all of its creditors."); *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 96 (Bankr. N.D. Tex. 2017) (emphasizing that "*the sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors*" (quoting *Augie/Restivo Baking Co.*, 860 F.2d at 518)).

judgment lien on all of Ingersoll-Rand's and Trane's assets.  After the Corporate Restructuring, the recourse of asbestos claimants became limited to a certain amount of cash, certain insurance rights, equity interests in 200 Park and ClimateLabs, and two unsecured and contingent contracts (the Funding Agreements).  Instead of having direct recourse against all the former assets of Ingersoll-Rand and Trane, asbestos claimants must now depend on the Debtors' rights under the Funding Agreements and the Debtors' willingness to press those rights successfully given the contingent nature of TTC's and Trane's obligations to pay thereunder.[112]  As a result of the bankruptcy filings, asbestos lawsuits are stayed.  The non-asbestos creditors of TTC and Trane, in contrast, are not stayed.  Free to conduct "business as usual"[113] without the oversight and creditor protections that accompany a bankruptcy filing, TTC and Trane are paying those creditors in the ordinary course of business.[114]

54.    Despite the importance of the Funding Agreements to the Debtors and the Corporate Restructuring, the Debtors do not have fundamental protections (such as guaranties and collateral security from the Nondebtor Affiliates, Trane plc, or any other affiliate) to preserve the Funding Agreements—allegedly the Debtors' most valuable assets—and secure TTC's and Trane's contractual obligations thereunder.

55.    Equity holders are also being paid ahead of asbestos creditors and thus benefit from the scheme fashioned by Ingersoll-Rand and Trane.  As a result of the Corporate Restructuring, the Nondebtor Affiliates, especially new Trane, are free to engage in "cash management" practices that upstream substantial earnings to the parent holding companies.  From 2017 through April

---

[112]  Hr'g Tr. 400:8-404:4, May 6, 2021 (Diaz Direct).

[113]  ACC Ex. 18 (emails dated December 2019 describing TTC and Trane's operations post-Corporate Restructuring as "business as usual").

[114]  Hr'g Tr. 399:11-400:7; 401:15-18, May 6, 2021 (Diaz Direct).

2020, Ingersoll-Rand and Trane paid their parent companies distributions *totaling close to $9 billion*.[115]

56.   The upstreaming of cash has continued while the Debtors have been in chapter 11. Trane plc and its predecessors have paid consecutive quarterly and annual dividends on their common shares for over a century.[116]   Trane plc paid quarterly and annual dividends to its shareholders in 2020, and dividends for the first and second quarters of 2021.  In addition, Trane plc will be paying its shareholders this year quarterly dividends *in excess of $564 million*—money that might otherwise go to compensating asbestos victims.[117]   Since new Trane and its operating subsidiaries account for approximately $8 billion of the $12.5 billion in revenue generated by the enterprise group, one cannot rule out Trane as the principal source of cash for these handsome dividends.

57.   Had the Nondebtor Affiliates filed chapter 11, they would have been unable to upstream cash to their parent companies because of the absolute priority rule.  But the Corporate Restructuring has spared the Nondebtor Affiliates the "inconvenience" of abiding by the absolute priority rule and paying *all* creditors first.

58.   If the benefits and protections of the automatic stay and chapter 11 are to be attained, the entirety of the TTC and Trane businesses—not just the pieces that were carved out of TTC and Trane in the Corporate Restructuring—should be made subject to chapter 11.  This would ensure equitable treatment of all creditors.  "It has been a cardinal principle of bankruptcy law from the beginning that its effects do not normally benefit those who have not themselves 'come into' the bankruptcy court with their liabilities *and* all their assets . . . ."  *In re Venture Props., Inc.*,

---

[115]   *See supra* para. 38.

[116]   *See supra* para. 39.

[117]   *See id.*

37 B.R. 175, 177 (Bankr. D.N.H. 1984), *quoted in Robbins v. Chase Manhattan Bank, N.A.*, No.

93-0063-H, 1994 WL 149597, at *6 (W.D. Va. Apr. 4, 1994).  Substantive consolidation will

uphold this cardinal principle of bankruptcy by bringing assets intentionally left out of bankruptcy

into these chapter 11 cases.  Substantive consolidation will effectively undo the Corporate

Restructuring and put a stop to efforts of the Debtors and Nondebtor Affiliates to isolate their

unwanted asbestos creditors in chapter 11 and single them out for unfair and discriminatory

treatment.  By granting substantive consolidation, this Court will fulfill the doctrine's central

purpose of ensuring that all creditors are treated equitably.

## III.    EQUITY SUPPORTS SUBSTANTIVE CONSOLIDATION

59.    As substantive consolidation is a remedy rooted in equity, "courts have broad

discretion in determining whether to substantively consolidate bankruptcy cases."  *Gyro-Trac*

*(USA), Inc.*, 441 B.R. at 487 (citing 2 COLLIER ON BANKRUPTCY ¶ 105.09[d][2] (16th ed. 2010)).

In exercising its equitable discretion, this Court should consider the following facts and

circumstances that tip the balance in favor of substantive consolidation:

60.    *First*, similar to what occurred in *Sampsell*, the Corporate Restructuring placed

virtually all the assets of Ingersoll-Rand and Trane beyond the reach of asbestos creditors.[118]  The

formation of Aldrich and Murray, along with a bankruptcy filing 49 days later, is an intentional

effort to hinder and delay the asbestos claimants.  The March 2020 Project Omega communications

plan demonstrates the intention:  "We will isolate the Asbestos liabilities into stand alone entities

and will take the entities bankrupt."[119]  And the Court's Findings and Conclusions determined that

---

[118]   The Corporate Restructuring separated 99% of Ingersoll-Rand's and 98% of old Trane's assets from their asbestos liabilities.  Hr'g Tr. 394:1-3; 396:11-18, May 6, 2021 (Diaz Direct).

[119]   ACC Ex. 192, at TRANE_00014949.  Project Omega members also expected and planned for a long-term bankruptcy prior to the Corporate Restructuring, which they estimated would last five or more years.  *Id.* (stating on March 5, 2020 that the Debtors expected to stay in bankruptcy for 5 to 8 years); ACC Ex. 18, at TRANE_00006711 (stating on December 4, 2019 that bankruptcy was estimated to last 2 to 5 years).

the Corporate Restructuring and subsequent chapter 11 filings were not "undertaken for the benefit

of the asbestos claimants.  Rather, these bankruptcies were designed to isolate the asbestos

claimants from the overall corporate enterprise and strand them in bankruptcy until such time as

they agree to a Section 524(g) plan."[120]

61.    As a result of the Corporate Restructuring, asbestos claimants do not have the same

degree of recourse against Aldrich and Murray that they had against Ingersoll-Rand and Trane.[121]

The Funding Agreements do not cure this problem because TTC's and Trane's funding obligations

thereunder are unsecured and conditional, and the Funding Agreements do not protect asbestos

claimants from further asset transfers or divisional mergers.  Instead of having direct recourse

against the former assets of Ingersoll-Rand and Trane, asbestos claimants must now depend on the

Debtors' willingness to assert their rights under the Funding Agreements, which is untenable given

the Debtors' hostility to asbestos claimants and their dependence on Nondebtor Affiliates.  In

ruling on the PI Motion, this Court noted that the divisional mergers appear to have "had a material,

negative effect on the asbestos claimants' ability to recover on their claims.  Thus, an action to

contest the mergers and the exclusive allocation of all asbestos claims to Aldrich and Murray

appears to be a viable cause."[122]  The Court's observations are entirely correct for the reasons

explained herein, and substantive consolidation not only is a viable cause but a necessary remedy.

62.    *Second*, the Corporate Restructuring was an abuse of the Texas statute under which

it was implemented.  The divisional merger law was never intended as a device to disadvantage

creditors the way the Debtors and their cohorts have done here.  Indeed, the Texas legislature made

---

[120]   Court's Findings and Conclusions ¶ 121.

[121]   *Id.* ¶ 174 ("As a result of the 2020 Corporate Restructuring, . . . [the assets of old Ingersoll-Rand and former Trane] were placed beyond the reach of asbestos creditors, and recovery was made dependent on the Debtors' willingness to press their rights under these Funding Agreements.").

[122]   *Id.* ¶ 176.

a conscious decision to include a provision in the Texas Business Organizations Code—section 10.901—that preserves all "rights of . . . creditor[s] under existing laws," notwithstanding any other provision in that Code, including the divisional merger provisions. TEX. BUS. ORGS. CODE § 10.901. The purpose of section 10.901 is to protect creditors from companies that use the divisional merger law to impact creditor rights.[123] By allocating all of the asbestos liability to one company and moving the valuable operating assets to another, the Debtors' predecessors used the divisional merger law in an untenable and egregious manner.[124]

63.    *Third*, as a result of the Corporate Restructuring, asbestos claimants are facing Debtors that have no operating business and are inadequately capitalized. The Debtors have no businesses to reorganize or rehabilitate in chapter 11. And, according to the Debtors' own metrics, the Debtors' assets (without the unsecured and contingent Funding Agreements) are already insufficient, as they are less than their asbestos liabilities.[125] In sum, the Corporate Restructuring and subsequent bankruptcy filings constitute a legal strategy to disadvantage asbestos victims and gain leverage over them, with the expectation that—as claims remain unpaid, victims die, memories fade, and legal rights and remedies are lost—the asbestos claimants and their attorneys will eventually knuckle under and settle for 524(g) trust funding that would be far less than

---

[123]    According to one of the primary authors of the Texas divisional merger statute, the preservation of creditor rights was meant for the scenario where "in a merger with multiple survivors, the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation." Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109, 133 (1989).

[124]    Reorganizations like the Corporate Restructuring have been described as "egregious" usages of the Texas statute by at least one commentator. *See* Cliff Ernst, *Steps to Accomplish a Divisional Merger, in* DEVISIVE [SIC] MERGERS: HOW TO DIVIDE AN ENTITY INTO TWO OR MORE ENTITIES UNDER A MERGER AUTHORIZED BY THE TEXAS BUSINESS ORGANIZATION CODE, 2016 WL 10610449 (Tex. 2016) ("[O]ne could certainly imagine an egregious situation where all assets were allocated to one party to the merger and all liabilities were allocated to another party without assets . . . .").

[125]    *See, e.g.*, Court's Findings and Conclusions ¶ 174 ("Without monies obtained under the Funding Agreements, each Debtor lacks the ability to pay its current asbestos claims and future demands.").

warranted in light of the extensive asbestos liabilities.  This is the epitome of inequitable and discriminatory treatment of asbestos creditors that this Court of equity should not countenance.

64.     Substantive consolidation is therefore necessary to cure this unjust state of affairs. Substantive consolidation will ensure that asbestos claimants are once again on par with other unsecured creditors and have priority over equity holders, instead of being structurally subordinated to both.  Through substantive consolidation, Ingersoll-Rand's and Trane's former assets will once again be housed within the same entities holding the Ingersoll-Rand and Trane asbestos liabilities.  Substantive consolidation will thus uphold the cardinal principle that debtors must enter bankruptcy not only with their liabilities but *all* of their assets.  And substantive consolidation will halt the parent companies' siphoning of enormous cash sums out of TTC and Trane.  That will put these chapter 11 cases on a footing for a more seasonable exit through a consensual 524(g) plan, instead of prolonged and costly litigation on ancillary issues.

## IV.     THIS COURT SHOULD GRANT *NUNC PRO TUNC* RELIEF

65.     This Court should exercise its discretion to order substantive consolidation *nunc pro tunc* to the Petition Date.  *See Bonham*, 229 F.3d at 771 (affirming a bankruptcy court's order of substantive consolidation *nunc pro tunc* based on the "discretion of the bankruptcy court to determine in light of the equitable nature of substantive consolidation whether *nunc pro tunc* consolidation should be ordered").  Retroactive relief will allow these chapter 11 cases to move forward from where they should have started:  with all the assets and liabilities housed in single entities on the Petition Date.  It will also enable representatives of the consolidated estates to avoid and recover, as unauthorized postpetition transfers, cash that has been upstreamed from TTC and Trane since the Petition Date.  And representatives of the consolidated estates will also be in a position to claw back potentially billions of dollars taken out of Ingersoll-Rand and old Trane before the Petition Date.  For these reasons, *nunc pro tunc* relief is warranted.

## V.   ALTERNATIVELY, THE COURT SHOULD REALLOCATE THE ASBESTOS LIABILITIES ASSIGNED IN THE CORPORATE RESTRUCTURING FROM ALDRICH TO TTC AND MURRAY TO TRANE

66.     The intercompany agreements drafted in support of the Corporate Restructuring—most notably, the plans of divisional merger, the Funding Agreements, and the Support Agreements—are unconscionable contracts because they improperly structurally subordinate the asbestos claimants while simultaneously elevating former Ingersoll-Rand and old Trane's non-asbestos unsecured creditors and equity holders.  Each of these documents unreasonably favors the Nondebtor Affiliates by (a) assigning all of the asbestos liability of former Ingersoll-Rand and old Trane to the Debtors and freeing the Nondebtor Affiliates from burdensome asbestos-related payments; (b) requiring the Debtors to indemnify the Nondebtor Affiliates for any asbestos-related liabilities paid by the Nondebtor Affiliates; (c) providing that the Funding Agreements are only backstops designed to pay out to the Debtors only if the Debtors' own assets are insufficient; and (d) limiting the entities able to enforce payment from the Funding Agreements to the Debtors.

67.     The structure of the Corporate Restructuring deprived the Debtors of any meaningful input regarding the negotiation and execution of the intercompany agreements.  As previously detailed, the board members and officers of the Nondebtor Affiliates and the Debtors are intertwined and hopelessly conflicted, and there was no possibility that the Debtors reached a voluntary and independent meeting of the minds as it related to the Corporate Restructuring, the plans of divisional merger, or the supporting intercompany agreements.  Essentially, TTC and Trane contracted with themselves and even used the same legal counsel *now representing the Debtors* to effectuate the divisional merger.

68.     Therefore, the plans of divisional merger and the supporting intercompany agreements each should be deemed unenforceable and the asbestos-related liabilities should be assigned to the Nondebtor Affiliates.

## CONCLUSION

For the reasons stated above, the Committee requests that this Court (i) enter the order

substantially in the form annexed hereto as **Exhibit A**, and (ii) grant such other and further relief

as this Court deems just and appropriate.

Respectfully submitted,

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

*/s/ Glenn C. Thompson*
Glenn C. Thompson (Bar No. 37221)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email: gthompson@lawhssm.com

*Local Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Jeffrey A. Liesemer (admitted *pro hac vice*)
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
        tphillips@capdale.com
        jliesemer@capdale.com

*Counsel to the Official Committee of Asbestos*
*Personal Injury Claimants*

ROBINSON & COLE LLP
Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com
        dwright@rc.com

*Counsel to the Official Committee*
*of Asbestos Personal Injury Claimants*

David Neier (admitted *pro hac vice*)
Carrie V. Hardman (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
Email: dneier@winston.com
       chardman@winston.com

*Special Litigation Counsel to the Official
Committee of Asbestos Personal Injury
Claimants*

Dated:  October 18, 2021