

FILED & JUDGMENT ENTERED
Steven T. Salata

December 28 2023

Clerk, U.S. Bankruptcy Court
Western District of North Carolina



J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Aldrich Pump LLC,** | ) | Chapter 11 |
| **Murray Boiler LLC**, | ) | Case No. 20-30608 |
| | ) | |
| Debtors. | ) | |
| | ) | |

## ORDER DENYING MOTIONS TO DISMISS

**THIS MATTER** is before this Court upon 1) the Motion to Dismiss on Behalf of Robert Semian and Other Clients of MRHFM (the "Maune Motion") and 2) the Motion of the Official Committee of Asbestos Personal Injury Claimants to Dismiss the Debtors' Chapter 11 Cases (the "ACC Motion"). *Semian's Motion to Dismiss*, Case No. 20-30608, Doc. 1712 (Apr. 6, 2023); *The Official Committee of Asbestos Personal Injury Claimants' Motion to Dismiss*, Case No. 20-30608, Doc. 1756 (May 15, 2023). Joinders to these motions have been filed by several asbestos claimants' law firms and by the decedent's estate of one claimant. *See Motley Rice's Supporting Motion to Dismiss*, Case No. 20-30608, Doc. 1716 (Apr. 13, 2023); *Nemeroff's Joinder in Motion to Dismiss*, Case No. 20-30608, Doc. 1746 (May 9, 2023); *DeRobertis & Waxman's Joinder in*

*Motion to Dismiss*, Case No. 20-30608, Doc. 1778 (May 31, 2023); *Hazelwood's Joinder in Motion to Dismiss*, Case No. 20-30608, Doc. 1810 (June 15, 2023).

The Debtors, Aldrich Pump LLC ("Aldrich") and Murray Boiler LLC ("Murray") (together, the "Debtors"), and the Future Asbestos Claimants' Representative ("FCR") have objected to the Motions. *Future Asbestos Claimaints' Representative's Opposition to Motion to Dismiss*, Case No. 20-30608, Doc. 1779 (June 1, 2023); *Aldrich Pump's Objection to Motion to Dismiss*, Case No. 20-30608, Doc. 1781 (June 1, 2023); *Future Asbestos Claimaints' Representative's Opposition to Motion to Dismiss*, Case No. 20-30608, Doc. 1809 (June 15, 2023); *Aldrich Pump's Objection to Motion to Dismiss*, Case No. 20-30608, Doc. 1813 (June 15, 2023). Joinders to the Debtors/FCR objections have been filed by the Debtors' Affiliates and even certain adversary proceeding defendants. *Trane Technologies Company's Joinder to the Debtor's Objection to Motion to Dismiss*, Case No. 20-30608, Doc. 1784 (June 1, 2023); *Trane Technologies Company's Joinder to the Debtor's Objection to Motion to Dismiss*, Case No. 20-30608, Doc. 1815 (June 15, 2023); *Joinder of the Fiduciary Duty Proceeding Individual Defendants to Debtors' Objection to Motion to Dismiss*, Case No. 20-30608, Doc. 1817 (June 15, 2023). A hearing on the Motions was held on July 14, 2023.

### INTRODUCTION

On June 18, 2020, seven weeks after having been born in a Texas law divisional merger out of the former Trane companies, Aldrich and Murray filed Chapter 11 in this judicial district. They brought with them all their predecessor companies' considerable asbestos liabilities: over 90,000 lawsuits. These liabilities, and those to come, had been allocated to the Debtors in the merger. By contrast, the Debtors possessed no employees, a limited business, and only a fraction of their predecessors' assets. These assets are insufficient to pay the asbestos claims. However,

each Debtor holds one asset of potentially material value: a contract promise from its substantially more prosperous twin, denominated a 'Funding Agreement.'

Those twins, Trane Technologies Company LLC ("New TTC")[1] and Trane U.S. Inc. ("New Trane")[2] were also created in the merger.  They, however, had been blessed with all of the companies' employees and almost all of the assets and operations.  Under the Funding Agreements, New TTC owed Aldrich a contractual promise and New Trane owed the same to Murray: should the Debtors enter bankruptcy and confirm a Section 524(g) plan shielding New Trane and New Trane Technologies from their predecessor's asbestos claims, the twins would fund an asbestos trust to pay the allowed claims of asbestos victims.

To that end, Aldrich and Murray filed voluntary petitions on June 18, 2020.  Since then, the Debtors and their backers have battled the asbestos claimants over the propriety of these cases and the effort to resolve the tort claims of admittedly solvent entities in bankruptcy.

## STATEMENT OF POSITIONS

**Maune/Semian.**    The Maune law firm represents forty-seven asbestos claimants (collectively, the "Maune Claimants"), including claimant Robert Semian (individually, "Semian").  The Maune Claimants maintain that these reorganization cases are "bad faith" filings. In their view, bankruptcy relief is reserved for companies and individuals having trouble paying their bills or imminently in danger of having trouble paying their bills.  Such "financial distress" they deem to be a "categorical" and "jurisdictional" bankruptcy requirement. *Semian's Motion to Dismiss*, Doc. 1712, p. 10 [hereinafter: "Maune's Motion to Dismiss"].  Because Aldrich and Murray and their legal predecessors are not now—and never have been—financially distressed, the Maune Claimants say these Debtors need no resuscitation and require no fresh start. *See id.* at

---

[1] Twin of Aldrich.
[2] Twin of Murray.

pp. 8-9.   Nor should such companies be permitted to wield a bankruptcy court's "powerful equitable weapons" for the benefit of their non-debtor affiliates.  *Id*. at pp. 10-11.  The weapons referenced are primarily the ability to deny claimants their due process and jury trial rights in favor of a "no opt out" trust claims resolution mechanism.  Finally, the Maune Claimants argue that the Fourth Circuit's seminal "bad faith" filing decision, *Carolin Corp v. Miller,* does not preclude dismissal of these cases,[3] but requires it.  886 F.2d 693 (4th Cir. 1989).

**ACC.**  The Official Committee of Asbestos Personal Injury Claimants ("ACC") reiterates the argument that the Debtors can pay their creditors in the ordinary course of business, their economic viability is not threatened by their liabilities, and therefore these cases were filed in "bad faith."  *ACC's Motion to Dismiss*, Doc. 1756, p. 64.  The ACC also maintains that affording bankruptcy relief to such solvent, non-distressed entities exceeds the enabling powers granted to Congress by the Bankruptcy Clause of the Constitution.  *Id*. at p. 33.  The ACC characterizes this as a "threshold constitutional matter."  *Id*.

Alternatively, the ACC believes "cause" exists to dismiss these cases under 11 U.S.C. § 1112(b), for four separate reasons: a) the "Texas Two-Step" (the corporate restructuring that created these debtors and the follow-on bankruptcies that Aldrich and Murray filed) is an improper, prejudicial manipulation of the bankruptcy process designed to delay and suppress recoveries for the asbestos creditors, *id.* at p. 54,; b) the Debtors are using these Chapter 11 cases to benefit insiders and affiliates at the expense of the asbestos claimants, thus breaching their fiduciary duties to creditors, *id*. at pp. 57-58,; c) the debtors are a modern form of the "new debtor syndrome," which courts have long treated as cause for dismissal, *id*. p. 58; and d) "unreasonable delay" exists, as we are three years into these cases and the Debtors still have been unable to achieve their stated

---

[3] As recently held in a similar case from this district.  *In re Bestwall*, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019).

goal of fashioning a "final" and "fair" resolution of their asbestos liabilities that compensates victims in "full." *See id*. at pp. 63-64.

**Debtors.** The Debtors would have me deny these motions for laches and on estoppel grounds. *Debtor's Objection*, Doc. 1781, p. 24; *Debtor's Objection*, Doc. 1813, p. 21. They argue these motions could have been filed at the outset of these cases but instead were not. *Debtor's Objection*, Doc. 1813, pp. 21-22. They contend three years into these cases is simply too late to contest the propriety of the bankruptcy filings. *Debtor's Objection*, Doc. 1781, p. 27.

Second, Aldrich and Murray believe their cases to be entirely proper. They maintain that subject matter jurisdiction lies under 28 U.S.C. §1334, and their eligibility as chapter 11 debtors is clearly established under section 109(d) of the Bankruptcy Code. *Debtor's Objection*, Doc. 1781, p. 8; *Debtor's Objection*, Doc. 1813, pp. 15-16. And, according to the Debtors, these dismissal motions are not "jurisdictional;" nor are their cases "unconstitutional." *Debtor's Objection*, Doc. 1813, pp. 10-11.

The Debtors further maintain that their cases were filed in "good faith." First, they do not believe "financial distress" to be a requirement for filing Chapter 11. *Debtor's Objection*, Doc. 1781, p. 32; *Debtor's Objection*, Doc. 1813, pp. 12-13. Second, at the filing date, Aldrich and Murray faced 90,000 asbestos claims, and they anticipated that such claims would continue to be asserted against them for decades. *Informational Brief of Aldrich Pump LLC and Murray Boiler LLC*, Case No. 20-30608, Doc. 5, pp. 36-38 (June 18, 2020). Such a volume of claims could not be tried in the tort system. Thus, Aldrich and Murray filed Chapter 11 to access the Section 524(g) trust mechanisms of the Code to pay allowed claims more efficiently. *Debtor's Objection*, Doc. 1781, p. 60, *see Debtor's Objection*, Doc. 1813, p. 26. Paying asbestos claims under a bankruptcy trust is, to their minds, a "valid reorganizational purpose." *Debtor's Objection*, Doc. 1781, p. 56;

*Debtor's Objection*, Doc. 181, p. 10.

Aldrich and Murray further maintain that their cases pass the Fourth Circuit's "bad faith" test in *Carolin Corp. v. Miller*, as recently applied in a similar case from this judicial district, *In re Bestwall LLC.  See Bestwall,* 605 B.R. at 49; *Carolin Corp*, 886 F.2d 693.

The Debtors say that any "cause" or "unreasonable delay" under Section 1112 in these cases must be placed at the feet of the ACC and the asbestos claimants.  *Debtor's Objection*, Doc. 1813, p. 27.  Since filing Chapter 11, the Debtors have attempted to move with dispatch; they have reached accord with the FCR on a plan and have secured funding for the same.  *See Chapter 11 Plan*, Case No. 20-30608, Doc. 831 (Sep. 24, 2021).  Meanwhile, the ACC and the claimants' law firms are accused of attempting to derail this reorganization by refusing to engage in plan negotiations, and filing adversary proceedings against the Debtors, their affiliates, and their officers and directors—all in hopes of overturning the divisional mergers and returning the claims to the tort system for the benefit of the plaintiff law firms.  *See Debtor's Objection*, Doc. 1813, p. 27.

Finally, the Debtors deny any breach of duty to the claimants.  *Debtor's Objection*, Doc. 1813, p. 28.  Their intention is to pay claimants in full.  *Debtor's Objection,* Doc. 1813, p. 29.

**FCR.**  The Future Claims Representative echoes the Debtors' arguments.  As fiduciary for the "Futures,"[4] the largest claimant constituency in these cases, he supports the proposed plan and the contemplated trust.  The FCR sees the trust as a more expeditious, superior way to resolve the mass asbestos claims than piecemeal litigation in the tort system.  *See e.g., FCR's Opposition*, Doc. 1779, p. 8, n. 28.

---

[4] Those persons who have been exposed to asbestos but have yet to manifest disease symptoms.

The Dismissal Motions must be **DENIED**.  The issue has received scant attention, and there are no cases holding "financial distress" to be a constitutional requirement for filing a Chapter 11 case, much less a "jurisdictional" prerequisite.

While the appellate courts have held that a bankruptcy case may be dismissed at the outset for a lack of good faith in the filing, they do so under a variety of tests.  The Third Circuit in *LTL Management, LLC,* made "financial distress" a "good faith" prerequisite to a Chapter 11 filing.  *In re LTL Management, LLC,* 64 F.4th 84, 103-04 (3d Cir. 2023).  However, the Fourth Circuit employs a different dismissal standard: a more restrictive two-prong test that requires the movant to demonstrate both the objective futility of the case and the subjective bad faith of the petitioner.  *See Carolin Corp.*, 886 F.2d 693, 700-01.  Just as in *Bestwall*, the Movants have failed to demonstrate the objective futility of these cases.  While the Movants make a compelling argument that the objective futility prong should not apply in cases filed by solvent, non-distressed debtors, as applied in *Premier Auto* and *Bestwall*, the *Carolin* test requires it.  With the *Carolin* objective futility prong unmet, these cases may not be dismissed as "bad faith" filings.

And as to the ACC's alternate suggestion that "cause" for dismissal exists under Section 1112(b), their assertions about the "Texas Two-Step" and the "new debtor syndrome," are simply recast "bad faith" filing arguments.  Certainly, there has been no unreasonable delay by the Debtors in these cases.  Finally, the question of whether a breach of fiduciary duties to creditors has occurred is currently being litigated in an adversary proceeding, so that issue cannot be decided on this motion.  Thus, both Motions must be **DENIED.**

**FACTUAL BACKGROUND**

The details of the convoluted corporate restructuring that created these two Debtors and their raison d'être are detailed in the Findings of Facts and Conclusions of Law Regarding Order: (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting in Part Denying in Part the Motion to Compel. *See* Case No. 20-3041, Doc. 308, (Aug. 23, 2021). Although technically a preliminary injunction, that matter was heard after a year of voluminous discovery, a multi-day evidentiary hearing, and upon consideration of hundreds of exhibits and deposition excerpts. Those findings and conclusions are adopted herein.

**Old IRNJ/Old Trane.** The Debtor's predecessors are respectively, the former Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company (a former New Jersey corporation) (collectively, "Old IRNJ"), and the former Trane U.S. Inc. ("Old Trane"). These predecessor entities and their subsidiary companies were global manufacturers of climate control products for buildings, homes, and transportation. Old IRNJ and Old Trane made industrial equipment: pumps, compressors, HVAC equipment, and boilers that—in some instances—incorporated encapsulated, asbestos-containing components (primarily the gaskets and packing) that were manufactured and designed by third parties. *Findings of Facts and Conclusions of Law*, Doc. 308, pp. 11-12.

Old IRNJ and Old Trane were served with their first asbestos complaints in the 1980s. *Id*. at p. 13. Together, Old IRNJ and Old Trane paid less than $4 million to settle mesothelioma claims in the tort system from the mid-1980s through 2000. *Id*. However, as the primary asbestos manufacturers (commonly known as the "Big Dusties") began to file for bankruptcy protection in the early 2000s, the number of claims filed against Old IRNJ and Old Trane

increased exponentially.  *Id.*  By the late 2000s, over 2,500 new mesothelioma claims were being

asserted against the Old IRNJ and Old Trane, annually.  *Id.*  Inclusive of claims involving lung

cancer and other diseases, approximately 5,000 asbestos-related claims were filed annually

against Old IRNJ and Old Trane from 2015 to 2019.  *Id.*

During that period, Old IRNJ and Old Trane spent nearly $100 million annually to defend

and resolve asbestos claims.  *Id.*  In total, Old IRNJ and Old Trane have paid nearly $2 billion in

asbestos-related indemnity and defense costs.  *Id.*

As of July 31, 2020, nearly 90,000 asbestos-related claims were pending against Old

IRNJ and Old Trane (or the Debtors) in jurisdictions throughout the United States.  *Id.* at p. 13.

Nearly 50,000 of these claims were on active dockets.  As of December 31, 2019, IR plc[5]

projected the current and future asbestos liabilities of Old IRNJ and Old Trane to be at least $547

million.  *Id.*

It is likely that thousands of additional claims will be filed against Aldridge/Murray for

decades to come.

**The Corporate Reorganization/Divisional Merger.**  On May 1, 2020, Old IRNJ and

Old Trane utilized a provision under Texas law to undergo divisional mergers.  *Id.* at p. 2.  Old

IRNJ divided itself into two companies: New TTC and Aldrich, and Old Trane similarly divided

itself into two companies: New Trane and Murray.  *Id.*

New TTC and New Trane are almost mirror images of Old IRNJ and Old Trane: fully

operating companies that retained their predecessor's employees, almost all of their assets and

business operations,[6] and their non-asbestos creditors.  *Id.*

---

[5] IR plc is another division of the Ingersoll-Rand Corporation.
[6] New TTC received 99% of Old IRNJ's assets, *id.* at 19, New Trane received 98% of Old Trane's assets.  *Id.* at 21.

By design, the Debtors, Aldrich and Murray, were not so blessed. The merger allocated
to them no employees, no operations, and relatively few assets. *Id.* at 2. By contrast, they
received 100% of their respective predecessor's considerable asbestos liabilities. *Id.* The
restructuring was undertaken to isolate these liabilities. *See Maune's Motion to Dismiss*, Doc.
1712, pp. 32-33.

**The "Bad" Companies File Bankruptcy.** The Corporate Restructuring (inclusive of the
Divisional Merger which created these Debtors) contemplated that the newly created "bad"
subsidiaries would file bankruptcy. Their goal was to enable the entire Trane enterprise to access
the tools of Section 524(g) without having to file bankruptcy itself. *See also Maune's Motion to
Dismiss*, Doc. 1712, pp. 32-33.

At the June 18, 2020 petition date, Aldrich and Murray were (and still are) indirect
subsidiaries of Trane Technologies plc, a publicly traded global manufacturing company (the
"Trane Enterprise"). *Corporate Ownership Statement*, Case No. 20-30608, Doc. 2 (June 18,
2020).

There is no dispute that the corporate restructuring was performed to isolate the asbestos
liabilities from the rest of the Trane Enterprise. *See Maune's Motion to Dismiss*, Doc. 1712,
p. 32. Nor is there any dispute that the sole purpose of these bankruptcy cases is to permit the
Trane Enterprise to achieve "a holistic and global resolution" of those asbestos liabilities
pursuant to an asbestos trust formed under Bankruptcy Code Section 524(g), without having to
file bankruptcy themselves. *Transcript for Hearing/Trial held on 6/22/2020,* Case No. 20-
30608, Doc. 115, 25:19-21 (June 22, 2020).

**Were Old IRNJ and Old Trane in Financial Distress at Restructuring?** The signal
issue separating our parties is whether the Debtors or their predecessors are or were in financial

10

distress.  The Movants contend they were not; the Debtors say they were.  Clearly, it depends on how one defines the term.

The Movants point out that before the divisional merger, Old IRNJ and Old Trane managed and paid the settled claims and the few judgments they owed, without exception and without strain. The companies swore to the SEC and shareholders that there was no expectation of asbestos-related liability having any "material adverse impact on [their] results of operations, financial condition, liquidity or cash flows."  *Maune's Motion to Dismiss*, Doc. 1712, p. 94.  Meanwhile, the companies' independent auditors tested "[m]anagement's key assumptions underlying the estimated asbestos-related liabilities" and certified that conclusion.  *Id*. at p. 5; *see also id*. at 100 ("In our opinion, pending legal matters [expressly including asbestos-related claims] are not expected to have a material adverse impact on our results of operations, financial condition, liquidity or cash flows.").

The Companies booked cash reserves to satisfy these contingent asbestos liabilities.  *See id*. at 94 ("As required by generally accepted accounting principles in the United States, we establish reserves based on our assessment of contingencies."); *see also id*. at pp. 103, 99, 106, 109.  The Companies booked those reserves based on actuarial estimates and historical and predicted data.  *Id*. at p. 96.  On multiple occasions they represented to their shareholders and the SEC that they "believe our estimated reserves are reasonable and do not believe the final determination of the liabilities with respect to these matters would have a material effect on our financial condition, results of operations, liquidity or cash flows for any year."  *Id*.[7]  Additionally,

---

[7] In contrast, a fundamental basis for the finding that Johns-Manville "was and remains 'a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future" was the fact that Johns-Manville was going to have to book a $1.9 billion dollar asbestos liability [approximately $6 billion in 2023 dollars] and that would, in turn, have put the company in danger of liquidation.  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649-50 (2d Cir. 1988).

the companies had substantial insurance coverage that contributed to their ability to pay asbestos claims.  Thus, the Movants consider Aldrich and Murray and their predecessors to have been under no financial distress.

However, from the Debtors' perspective there was plenty of distress: nearly 90,000 pending asbestos-related claims with thousands more to come, having a projected cost of at least $547 million.  *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 36; *Informational Brief*, Doc. 5, p. 36.  This was compounded by a lack of insurance: as projected, these asbestos liabilities would surpass insurance recoveries by almost $240 million.  *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 39.  There were so many claims that one could not even defend the claims on the merits; if any asbestos lawsuits could not be dismissed quickly, there would be no choice but to pay to settle them.  Thus, while Aldrich and Murray don't agree on whether it is a requirement for filing chapter 11, they consider themselves (and their parent companies) to have been under quite a bit of financial distress at the filing date.  *Debtor's Response*, Doc. 1781 at p. 58.

**The Funding Agreements and the Debtors' "Ability to Fund" Asbestos claims.**  In contemplation of the Divisional Merger, Old IRNJ and Old Trane purported to make several agreements as between the yet-to-be-formed Aldrich and New TTC, Murray and New Trane, as well as agreements between their prospective successors and certain Non-Debtor Affiliates.  *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 65.  These Agreements were dated "as of" May 1, 2020, the day of the divisional mergers.  *Declaration of Ray Pittard in Support of First Day Pleadings*, Case No. 20-30608, Doc. 27, p. 24 & 43.  Among these are two Funding Agreements, an essential feature of Texas Two-Step bankruptcies.  *See id*.  In simplified terms, under certain conditions, the Debtors' affiliates promise to provide Aldrich and Murray with

sufficient monies to pay allowed asbestos claims under a Plan and the costs of these bankruptcy cases.

The Funding Agreements are the basis of Aldrich/Murray's bold proclamation that "the Debtors have the same ability to pay asbestos claims as did their predecessors.'" *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 151; *see also Declaration of Allan Tananbaum*, Case No. 20-30608, Doc. 29, ¶ 36 (swearing that the Debtors "have access to additional uncapped funds through the Funding Agreements…").[8]

Undisputedly, New TTC and New Trane can fund their obligations under the two Funding Agreements. *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 129. This was established in the Preliminary Injunction hearing. Before the merger, Old Trane and Old IRNJ comprised "a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities." *Id*. at ¶ 47. While the current and future asbestos liabilities of Old Trane/Old IRNJ were projected to be at least $547 million, *id*. at ¶ 36, only $240 million (43%) of that projection would not be covered by insurance.[9] *Id*. at ¶ 39. This was certainly within their grasp to pay in the ordinary course.

The same is true of the new non-Debtor affiliates. "That ability is demonstrated by, among other things, New TTC's book-value equity of approximately $7.8 billion and New Trane's book-value equity of $3 billion, as of December 31, 2020." *Id*. at ¶ 129.

---

[8] Obviously, the Funding Agreements are not arm's length agreements. They and the merger itself are presently being challenged under the Texas merger laws as being prejudicial to creditors. TEX. BUS. ORGS. CODE 1.002(55)(A); *Official Committee of Asbestos Personal Injury Claimants v. Aldrich Pump LLC et al* (*In re Aldrich Pump*), Case No. 21-03029; *Official Committee of Asbestos Personal Injury Claimants v. Ingersoll-Rand Global Holding Company Limited et al.* (*In re Aldrich Pump*), Case No. 22-03028; *Official Committee of Asbestos Personal Injury Claimants v. Trane Technologies PLC et al.* (*In re Aldrich Pump*), Case No. 22-03029.

[9] The highest amount of liability estimated on the record is $500 million each for both Aldrich and Murray; it does not account for available insurance. *See Debtor's Petition Under Chapter 11*, Case No. 20-30608, Doc. 1, p. 4 (June 18, 2020). These estimates and assertions come from the Debtors. The Movants do not agree that the Debtors have adequately estimated their present and future asbestos liabilities, but to date they have not offered their own estimate of liabilities.

**The Debtors'/Trane Enterprise's Ability to Pay Asbestos Liabilities.**  Three years later, that ability to pay appears to be even stronger.  In 2020, the Debtors' affiliates produced sales revenue of $12.5 billion.  *Maune's Motion to Dismiss*, Case No. 20-30608, Doc. 1712, p. 135.  These companies paid dividends of $2.12 per share for over 243 million shares, totaling over $515 million.  *Id.* at p. 7; *see also id.* at p.139.[10]  They retired $300 million in debt and bought back $250 million in stock.  *Id.* at 136.  In short, the Debtors' corporate affiliates distributed excess cash flow totaling over $1,065,000,000 ($1.065 billion)--more than 400% of Debtor's sworn, audited estimate of its all-in, forever asbestos liabilities, net of insurance.

In 2021, the Debtors' affiliates did even better.  Net revenues totaled $14.1 billion.  *Id.* at p. 146.  The companies paid $561 million in dividends, bought back $1.1 billion in stock, and retired $425 million in debt.  *Id.* at p. 7.

The 2022 revenues eclipsed the prior years: $16.0 billion of consolidated revenue, $1.2 billion in buybacks, and $620.7 million in dividends declared.  *Id.* at p. 31.

The Debtors' affiliates' growing annual profits—to say nothing of their total book value—dwarf the Debtors' sworn estimate of all-in, total asbestos liability.  This is particularly true given that over half of that liability is covered by third-party insurance.

In short, by their own estimation, the Debtors owe $240 million in asbestos liabilities net of insurance—a sum greater than the assets allocated to them in the merger.  However, they were designed to be reliant on the Trane organization, through the Funding Agreement.  And the Trane organization boasts $16 billion in *annual* revenues, *annual* excess cash flow eclipsing $1.8 billion ($620.7 million in dividends plus $1.2 billion stock buyback; three-year total over $1.5 billion in dividends and $2.5 billion in stock buybacks), and a market cap of $54 billion.

---

[10] Attached here and available at https://investors.tranetechnologies.com/stock-information/dividend-history/.

When taken with their own limited assets, this means that the Debtors had the ability to fund their asbestos obligations at the petition date with no threat to the Debtors' "operations, financial condition, liquidity or cash flows" due to asbestos litigation liabilities. *See id.* at pp. 96 & 110.

While the ability of New TTC or New Trane to pay asbestos claims is not in doubt, the claimants' ability to collect from them is uncertain. The Funding Agreements are not secured, they are not enforceable by creditors, and they cannot be assigned without written consent. The Funding Agreements have "Automatic Termination" provisions whereby New TTC and Trane's respective funding obligations automatically cease "on the effective date of a Section 524(g) Plan." *Declaration of Pittard*, Case No. 20-30608, Doc. 27, pp. 30 & 49. Practicably, the only people who can enforce the agreements are the people against whom they would be enforced, the shared officers and directors of the Debtors and the Affiliates.

Most significant, and in contrast to the unconditional funding agreements found in *Bestwall*, the present Funding Agreements stipulate that as a precondition to funding a § 524(g) trust, that the chapter 11 plan must provide New TTC or New Trane, as applicable, "with all the protections of section 524(g) of the Bankruptcy Code." *Declaration of Pittard*, Doc. 27, pp. 29 & 48. Whether New TTC or New Trane are legally entitled to such relief is an open question. Even if they are, the current asbestos claimants must first, by a 75% vote, approve the Plan. Otherwise, these Debtors have no ability to pay the asbestos claims assigned to them by the Divisional Merger. Thus, my conclusion in the preliminary injunction hearing was that these agreements are conditional, potentially unenforceable, and they will be honored only if the Affiliates wish them to be honored. *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 79.

## DISCUSSION

### I. Preliminary Matters.

#### A. Jurisdiction/Venue

Subject matter jurisdiction is contested and, if lacking, would mandate dismissal of these cases. It is discussed below in Section II. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.[11] These are core proceedings under 28 U.S.C. § 157(b)(2).

#### B. Burden of Proof

A party asserting subject matter of a court has the burden of proof proving that subject-matter jurisdiction. *Piney Run Reservation Ass'n v. Comm'rs of Carroll Cnty, MD*, 523 F.3d 453, 459 (4th Cir. 2008); *Demetres v. E. W. Constr.,* 776 F.3d 271, 272 (4th Cir. 2015). On the other hand, in a bankruptcy case the moving party "has the burden of proof to establish cause for dismissal." *Bestwall,* 605 B.R. at 48 (providing supporting case law).

#### C. Laches

As a preliminary matter, the Debtors say the motions should be denied outright based on laches and estoppel. I do not agree.

"Laches imposes on the defendant the ultimate burden of proving "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282, (1961).

Lack of diligence exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *National Wildlife Federation v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987); *see*

---

[11] While the Maune claimants argue that the Debtors have engaged in forum shopping, this is hardly so. Aldrich and Murray and their predecessors are/were headquartered in this judicial district and possess principal assets here, thus establishing venue under 28 U.S.C. §1408.

*also Giddens v. Isbrandtsen Co.,* 355 F.2d 125, 128 (4th Cir. 1966); *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990).

Prejudice is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct. *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844 (D.C. Cir. 1982). A defendant "is aided by the inference of prejudice warranted by the plaintiff's delay." *Giddens,* 355 F.2d at 128. Even so, a defendant must also prove prejudice either from the inference alone or by introducing additional evidence. *Id.*; *see also White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); Fed. R. Civ. P. 8(c).

The Debtors see inexcusable delay from the fact that these motions were filed almost three years into the chapter 11 cases. From the outset, the ACC has contested the propriety of the "Texas Two-Step"[12] and these Chapter 11 cases. The Maune Firm has served on the ACC since the Committee was established. The salient facts were known. Thus, these dismissal motions could have been filed long ago.

Regarding prejudice, the Debtors point to the tens of millions of dollars in professional fees they have paid in these cases over the last three years, and not just to their own professionals. As debtors in possession, they are also bearing the fees for the ACC and FCR's professionals.

I agree that for the ACC and most of the Maune Claimants, the delay in bringing the "bad faith" filing portion of these motions was inexcusable. Nevertheless, I do not believe that these motions can—nor should be—decided by laches.

---

[12] We do not use the term pejoratively as do some commentators, but rather as verbal shorthand. The 'Texas Two-Step' is generally understood to mean a corporation 1) splitting itself in two via a Texas state law divisional merger, followed shortly thereafter by 2) a Chapter 11 bankruptcy filing.

First, these dismissal motions make jurisdictional, constitutional arguments. Lack of subject matter jurisdiction can be asserted at any time. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings."); *United States v. Beasley*, 495 F.3d 142, 147 (4th Cir. 2007); *Hager v. Gibson*, 188 B.R. 194, 196 (E.D. Va. 1995), *aff'd* 108 F.3d 35 (4th Cir. 1997), *rev'd on other grounds*, 109 F.3d 201 (4th Cir. 1997) ("[F]ailure to raise the issue of lack of subject matter jurisdiction is not barred by the doctrine of laches."), Fed. R. Civ. P. 12(g)(3).

Second, both dismissal motions are founded in part on allegations of statutory "cause" to dismiss under Section 1112(b). Such dismissal motions may be filed whenever cause has arisen, i.e. wherever we are in the bankruptcy case. *See McDow v. Dudley*, 662 F.3d 284, 289 (4th Cir. 2011).

Third, while the ACC and the Maune firm (and many of its clients) have been case participants from the outset, Semian was not diagnosed with mesothelioma until May 2022-- almost two years after bankruptcy. *Reply in Support of Robert Semian's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)*, Case No. 20-30608, Doc. 1665, p. 40-39 (Mar. 23, 2023). Semian did not sleep on his rights. In short order, Semian filed a state court lawsuit against several alleged joint tortfeasors. *See id*. at p. 30. Seven months after his diagnosis, Semian asked this Court for stay relief so he could continue his action against the Debtors in state court. *Semian Motion for Relief from Stay*, Case No. 20-30608, Doc. 1588 (Jan.

24, 2023).  When that motion was denied, Semian (and the other Maune claimants) filed the
present dismissal motion.

A change in circumstances justifies a "later" filing of a motion to dismiss.  It is hard to
imagine a more valid change in circumstances than being diagnosed with mesothelioma.  Semian
could hardly participate in this case until he knew he was sick.  So, among the Maune Claimants,
at least one (Semian) would be entitled to now assert the "bad faith filing" dismissal motion, and
there may be others.

Second, and fees notwithstanding, I am hard pressed to find undue prejudice to the
Debtors.  The Debtors' predecessors intently studied the *Bestwall* case before they tried their
own Texas Two-Step filings.  *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, p. 27.
They knew this to be an untested and highly controversial strategy, and they must have
recognized their bankruptcy cases would be protracted, contested and difficult.

This has been proven true.  Thus far, we have litigated a preliminary injunction staying
actions against officers, directors, and affiliates.  The ACC has filed three separate adversary
proceedings challenging the divisional mergers and the actions of the participants.  The Debtors
have embarked on their preferred course of estimating their asbestos liabilities.  A plan has been
agreed to as between the Debtors and the FCR; however, the ACC and the present asbestos
claimants do not support it.  Little progress has been made towards confirmation.  Discovery is
just underway in the estimation matter and in the ACC's lawsuits.  Barring an unanticipated
settlement, each will need to be tried and determined by final order before any plan is confirmed.
Even after three years, we are still in the early stages of these cases.

The professional costs of these cases are admittedly high.  However, these costs are not
ultimately born by an insolvent bankruptcy estate, but rather by the non-Debtor Affiliates who

knew what they were buying into.  Finally, for the past three years, both the Debtors and the Affiliates have enjoyed a respite from the tort system and a 'payment holiday' from the $100 million-a-year costs they were previously incurring.[13]

### D. Estoppel

The Debtors also assert estoppel, based upon 1) the ACC previously filing pleadings in these cases asserting that the Court has subject matter jurisdiction, and 2) informing the Court at the March 2022 omnibus hearing that it, the ACC, would not be filing a motion to dismiss because of the stringent *Carolin* dismissal standards.  *Transcript for Hearing/Trial held on 03/3/2022*, Case No. 20-30608, 63:22-64:18; 138:6-10 (Mar. 16, 2022).  Now, the ACC seeks dismissal in part for bad faith.  Being contradictory, the Debtors say the ACC should be estopped from pursuing these motions.

"The doctrine of equitable estoppel allows "a person's act, conduct or silence when it is his duty to speak," to preclude him from asserting a right he otherwise would have had against another who relied on that voluntary action."  *In re Varat Enterprises, Inc*., 81 F.3d 1310, 1317 (4th Cir. 1996) (citation omitted).  The rule "is designed to protect any adversary who may be prejudiced by the attempted change of position."  *Id*., *see also Guinness PLC v. Ward*, 955 F.2d 875, 899 (4th Cir. 1992).

Equitable estoppel applies in bankruptcy if four criteria are met: 1) the party estopped knew the relevant facts; 2) the party estopped intended for its conduct to be acted or relied upon, or the party acting had the right to believe the conduct was so intended; 3) the party acting was ignorant of the true facts; and 4) the party acting relied on the conduct to its injury.  *Varat Enterprises*, 81 F.3d at 1317.

---

[13] Meanwhile, and unique among the creditors of Old Trane and Old Ingersol-Rand, the asbestos claimants are not being compensated.  If anyone is being prejudiced, it is the claimants.

Estoppel is "applied rarely and only from necessity." *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Washington, D.C. v. Rustam Guiv Found. of New York*, 822 F.3d 739, 753 (4th Cir. 2016). The moving party must prove "each element by clear, precise, and unequivocal evidence." *Id.*

This is not a case of equitable estoppel. The ACC has not sought and obtained a ruling that it now seeks to deny. As to the March 3, 2022 hearing, the Court was exploring ways to frame the issues relating to the "Texas Two-Step" with the parties, so that they could be expeditiously decided by final order and then appealed. The statement by the ACC's counsel was simply an 'off the cuff' answer to a question posed by the Court.

There was no suggestion that the ACC intended for its conduct to be acted upon, nor was it. The ACC did not obtain a favorable ruling which it now seeks to disavow, nor did the Debtors rely upon the statement of opposing counsel to their detriment. The Debtors' course of action in these cases was formulated long ago, and it has not changed. The Debtors were not ignorant of the true facts, nor did they rely on their opponent's statement to their injury.

Finally, and practically, ruling on the merits of these dismissal motions is in the best interests of judicial economy and of the parties. Until the propriety of the "Texas Two-Step" and its use by solvent "non-distressed" corporations is determined by the higher courts, no progress will be made in these bankruptcy cases. None has been made in *Bestwall,* which was filed six years ago. None has been made in *DBMP*, filed four years ago. And none has been made here. These cases are simply spinning round and about, to the growing frustration of all.

## II. Subject Matter Jurisdiction Exists over these Chapter 11 Cases

A. <u>Statutory Subject Matter Jurisdiction Lies</u>

"Whether a bankruptcy court may exercise subject matter jurisdiction over a proceeding is determined by reference to 28 U.S.C. § 1334." *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 839 n.3 (4th Cir. 2007); *Educ. Credit Mgmt. Corp. v. Kirkland (In re Kirkland)*, 600 F.3d 310, 315 (4th Cir. 2010) ("[S]ubject matter jurisdiction is determined by §1334."). Section 1334 vests district courts with "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §§ 1334(a)-(b).

Under 28 U.S.C. § 1334(a), a bankruptcy court acting under a general reference order has original and exclusive jurisdiction of all cases under Title 11." 28 U.S.C. § 1334(a). Here, the Debtors' petitions initiated Chapter 11 cases under Title 11. Pursuant to the general reference order of our District Court, those cases have been referred to this bankruptcy court.

B. <u>Movants' Constitutional Arguments Are Not Jurisdictional.</u>

The Movants say the jurisdictional problem is not statutory, but constitutional. The ACC rightfully observes that Congress cannot grant—and the bankruptcy courts cannot exercise—jurisdiction unless it is provided for in the Constitution. *ACC's Motion to Dismiss*, Case No. 20-30608, Doc. 1756 ¶¶ 49-50. They argue that this "Court does not have subject-matter jurisdiction over the Debtors' cases because the Debtors" are ineligible for bankruptcy. *Id*. at ¶ 1. The Debtors are "ineligible" because the "subject of Bankruptcies" does not include "non-financially distressed" debtors. *Id*. at ¶¶ 41-42, 47-48. Because these companies do not fall within the "subject of Bankruptcies" in Article I, Section 8 of the U.S. Constitution, Movants posit that this Court does not have subject matter jurisdiction to entertain their cases. *See, e.g.,*

*Maune's Motion to Dismiss*, Doc. 1712, p. 3 ("The Court must enforce the limits of its subject-matter jurisdiction and . . . dismiss the case").

In short, as Maune puts it, "bankruptcy is not a menu option for non-distressed companies . . . who want a better deal than they are entitled to under state or federal law . . . ." *Id.* at p. 10.

1.   *The Movants' Constitutional Arguments Are Not "Jurisdictional"*

Before addressing the constitutional arguments, I must first tackle the question of whether these questions are jurisdictional.[14]   A federal court must determine that it has subject-matter jurisdiction over a case before it can pass on the merits of that case.   *Steel Co. v. Citizens for a Better Env't* that 523 U.S. 83, 94–95, (1998) ("The requirement that jurisdiction be established as a threshold matter . . . "is inflexible without exception.""   Movants believe barring a non-distressed company from bankruptcy to be a "jurisdictional exercise."   *Id.*, p. 11.   The case law suggests that it is not.

In *MOAC Mall Holdings LLC v. Transform Holdco LLC*, the Supreme Court explained that rules and statutes are treated as jurisdictional only "if Congress clearly states as much." 598 U.S. 288, 298 (2023) (internal citation and quotation omitted).

Meanwhile, the Fourth Circuit has recognized that "[a]lthough the term 'jurisdiction' has been used somewhat loosely on occasion in the past, it is now well established that it refers to 'the courts' statutory or constitutional power to adjudicate the case.'"   *B.R. v. F.C.S.B.,* 17 F.4th 485, 492 (4th Cir. 2021) ((quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)) quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).

---

[14] Because laches and estoppel do not apply, whether the constitutional arguments are "jurisdictional" may not affect the outcome of these matters.   However, to provide a complete record, I will address the arguments.

There are no provisions in the Bankruptcy Code evidencing a congressional intent to impose a jurisdictional insolvency or "financial distress" requirement to file bankruptcy.  Nor do the movants deny there is an Article III "case-or-controversy" pending before this bankruptcy court.[15]  Rather, they simply suggest it would be unconstitutional for these two companies to file a bankruptcy case given their affluence.  Thus, the Movants' contentions are focused on the particulars of the Debtors, not on the nature of these cases.

I agree with the Debtors: a challenge to the propriety of a particular petitioner seeking bankruptcy, even one that asserts constitutional arguments, does not typically make those arguments jurisdictional.  Statutes are often constitutionally challenged as going beyond the bounds of legislative authority vested by Article I.  Take, for example, a person convicted of violating a criminal statute that is later deemed unconstitutional on appeal.  The appellate holding does not mean the trial court lacked subject matter jurisdiction to try the defendant for a crime.  Rather, it is the conviction that was improper—because Congress lacked the power to enact the unconstitutional statute under which the defendant was convicted.

This scenario was presented in *United States v. Lopez.*  514 U.S. 549 (1995).  In *Lopez*, after holding that a statute under which the respondent was convicted exceeded Congress's Article I power to regulate interstate commerce, the Supreme Court affirmed a decision that "reversed respondent's conviction."  514 U.S. 549, 552.  However, the Court did not call into question the trial court's jurisdiction to hear the case.[16]

---

[15] The ACC appears to deny that bankruptcy courts can wield Article III "case or controversy" jurisdiction, the reason being that the powers of the bankruptcy courts arise from the Bankruptcy Clause.  *ACC's Reply in Support of Motion*, Case No. 20-30608, Doc. 1847, ¶ 6.  However, as a recent Fourth Circuit decision explains, bankruptcy courts hear cases upon referral from the US District Court.  Before a bankruptcy case can be is referred to a bankruptcy court, the District Court must first have jurisdiction, meaning the case must satisfy Article III.  *Kiviti v. Bhatt*, 80 F.4th 520, 532–33 (4th Cir. 2023).

[16] The Supreme Court has an obligation to police its subject-matter jurisdiction.  If the Court had questioned the trial court's authority, presumably the Court would have raised and resolved that issue.  However, it need not because congressional power to legislate is distinct from judicial power to adjudicate.

I also agree with the Debtors that even when a constitutionally challenged statute bears on federal court jurisdiction, that fact does not merge the 'congressional power' and the 'judicial power' inquiries.  For example, in *Bunk v. Gosselin World Wide Moving, N.V.*, the Fourth Circuit declined to treat a challenge to the constitutionality of a substantive law (the False Claims Act) as jurisdictional, even though the court had jurisdiction solely because of the Act.  741 F.3d 390 (4th Cir. 2013).  In *Bunk*, success on the constitutional challenge would have eliminated the party's Article III standing to sue under the Act which, in turn, would have stripped the court of jurisdiction.  *See id*. at 402.  Nevertheless, the court held that the non-Article III "constitutional challenge[]" was "not a jurisdictional issue."  *Id*. at 404-05.  The party challenging the statute, therefore, had failed to preserve the issue.  *Id*. at 405.

Even a challenge to the propriety of a case based on the Eleventh Amendment—which provides sovereign immunity and itself speaks of "[t]he Judicial Power"—is not a "kind of Article III limitation on subject-matter jurisdiction" simply because it challenges the propriety of a case based on a constitutional provision.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005).  Thus, constitutional challenges which are not targeted at the scope of Article III are not challenges to the Court's subject matter jurisdiction.

Pared down, the ACC's jurisdictional argument is simply: solvent, non-distressed corporations are beyond the "subject of bankruptcies" in Article I, Section 8, and thus beyond the power of Congress to regulate and so their cases are beyond this bankruptcy court's subject matter jurisdiction.  *ACC's Reply in Support of Motion*, Doc. 1847, p. 2.  I disagree.

The Bankruptcy Clause provides: "[Congress shall have Power] To establish . . . uniform Laws on the Subject of Bankruptcies", U.S. Const. art. I, § 8, cl. 4, and it is contained within

Article I, which vests "[a]ll legislative powers . . . in a Congress of the United States."  U.S.

CONST. art. I, § 1.

In short, the Constitution delegated authority to Congress over not just an "insolvent" or

even a "distressed" debtor's case, but rather the entire subject of bankruptcies.  This is the

broadest type of delegation possible, one which we will consider below, in Section III B.

Congress then enacted a comprehensive bankruptcy scheme, the Bankruptcy Code.  The

Code sets eligibility requirements for debtors but makes no mention of additional insolvency or

financial distress requirements.  *See* 11 U.S.C. § 109(a).  Additionally, Congress granted the

United States District Courts extremely broad bankruptcy subject matter jurisdiction.  First, it

authorized original bankruptcy jurisdiction over cases "under title 11."  28 U.S.C. § 1334(a).

Then, it provided the United States District Courts with jurisdiction over a variety of other

proceedings that variously "arise in," "arise under" or are "related to" the bankruptcy case.  28

U.S.C. § 1334(b).

Questions as to the application of these jurisdictional provisions—that is, whether a

matter "arises in," "arise under" or is "related to" the bankruptcy case—would properly be

characterized as jurisdictional issues.  Questions as to the constitutionality of Title 11 <u>as applied

to a particular debtor</u>, would not appear to be jurisdictional.[17]

*2.  Eligibility to File Bankruptcy is Not a Jurisdictional Issue*

When Movants say it is unconstitutional for solvent, non-distressed companies like

Aldrich and Murray to file bankruptcy, this would appear to be either 1) a challenge to these

companies' eligibility as debtors or 2) a contention that the provisions of the Bankruptcy Code

are unconstitutional as applied to these Debtors.

---

[17] Even the Third Circuit's ruling in *LTL* does not support Maune's jurisdictional position.  *LTL*, 64 F.4th at 99 ("The Bankruptcy Court had jurisdiction of the bankruptcy case under, inter alia, 28 U.S.C. §§ 157(a) and 1334(a).").

Certainly, eligibility is not a jurisdictional question. *See In re Auto. Prof'ls., Inc.*, 370
B.R. 161, 167 (Bankr. N.D. Ill. 2007) (referencing *Promenade Nat'l Bank v. Phillips (Matter of
Phillips)*, 844 F.2d 230, 236 n.2 (5th Cir. 1988)) ("The question [of eligibility] is not one of
jurisdiction—the court has subject matter jurisdiction over all cases filed under the Bankruptcy
Code").

In section 109(d) of the Bankruptcy Code, Congress determined which entities are
eligible to file cases under chapter 11.  11 U.S.C. § 109(d).  These Debtors satisfy those
requirements.  As the Supreme Court held in *Toibb v. Radloff*, the "plain language" of the Code
determines which entities are eligible to file for chapter 11.  501 U.S. 157, 160 (1991) (finding
that courts could not engraft an "ongoing business requirement" into the Code to prevent non-
business debtors from filing under chapter 11 since section 109(d) contained no such restriction).
The Supreme Court stated in that case:

> Congress took care in § 109 to specify who qualifies-and who does not qualify-as
> a debtor under the various chapters of the Code.  Congress knew how to restrict
> recourse to the avenues of bankruptcy relief; it did not place Chapter 11
> reorganization beyond the reach of a nonbusiness individual debtor.

*Id.* at 161.

And again, per *MOAC Mall Holdings LLC*, rules and statutes are treated as jurisdictional
only "if Congress clearly states as much."   589 U.S. at 298.   There are no provisions in the
Bankruptcy Code evidencing a Congressional intent to impose a financial distress or insolvency
jurisdictional requirement on chapter 11 debtors.

**III. There are no "Constitutional impediments" to these Bankruptcy Filings.**

Jurisdictional or not, the Movants believe it would be unconstitutional for this court to entertain these chapter 11 cases by granting bankruptcy relief to non-distressed companies such as these Debtors.

    A.  <u>Financial Distress of these Debtors.</u>

As an initial matter, the parties vigorously disagree whether Aldrich and Murray or their predecessors were in "financial distress." *See Debtor's Response*, Doc. 1781 at p. 58*; Maune's Motion to Dismiss*, Doc. 1712, p. 10.

Judge Beyer found financial distress in Bestwall because the debtor faced 64,000 pending lawsuits by asbestos claimants. *Bestwall*, 605 B.R. at 49.  Here, the Debtors assert similar financial pressures. *See Debtor's Response*, Doc. 1781 at p. 58*.  Aldrich and Murray were subject to nearly 90,000 asbestos-related claims at the filing date. *Informational Brief*, Doc. 5, p. 36.  As of December 31, 2019, the projected asbestos liabilities of Old IRNJ and Old Trane were at least $547 million. *Findings of Fact and Law*, Case No. 20-03041, Doc. 308, ¶ 36.  It is likely that thousands of additional claims, in number and amount, will accrue for decades to come.  In 2019, it was projected that the current and future asbestos liabilities of Old IRNJ and Old Trane would surpass their total projected insurance recoveries by almost $240 million. *Id*. at ¶ 39.

From the Movants' perspective, this projection of liabilities entirely misses the point. Obviously, $240 million in total liabilities sounds oppressive.  However, that is only the numerator of the fraction: "the Debtors' asbestos liability is dwarfed when put over a denominator of $16 billion in *annual* revenue (over $42 billion in the last three years), or *annual* excess cash flow eclipsing $1.8 billion ($620.7 million in dividends plus $1.2 billion stock

buyback; three-year total over $1.5 billion in dividends and $2.5 billion in stock buybacks)."

*Supra The Debtors'/Trane Enterprise's Ability to Pay Asbestos Liabilities,* pp. 15-16. In short,

the Trane Enterprise could afford to pay those asbestos liabilities in the tort system.

Because I conclude that these cases are not jurisdictionally nor constitutionally infirm,

and because financial distress is not a factor in the controlling *Carolin* standard, I need not now

determine whether Aldrich and Murray should be considered in financial distress.[18] For present

purposes, I will simply assume that they were not in "financial distress." This frames the

Movants' constitutional question: are corporations which are neither insolvent nor in financial

distress a proper "subject of Bankruptcies" within the meaning of Article I, Section 8? The

Movants say they are not.

B. <u>Does a Bankruptcy Case filed by a Solvent, Non-Distressed Debtor Fall Outside</u>
   <u>Congress' Constitutional Power to Legislate on the Subject of Bankruptcies?</u>

As the ACC points out, federal courts are courts of limited jurisdiction which possess

only the powers authorized by Constitution and statute. *Kokkonen v. Guardian Life Ins. Co.*, 511

U.S. 375, 377 (1994). Congress may "determine the subject-matter jurisdiction" of a bankruptcy

court "[a]ssuming no constraints or limitations grounded in the Constitution are implicated . . . ."

*United States v. Denedo*, 556 U.S. 904, 912 (2009). However, if such limitations exist, then

subject matter jurisdiction is lacking, and the case must be dismissed. *ACC's Motion to Dismiss*,

Doc. 1756, ¶ 50.

The ACC first notes that Article I, Section 8 of the Constitution constrains bankruptcy

subject matter jurisdiction to debtors that are properly "the subject of Bankruptcies." *Id*. ¶ 33.

The ACC then explains the need for that limitation. It prevents the Constitutional bankruptcy

---

[18] This will likely be decided in the Adversary Proceedings or at confirmation.

power from impairing other Constitutionally established rights, including due process

guarantees:

> If an entity that is not constitutionally eligible for bankruptcy is allowed to file . . .
> an almost inevitable clash with due process will arise.  For example, a claimant
> has a due process property right in a tort cause of action.  Fundamental to this
> right is the claimant's autonomy and control over prosecution of his or her claim
> such that any "settlement" of that claim cannot be imposed on the claimant
> without his consent.

*Id*. ¶ 60 (internal citation omitted).  The ACC says "the use of bankruptcy by a non-financially

distressed entity for economic advantage, litigation advantage, or other motive not *requiring*

bankruptcy relief does not properly fall within "the subject of Bankruptcies.""  *Id*. ¶ 48.

Certainly, bankruptcy filings undertaken for improper purposes are not tolerated by the

courts.  *See e.g., In re Premier Automotive Services, Inc*., 492 F.3d 274 (4th Cir. 2007) (absence

of good faith is grounds for dismissal).  However, the ACC's contention that non-financially

distressed entities are categorically, constitutionally prohibited from filing bankruptcy cases is

unsupported.  Again, there are no cases holding that the Constitution imposes a financial-distress

requirement.

Lacking any such cases, the ACC anchors its contentions upon the Supreme Court's

admonition that resolution of constitutional issues in bankruptcy requires consideration of the

understanding and assumptions of the Founders and "[t]he history of the Bankruptcy Clause, the

reasons it was inserted in the Constitution and the legislation both proposed and enacted under its

auspices . . . ."  *ACC's Motion to Dismiss*, Doc. 1756, ¶ 32; *Cent. Va. Comm. College v. Katz*,

546 U.S. 356, 362-63 (2006); *see also Allen v. Cooper*, 140 S.Ct. 994, 1002 (2020) (the

exceptionalism of the Bankruptcy Clause as understood "at the Founding").

To that end, the ACC cites a law review article written by bankruptcy law professor

Thomas Plank.  Thomas E. Plank, *Constitutional Limits on Bankruptcy*, 63 TENN. L. REV. 487,

508-10 (1996) [hereinafter: Plank on Constitutional Limits].  In it, Professor Plank undertakes a

comprehensive review of the history of English and American bankruptcy laws.  *Id*. at III.  He

then examines Supreme Court and appellate cases referencing the bankruptcy power and other

constitutional provisions.  *Id*. at IV.  From these authorities, Plank draws the same conclusion as

our Movants: granting relief to a debtor that is neither "insolvent" (meaning balance sheet

insolvency) nor distressed ("going concern" insolvency), falls outside the "subject of

bankruptcies" under Article I, Section 8.  *Id*. at 492.

The ACC draws heavily from the Plank article, highlighting a number of Supreme Court

opinions describing bankruptcy and the "subject of Bankruptcies.  For example:

> "The subject of bankruptcies is nothing less than "the subject of the relations
> between an **insolvent or nonpaying or fraudulent debtor**, and his creditors,
> extending to his or their relief."  *ACC's Motion to Dismiss*, Doc. 1756, ¶ 36,
> (citing *Wright v. Union Central Life Insurance*, 304 U.S. 502, 513-514 (1938)
> (emphasis added)).

> "'Congress shall have power to establish uniform laws on the subject of any
> person's **general inability to pay his debts**[.]'"  *ACC's Motion to Dismiss*, Doc.
> 1756, ¶ 35 (citing *Kunzler v. Kohaus*, 5 Hill 317, 321 (N.Y. 1843) (emphasis
> added)).

> In the context of validating an expansion of bankruptcy law during the Great
> Depression, the admonition (even when  recognizing a valid expansion of
> bankruptcy law) that "it **does not follow that [congressional] power has no
> limitations**."  *ACC's Motion to Dismiss*, Doc. 1756, ¶ 36 (citing *Cont'l Ill*., 294
> U.S. 648, 669 (1935) (emphasis added)).

The ACC then suggests that the caselaw limits the Congressional bankruptcy power to

entities "facing significant and imminent threats to their very existence or who cannot or will not

timely pay their creditors."  *ACC's Motion to Dismiss*, Doc. 1756, ¶ 38.  It maintains that such

limitations are recognized in modern bankruptcy cases: "Although we have noted that '[t]he

subject of bankruptcies is incapable of final definition,' . . . Congress' power under the

Bankruptcy Clause 'contemplate[s] an **adjustment of a failing debtor's obligations**.'" *ACC's Motion to Dismiss*, Doc. 1756, ¶ 37, (citing *Campbell v. Alleghany Corp*., 75 F.2d 947, 952 (4th Cir. 1935) (emphasis added)). The ACC posits that this caselaw limitation on debtors still applies today: the "Bankruptcy Code strikes a balance between the interests of **insolvent debtors and their creditors**." *ACC's Motion to Dismiss*, Doc. 1756, ¶ 38, (citing *Bartenwerfer v. Buckley*, 143 S. Ct. 665 (2023) (emphasis added)).

Drawing from history, these judicial statements, and the need to reconcile the Bankruptcy Power with other constitutionally guaranteed rights, the ACC adopts Plank's description of modern bankruptcy "as a tool for companies to restructure before total collapse—thereby benefiting creditors, employees, customers, and society at large. tool for companies to restructure before total collapse—thereby benefiting creditors, employees, customers, and society at large." *ACC's Motion to Dismiss*, Doc. 1756, ¶ 39, (quoting *Plank on Constitutional Limits*, 63 TENN. L. REV. at 544).

Similarly, the ACC quotes another bankruptcy scholar, Professor Ralph Brubaker, who in writing about the "Texas Two-Step" asbestos cases, recently opined "debt overhang from massive disputed obligations" is a "problem[] bankruptcy is designed to address," but **only if it "presents a clear and present threat to entity viability and full payment of all claimants."** *ACC's Motion to Dismiss*, Doc. 1756, ¶ 40, n. 106, (quoting Ralph Brubaker, *The Texas Two-Step and Mandatory Non-Opt-Out Settlement Powers*, HAR. L. REV. BANKR. ROUNDTABLE (July 12, 2022), https://bankruptcyroundtable.law.harvard.edu/2022/07/12/texas-two-step-and-the-future-of-mass-tort-bankruptcy-series-the-texas-two-step-and-mandatory-non-opt-out-settlement-powers/ [hereinafter: Brubaker on Settlement Powers] (emphasis added)). Brubaker further suggests that "[w]hile a debtor may not need to be technically insolvent, bankruptcy is not

available to any business who wants to misuse its powers for its benefit—and their creditor/victims' detriment." *Brubaker on Settlement Powers,* HAR. L. REV. BANKR. ROUNDTABLE.

These arguments have considerable force. Common sense dictates that a solvent, non-distressed corporation should rarely consider bankruptcy—and even less often be afforded its protections. After all, in a capitalistic society, those who can pay their creditors, must pay. Otherwise, the economic system would collapse.

This commonsense principle has held throughout our nation's history. The vast majority of cases filed in the bankruptcy courts over the years have been by persons and corporations who are <u>both</u> insolvent and highly distressed. Thus, it is hardly surprising that the case law generally describes bankruptcy in this fashion. It is equally true that debtors with no such need for relief who seek bankruptcy for improper purposes have found no favor with the Courts. But is Chapter 11 is exclusively, constitutionally reserved for debtors who are insolvent and/or financially distressed? The case law suggests that the answer is "No."

The reach of the Bankruptcy Clause is very broad. In general, "[t]he power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount." *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929). The "core of the federal bankruptcy power" is "the restructuring of debtor-creditor relations." *N. Pipeline Const. Co. v. Marathon Pipe Line Co*., 458 U.S. 50, 71 (1982). It encompasses "nothing less than 'the subject of the relations between a debtor and his creditors.'" *Siegel v. Fitzgerald*, 596 U.S. 464, 473 (2022) (quoting *Wright v. Union Central Life Ins. Co.*, 304 U.S. at 513–14). The "[c]ritical features of every bankruptcy proceeding" are (1) "the exercise of exclusive jurisdiction over all of the debtor's property;" (2) "the equitable distribution of that property among the

debtor's creditors;" and (3) "the ultimate discharge that gives the debtor a 'fresh start.'" *Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. 356, 363-64 (2006).  Congressional power correspondingly may reach such things: all laws "tending to further the great end of the subject— distribution and discharge—are in the competency and discretion of Congress." *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 186 (1902).  Thus, "any law must be held to be a law on the subject of bankruptcies" if it "provides for the surrender" of a debtor's property to satisfy "claims of creditors" and "the discharge of the debtor from the remainder of his debts." *Bradford v. Fahey*, 76 F.2d 628, 631 (4th Cir.), *set aside on other grounds*, 77 F.2d 992 (4th Cir. 1935).

Given the Bankruptcy Clause's broad text and purpose,[19] the Supreme Court has never invoked it to invalidate a statute that provides uniform debtor-creditor rules.  To the contrary, it has approved "fundamental and radically progressive" extensions of the bankruptcy power "to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities." *Cont'l Illinois Nat'l Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 671 (1935).

To put the matter another way, the Plank article was published in 1996 and has been widely cited.  However, in the ensuing three decades, no court has adopted its conclusion that the Bankruptcy Clause requires insolvency (either balance sheet or going concern, financial distress) by the debtor.  The only case that Movants cite that even considered that question, rejected it.  *In re Marshall*, 300 B.R. 507, 509 (Bankr. C.D. Cal. 2003).

The court in *Marshall* concluded that "the constitutional history gives no support to the argument that the founders intended that bankruptcy relief be limited to insolvent debtors, or that this meaning was included in the Bankruptcy Clause." *Id*. at 515.  It added that the "Supreme

---

[19] And again, the rarity of cases where a solvent, non-distressed corporation files bankruptcy.

Court has repeatedly and consistently held that the Bankruptcy Powers are not limited to the meaning of the term 'bankruptcy' at the time of the formulation of the Constitution." *Id*. at 521. On appeal, the Ninth Circuit agreed and "adopt[ed] the bankruptcy court's opinion on [the] constitutional claims." *In re Marshall*, 721 F.3d 1032, 1045 (9th Cir. 2013).

Meanwhile, Chapter 11 has been successfully employed by any number of solvent entities (and/or those with prosperous corporate families). These include asbestos manufacturers (Johns Manville, USG Corporation, W.R. Grace & Co.) and companies with non-asbestos mass tort liabilities (PG&E Corp., A.H. Robins, Dow Corning).[20]

As discussed below, bankruptcy cases have often been dismissed for having been filed in "bad faith." However, no court has couched this as a constitutional imperative. The Fourth Circuit in *Premier Automotive*, certainly did not. *In re Premier Automotive Services, Inc.*, 492 F.3d 274 (4th Cir. 2007). Even the Third Circuit, which found "financial distress" to be required (and lacking) in *LTL Management*, recognized that the "Bankruptcy Court had jurisdiction of the bankruptcy case under, inter alia, 28 U.S.C. § 157(a) and 1334(a)." 64 F.4th at 99.[21]

Thus, I conclude "financial distress" is not a <u>constitutional</u> prerequisite to filing Chapter 11.

C. <u>A Solvent and/or Non-distressed Debtor May be Constrained in the Relief which it can Constitutionally Receive in a Bankruptcy Case</u>

There are, of course, constitution limitations on the bankruptcy power. Otherwise, and as Plank, Brubaker, and Professor Melissa Jacoby have argued, the Bankruptcy Clause could be

---

[20] A more complete list is found in *Debtor's Objection*. Doc. No. 1781, pp 41-49.
[21] Although the moving parties did not argue any constitutional infirmity in the case filing.

used by opportunistic corporations to override other constitutionally guaranteed rights of

creditors.  Melissa B. Jacoby, *Unbundling Business Bankruptcy Law*, 101 N.C. L. REV. 1703

(2023).  These would include rights arising under the Commerce clause, the Due process Clause

of the Fifth Amendment, and the Seventh Amendment right to trial by jury.  *See e.g.,* Plank on

Constitutional Limits, 63 TENN. L. REV. at 490; *Brubaker on Settlement Powers,* HAR. L. REV.

BANKR. ROUNDTABLE.

A claimant has a due process property right in his tort claim.  *See Tulsa Prof'l Collection

Servs. v. Pope*, 485 U.S. 478, 485 (1988).  Fundamental to this right is the claimant's autonomy

and control over prosecution of his or her claim—a "settlement" cannot be imposed on the

claimant without his consent.  *See Martin v. Wilks*, 490 U.S. 755, 768 (1989) ("A voluntary

settlement . . . cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of [those]

who do not join in the agreement."); *Local No. 93, Int'l Ass'n of Firefighters v. City of

Cleveland*, 478 U.S. 501, 529 (1986) ("Of course, parties who choose to resolve litigation

through settlement may not dispose of the claims of a third party . . . without that party's

agreement.").

In like measure, most tort claims are subject to a right of trial by jury.  U.S. CONST.

amend. VII.  Bankruptcy courts lack jurisdiction to determine personal injury claims and cannot

deprive personal injury claimants of their jury trial right.  *See* 28 U.S.C. §§ 157(b)(1); 28 U.S.C.

§ 1411(a).

Let us suppose—as in all recent asbestos bankruptcy cases—that the Chapter 11 debtor

proposes a plan featuring a "capped" trust.  Under a capped trust, the Debtor or those allied with

it, contribute a stated sum of money to an asbestos trust and are released.  They have no further

obligation to contribute to the trust.  A permanent injunction protects them and their affiliates

from future suits or collection attempts by the Claimants and the 'Futures.'[22]  Let us further

assume that the plan does not permit the asbestos claimants to "opt out" of the trust to return to

the tort system to litigate their claims before juries.  Constitutional?  Maybe.  It could depend on

whether the debtor it is insolvent and/or distressed.

In *Ortiz v. Fibreboard Corp.*, a class action case involving a fully solvent defendant, the

Supreme Court reviewed a mandatory no-opt-out "settlement" of a defendant's aggregate mass-

tort liability to present and future asbestos claimants which had been approved by the lower

courts.  527 U.S. 815 (1999).  The Supreme Court reversed; a mandatory "no-opt-outs"

settlement of a defendant's aggregate mass-tort liability is **unconstitutional if the defendant's**

**resources are sufficient to fully pay all of the claims**.[23]  527 U.S. at 817-18 (emphasis added).

The Court held that depriving individual asbestos claimants of their due process right to exclude

themselves from the class and to pursue their claims on an individual basis could be justified

only if the defendant's resources were insufficient to fully pay all claims.  *Id*. at 837

("[O]therwise some . . . would be paid and others . . . would not.").

If, however, the defendant "admit[s] assets sufficient to cover its debts, . . . no [such]

prejudice . . . would result" from permitting individual claimants to pursue their claims

separately [by opt out].  *Id*. at 837 n.17.  Thus, in the case of a solvent asbestos defendant, due

process requires that a "plaintiff [must] be provided with an opportunity to remove himself" from

---

[22] The justification for capping an asbestos trust under a plan is pragmatic—the debtor company seeks a "final" solution to end the litigation in the tort system.  Typically, the claimants agree to a sum of money to be paid into the trust that will be sufficient to pay all claims or as much as can be obtained, given the Debtor's limited resources. This arrangement places the risk that the trust fund will be depleted and insufficient to pay all claims and demands on the asbestos victims.  The history of the nation's asbestos bankruptcy trusts has demonstrated this to be a real and considerable risk.

[23] Indeed, it is a core responsibility of bankruptcy courts to allocate limited funds to protect the rights of all creditors.  *See* 11 U.S.C. § 157(b); *In re Joe Gibson's Auto World, Inc*., 416 B.R. 469, 476 (Bankr. D.S.C. 2009) (evaluating whether a proceeding is core in part from whether it "has a direct affect [sic] on a bankruptcy court's core administrative function of asset allocation among creditors").

the aggregate resolution process.  *Id*. at 848 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

And with respect to the aggregate resolution of money damages claims, the Supreme Court has repeatedly emphasized that the "absence of . . . opt out violates due process." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011); *Ortiz*, 527 U.S. at 846-48; *Shutts*, 472 U.S. at 812.

"The concept driving this "limitation of claimants' ownership control over their individual claims is, therefore, insufficiency," which alone justifie[s] the limit on an early feast to avoid a later famine.  The equity of the limitation is its necessity." *Id*. at 838-39 (internal citations omitted).

The Supreme Court also observed that a mandatory no-opt-outs settlement process "compromises [claimants'] Seventh Amendment [jury trial] rights without their consent." *Id*. at 846.

*Ortiz* was a class action proceeding.  However, as Brubaker has observed, the rights and considerations that caused the Supreme Court to reject that class action are also found in bankruptcy:[24]

> "[T]he binding distribution scheme effectuated by a confirmed plan of reorganization is functionally identical to the mandatory non-opt-out settlement at issue in *Ortiz*.  Both systems enable a mass-tort defendant to impose a judicially approved hard cap on their aggregate mass-tort liability, without any opt-outs by nonconsenting claimants."

*Brubaker on Settlement Powers,* HAR. L. REV. BANKR. ROUNDTABLE; *see also* Ralph Brubaker,

*Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, 131 YALE L.J.F. 960, 997-98

---

[24] As recognized by the Court in *Ortiz*, the most prominent exception to individual claimants' due process right to opt out of an aggregate claims resolution process is bankruptcy.  See *Ortiz*, 527 U.S. at 846 (quoting *Martin*, 490 U.S. at 762 n.2).

(2022) [hereinafter: Brubaker on Aggregation]; Ralph Brubaker, *Assessing the Legitimacy of the Texas Two-Step Mass Tort Bankruptcy*, 42 BANKR. L. LETTER No. 8, 1 & 9-10, (Aug. 2022) [hereinafter: Brubaker on Legitimacy].

The Constitution permits a mandatory, no-opt-outs settlement process in the Bankruptcy Clause, via the "[t]he 'great' discharge power . . . ." *Brubaker on Aggregation*, 131 YALE L.J.F. 960, 984. And as Brubaker further observes, "the mandatory no-opt-outs aspect of limited fund class actions[,]" such as the one at issue in *Ortiz*, "is functionally identical to a bankruptcy discharge, which is a foundational pillar of Congress's constitutional Bankruptcy Power." *Brubaker on Legitimacy*, 42 BANKR. L. LETTER at 9 n. 86; Brubaker, *Brubaker on Aggregation*, 131 YALE L.J.F. at 977 (quoting *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 186 (1902)).

As Brubaker further explains, the legal justification for such a mandatory, "no-opt-out" provision—be it in a class action case or a bankruptcy case—is the "limited fund" principle. *Brubaker on Legitimacy*, 42 BANKR. L. LETTER at 9. While a party has a jury right trial right and a property interest in his tort claim, those rights are necessarily limited in bankruptcy cases because of the limited pool of assets available to pay creditors. For example, in traditional bankruptcy cases, jury trial rights give way to a summary claims process. In limited fund asbestos cases, such claims determinations are typically made under summary trust procedures. Individual creditors lose certain rights so that the body of creditors (and the debtor) do not needlessly suffer.

Where the debtor corporation is solvent and non-distressed, the "limited fund" is not a concern. Thus, there is no rational justification in such situations for impinging on the creditors' constitutional rights.

In sum, a "no-opt-out" bankruptcy plan and trust is entirely appropriate for an insolvent or even a distressed[25] debtor.  However, under *Ortiz* and for solvent and non-distressed debtors, a plan/trust which does not permit creditors to "opt out" and return to the tort system for their jury trials may cause an unconstitutional impairment of the claimants' due process and jury trial rights.

In these cases, the Debtors' current plan proposal contemplates a capped plan and a "no-opt-out" trust.  If neither Aldrich nor Murray are insolvent nor financially distressed, the question lies: is that plan constitutional?[26]  That, fortunately, is a question for another day.

D.  Nevertheless, Chapter 11 May Offer Advantages for a Solvent, Non-Distressed Debtor and its Creditors.

Even if solvent, non-distressed asbestos debtors can only constitutionally wield limited bankruptcy tools, Chapter 11 may still serve a public purpose.  The Supreme Court has recognized that the courts of this country are simply ill-equipped to handle the "elephantine mass" of asbestos litigation.  *Ortiz*, 527 U.S. at 821.  These cases cannot be individually tried; there are too many of them and the costs of litigating individual claims are prohibitive.  Meanwhile, state and federal multidistrict litigations (MDLs) cannot address the issue of future claims, and the Supreme Court has determined class actions in limited fund cases must meet a near-impossible prerequisite threshold.[27]

---

[25] While a solvent debtor has sufficient assets to pay all claims, when the company is "distressed," (facing an imminent threat of insolvency or near the point of bankruptcy) a scramble by creditors typically ensures.  Some creditors are paid, others are not.  And typically, debtors are unable to fully realize on the value of their assets, particularly "going concern" value.  Between these two situations, creditors risk not being paid.

[26] Of course, such a plan would be unlikely to get sufficient votes from the asbestos claimants to even reach a confirmation hearing.

[27] *Ortiz*, 527 U.S. at 864 ("it would be essential that the fund be shown to be limited independently of the agreement of the parties to the action . . . [and] that the class include all those with claims unsatisfied at the time of the settlement negotiations, with intraclass conflicts addressed by recognizing independently represented subclasses.").

This leaves bankruptcy.  Congress passed section 524(g) of the Bankruptcy Code with the stated intention that a debtor with **"substantial"** asbestos liabilities could access it.  *In re Kaiser Gypsum Co., Inc.*, 60 F.4th 73, 77-78 (4th Cir. 2023) (emphasis added).  Thus, there is much truth in the Debtors' assertion that Section 524(g) is the only collective mechanism by which a debtor and its claimants can achieve a resolution of asbestos liabilities.

The benefits to all parties of resolving mass tort asbestos liability in a bankruptcy proceeding are numerous.  As the Third Circuit has observed:

> Furthermore, the trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability.  In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution.

*In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 362 (3d Cir. 2012).

Even for solvent or non-distressed debtors, it would appear mutually advantageous to employ a trust mechanism to pay the claims of victims who prefer these more expeditious procedures to pursuing their claims in the tort system.  Potentially, a plan/trust might offer "evergreen" trust funding by the debtor and its allies to ensure all claims are paid in full.  Or an "opt out'" right could preserve the right to litigate in the tort system for those claimants who prefer that course.  Thus, even for a solvent and "non-distressed" asbestos debtor and its creditors, there may advantages to be obtained in Chapter 11.

It may be, as the Movants argue, that these are "bad faith filings" subject to dismissal.  If not, there may also be limits to the relief that Aldrich and Murray can constitutionally receive in these cases.  However, the case filings themselves do not appear to be constitutionally infirm as being beyond the "subject of Bankruptcies."

**IV. Under *Carolin*, these are Not "Bad Faith" Case Filings**

Even if not a constitutional violation, Movants argue that these are "bad faith"
bankruptcy filings that courts have dismissed for many years. *Maune's Motion to Dismiss*, Case
No. 20-30608, Doc. 1712, p. 9. They reiterate the factual arguments detailed above concerning
the purposes behind these Debtors' filings and their financial resources. They also reference the
Third Circuit's *LTL* decision and attempt to reconcile that decision with the Fourth Circuit's
*Carolin/ Premier Auto* "bad faith filing" decisions. *Id*. at p. 15.

Again, the longstanding standard in this Circuit for dismissal of a Chapter 11 bankruptcy
case for bad faith in the filing is *Carolin Corp. v. Miller*. 886 F.2d at 700-01.

The Carolin debtor was a holding company that owned a fire-damaged industrial
building. *Id*. at 695. It owed a single debt to a secured creditor with a purchase money
promissory note and deed of trust on the property. *Id*. After a default by the debtor, the secured
creditor attempted to foreclose. *Id*. at 695-96. Fifty minutes before the foreclosure sale, Carolin
attempted a most unlikely Chapter 11 reorganization. *Id*. at 696. The debtor had no income (the
property was unrentable), the debtor's owners were unwilling to provide the company with funds
to repair the property, and the holding company had no other significant assets. *Id*. at 702-03.
Nor did it owe any unsecured debts. *Id*.

The bankruptcy court dismissed Carolin's Chapter 11 case for "lack of good faith in filing
the petition." *Id*. at 696. The court noted "a number of factors suggest[ing] that [Carolin's]
bankruptcy filing was not in good faith." *Id*. Among them, Carolin's case "fit squarely into the
'new debtor syndrome' . . . in which a one-asset entity has been created or revitalized on the eve
of foreclosure to isolate . . . insolvent property and its creditors." *Id*. (internal citations omitted).
The bankruptcy court also found several the other "indicia" of bad faith filings recognized by the

Little Creek. *Id*. It held the debtor's bankruptcy to be both objectively futile and filed in subjective bad faith—the debtor's owners were attempting to make a riskless investment in the property rather than rehabilitating the debtor through ongoing investment. *Id*. at 702-03. Both the District Court and the Fourth Circuit affirmed. *See id*. at 706.

In *Carolin*, the Fourth Circuit held that a Chapter 11 case may be dismissed as a bad faith filing only when the bankruptcy reorganization is <u>both</u> (i) objectively futile and (ii) filed in subjective bad faith. *Id*. at 700-01. The Movant has the burden of proof as to each element. *In re Bestwall*, 71 F.4th 168, 182 (4th Cir. 2023); *see also In re SUD Props., Inc*., 462 B.R. 547, 551 (Bankr. E.D.N.C. 2011) ("First Bank [the movant] bears the burden of demonstrating both objective futility and subjective bad faith by a preponderance of the evidence.").

The *Carolin* majority recognized that "denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, is inherently drastic and not lightly to be made." *Carolin,* 886 F.2d at 700. Thus, it set a high standard for dismissal. While other Circuits either had, or later would, hold that either subjective bad faith or objective futility would support dismissal, the Fourth Circuit demanded both:

> [I]t is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk the wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in prejudging its futility at the threshold.

*Id*. at 701.

The *Carolin* majority then defined "objective futility" and "subjective bad faith." *See id*. at 701-02. The objective futility prong focuses on "assessing whether there is no going concern to preserve [and] no hope of rehabilitation, except according to the debtor's terminal euphoria." *Id*. (quotations and citation omitted). Meanwhile, the subjective bad faith prong focuses on

"whether the petitioner's real motivation is to "abuse the reorganization process" and "to cause
hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of
invoking the automatic stay, without an intent or ability to reorganize his financial activities."
*Id*. at 702.

My colleague applied the *Carolin* standards to *Bestwall,* a factually similar Texas Two-
Step asbestos reorganization case.[28]  There, the ACC moved for dismissal[29] and, at hearing, made
many of the same arguments being advanced in the present cases.  *The Official Committee of
Asbestos Claimants' Motion to Dismiss for Bad Faith Filing*, Case No. 17-31795, Doc. 495
(Aug. 15, 2018).  Not surprisingly, Judge Beyer denied the dismissal motion.  *Order Denying the
Official Committee of Asbestos Claimants' Motion to Dismiss*, Case No. 17-31795, Doc. 891
(July 29, 2019).

Judge Beyer's *Bestwall* decision starts with a generally uncontroversial observation:
"attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational
purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need
not be due to insolvency."  *Order Denying the ACC's Motion to Dismiss*, Doc. 17-31795, p. 5.
Because Bestwall was facing tens of thousands of such claims and would continue to receive
new asbestos claims through 2050, Judge Beyer concluded that Bestwall faced "sufficient
financial distress to seek resolution of those claims under section 524(g).  *Id.*

Further, Judge Beyer held that Bestwall had the ability to reorganize and establish a trust
under Section 524(g).  *Id.*  This was because Bestwall " . . . has substantial assets, owns ongoing
active businesses, and receives substantial cash flow.  *Id.*  Importantly, "Bestwall has the full

---

[28] Bestwall is a subsidiary of Georgia Pacific LLC.
[29] It has since unsuccessfully attempted to appeal that interlocutory order, and filed a second dismissal motion which
is currently pending.  *The ACC's Motion to Dismiss for Lack of Subject-Matter jurisdiction*, Case No. 17-31795,
Doc. 2925 (Mar. 30, 2023).

ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement. *Id*. Thus, Bestwall's case was not "objectively futile" and lacking that prong, the *Carolin* test was not met. *Id*. at 7. Judge Beyer did not need to determine whether the bankruptcy case was filed in subjective bad faith. *Id*. Rather, she reserved that issue to confirmation, where the "good faith" of Bestwall would be a confirmation requirement. *Id*.; *see* 11 U.S.C. § 1129(a)(3).

Hoping to avoid a similar result, the Movants attempt to sidestep *Carolin's* 'objective futility' requirement. The Maune firm suggests that *Carolin* is factually inapposite to these Texas Two-Step cases because *Carolin* involved an insolvent, fatally distressed debtor. *Maune's Motion to Dismiss*, Doc. 1712, p. 26; *see also Carolin Corp*., 886 F.2d at 696. By contrast, the Texas Two-Step cases involve solvent, non-distressed debtors; they were created to ferry the asbestos liabilities of their prosperous corporate conglomerates into bankruptcy. *See Maune's Motion to Dismiss*, Doc. 1712, p. 27. Maune argues that if *Carolin's* two-prong test for bad faith is applied to such companies, an anomalous result obtains: an entirely solvent, unstressed corporation (Bestwall, Aldrich, and Murray) may enter Chapter 11 and employ the bankruptcy laws to obtain unwarranted litigation advantages against its creditors,[30] but an insolvent, fatally destitute company (*Carolin*) would see its case dismissed at the outset.

Second, Movants argue that *Carolin* has been misconstrued. They say courts have improvidently focused on *Carolin's* two-prong test in derogation of the overarching, mandatory Chapter 11 principles upon which it is founded. *Id*. at p. 16. These two arguments intertwine, so I will consider them together.

---

[30] Meaning, denial of the claimants' due process and jury trial rights, as well as their being judicially compelled to negotiate their claims.

When it comes to bad faith filings, the ultimate question to be answered is whether the bankruptcy case is consistent with the purposes of the Code. Maune posits that because Carolin was a terminally financially distressed debtor, objective futility was an appropriate consideration. *Id*. at p. 26. However, such "objective futile" is not the only indicia of a "bad faith filing." The *Carolin* majority instructed that courts must look to the "totality of the circumstances" when considering a dismissal for bad faith and that "proof inevitably will overlap" as to the two-prongs. *Carolin Corp.*, 886 F.2d at 701. "Evidence of subjective bad faith in filing may tend to prove objective futility, and *vice versa*." *Id.*

Maune suggests that the cases interpreting *Carolin* have ignored its express statement of purpose for the objective futility prong—ensuring the petition furthers the Code's purpose of rehabilitating a "financially troubled" company. *Maune's Motion to Dismiss*, Doc. 1712, p. 2. Instead, they have improperly focused on *Carolin's* analysis of whether there was enough life left in that terminally ill debtor to even bother trying to resuscitate it. *Id*. This focus works in the case of a fatally insolvent, bad faith company. However, where the Debtors (or their affiliates) are awash in disposable income dwarfing their liabilities (as seen here)—and where they can avail themselves of massive net assets far beyond those liabilities—Movants say there is no legal, factual, or even logical support for twisting *Carolin* to foreclose dismissal. *See id*. at pp. 2-3.

The Movants further suggest that nothing in *Carolin's* discussion of how to analyze "objective futility" in the context of a financially distressed company conflicts with *Carolin's* express statement that Chapter 11 is for financially distressed companies in need of resuscitation. *Id*. at p. 13. Carolin had "no realistic chance" of resuscitation. *Id*.; *see also Carolin Corp.*, 886 F.2d at 702. By contrast, Aldrich and Murray have "no need" of resuscitation. *Carolin's*

exposition of how to look at "objective futility" when examining a company that is financially distressed is facially inapplicable to companies that are not in financial distress.  *Id*. at p. 13.  In short, *Carolin* has been applied beyond its facts.

Movants assert that *Premier Auto*—the Fourth Circuit's later examination of a <u>non-distressed</u> debtor's bad faith filing—is controlling here.  *Id.;* 492 F.3d 274 (4th Cir. 2007). *Premier Auto* forbids "the wielding of bankruptcy courts' "powerful equitable weapons" by "financially healthy companies with no need to reorganize."" *Maune's Motion to Dismiss*, Doc. 1712, p.10 (quoting *In re Premier Auto. Servs., Inc.*, 492 F.3d at 274, 277).

Premier Automotive Services filed Chapter 11 to forestall eviction on an expired lease and to compel its landlord to negotiate a new lease.  *Premier Auto*, 492 F.3d at 277.  The Fourth Circuit affirmed dismissal of its case, holding there was substantial evidence to support findings of both objective futility and subjective bad faith.  *Id.* at 280.  Premier had "no right to judicially compelled negotiations[;]" it filed its petition to escape a looming obligation to quit a leased premises, admitted that its plan for reorganization was the Chapter 11 litigation itself, and—most importantly—was not "experiencing financial difficulties." *Id.* at 280–81.

As to that financial condition, Premier was "a solvent business entity with no unsecured creditors and few, if any, secured creditors.  **This fact alone may justify dismissal of [a] Chapter 11 petition**." *Id.* at 280 (emphasis added).  The Fourth Circuit specifically noted that federal courts "have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11." *Id*.

And while the Debtors say that "financial distress" is the test for bad faith filings in the Third Circuit—but not in the Fourth Circuit—Maune argues that is a demonstrably incorrect conclusion.  *Maune's Motion to Dismiss*, Doc. 1712, p. 13.

In *LTL*, the Third Circuit dismissed the (first) Chapter 11 case of LTL Management LLC, a Texas Two-Step spinoff of pharmaceutical giant Johnson & Johnson. *In re LTL Mgmt., LLC*, 58 F.4th 738, 754–55 (3d Cir. 2023). The factual circumstances presented in *LTL* closely parallel those of our Debtors.[31]

*LTL* relied upon *In re SGL Carbon*, an earlier Third Circuit case which held that a "financially healthy company" that filed a Chapter 11 petition in the face of potentially significant civil liability acted outside the purposes of the Code. *Id*. at 754.

SGL faced "no immediate financial difficulty . . . management repeatedly asserted the company was financially healthy at the time of the filing." *Id*. at 163. And in fact, the company had "only $276 million" in liabilities and assets of $400 million, a liability-to-asset ratio of 69:100. *Id*. In that case, the Third Circuit observed that a Chapter 11 petition "cannot serve the rehabilitative purpose for which it was designed" if a "petitioner has no *need* to rehabilitate or reorganize." *Id*. at 166. Thus, the exercise of bankruptcy's "considerable" equitable powers is not "justified." *Id*. at 165-66.

SGL Carbon's financial health meant it lacked "a valid reorganizational purpose," and consequently lacked good faith. *Id*. at 166. "When financially troubled petitioners seek a chance to remain in business, the exercise of [bankruptcy] powers is justified. But this is not so when a petitioner's aims lie outside the Bankruptcy Code." *Id*. at 165–66 (citing, *inter alia Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983) ("Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to evade contractual or other

---

[31] *LTL* was filed by the same law firm that represents the other Texas Two-Step Debtors in this judicial district: *Bestwall, DBMP, Aldrich* and *Murray*. Having been filed after the others, *LTL* drew extensively upon lessons learned in these other cases.

liabilities.")).  The Third Circuit remanded the case for dismissal on bad faith grounds.  *In re SGL Carbon*, 200 F.3d 154, 162–63.

In *LTL*, the Third Circuit reiterated the *SGL* standard: "The theme is clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose."  *In re LTL Mgmt., LLC*, 58 F.4th at 754–55 (3d Cir. 2023).  "[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so."  *Id.* at 763.

As to the Debtors' suggestion that there is a difference between the Third Circuit's "financial distress" approach and that of the Fourth Circuit, the Movants point out that the *LTL* decision relied not just on *SGL Carbon*, but also cases from other circuits including the Fourth Circuit's *Carolin decision*.  *LTL*, 58 F.4th at 756 n.14 (citing *Connell v. Coastal Cable T.V. Inc.*, *(In re Coastal Cable T.V., Inc.*,), 709 F.2d, 762 762 (1st Cir. 1983); *Cohoes Indus. Terminal*, 931 F.2d 222 (2d Cir. 1991); *Carolin Corp.*, 886 F.2d at 701; *Little Creek Dev. Co. v. Commonw. Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068 (5th Cir. 1986); *In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375 (8th Cir. 2000)).  In *LTL*, the congruity of the Circuit cases was so clear that Judge Ambro observed that the universality of this basic premise of bankruptcy law (the requirement of "financial distress") provided him with reassurance of the correctness of his decision.[32]  *LTL Management*, 58 F.4th 738, 757.

If this is not enough, the Movants point out that the Fourth Circuit in *Premier Auto* expressly relied upon *SGL* to support dismissal of a non-distressed debtor's case.  *Maune's Motion to Dismiss*, Doc. 1712, p. 14.  Meanwhile, *SGL* relies upon the Fourth Circuit's *Carolin*

---

[32] The Third Circuit unanimously rejected LTL's request for rehearing en banc on March 22, 2023.  *In re LTL Management LLC*, Docket No. 22-02006 (3d Cir. May 26, 2023).

decision.  *Maune's Motion to Dismiss*, Doc. 1712, p.15 (internal citations omitted).  The Third

Circuit in *LTL* relies upon both.  *Id*. at p. 16 (internal citations omitted).  Maune argues that the

Circuit Court standards are not different when faced with a non-distressed corporation's attempt

to misuse Chapter 11.  *Id.*

Even if there is a distinction between the tests employed by the Circuits, Movants recite

factors identified in *Premier Auto*, 492 F.3d at 280, that courts use to identify a lack of good

faith.  *Maune's Motion to Dismiss*, Doc. 1712, pp. 17-18.  Several are present here:

> The attempt to use bankruptcy to force creditors into "judicially compelled
> negotiations;" (*Premier Auto*, 492 F.3d at 280.  *See also In re Patel*, 2022 WL
> 1420045, at *7); . . .
>
> Isolating one class of debt in the bankruptcy (*In re Kestell*, 99 F.3d at 149–50);
> . . .
>
> Forum shopping (*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir.
> 1988) (cited favorably in *Patel*, 2022 WL 1420045, at *5); . .
>
> [and] the new debtor syndrome. *In re Little Creek Dev. Co.*, 779 F.2d at 1072–73.

*Maune's Motion to Dismiss*, Doc. 1712, pp. 17-18.

These are persuasive arguments and if writing on a clean slate, I might well agree with

the Movants.  Because *Carolin* involved a fatally insolvent debtor, the application of its two-

prong standard to a case filed by a solvent, financially non-distressed debtor means all such cases

survive dismissal, regardless of purpose.  And given the rarity of such non-distressed entities

filing bankruptcy, particularly in 1989 when *Carolin* was decided, one wonders whether the

*Carolin* majority contemplated that its test would be employed to the cases of solvent, non-

distressed corporations.

Most importantly, *Carolin* is written in a manner that accentuates its two-part test, while minimizing the governing principles upon which the test is founded.  Deconstructed,[33] *Carolin* says this:

1.  The purposes of the Bankruptcy Code are:

    a.  To pay creditors with the debtor's assets, and

    b.  To relieve an honest Debtor from oppressive indebtedness.  *See Carolin Corp.*, 886 F.2d at 698; *Williams v. U.S. Fidelity G. Corp.*, 236 U.S. 549, 554-55.[34]

2.  The aim of the Two-Prong Test is to determine whether those purposes are served by the Chapter 11 filing.  *Carolin Corp.*, 886 F.2d at 701.

3.  The Two-Prong Test then asks whether there is objective futility and subjective bad faith present:

    a.  The Objective Futility prong examines:

        i.  whether there is no going concern to preserve [and] no hope of rehabilitation, but also,

        ii.  whether the petition serves to resuscitate a financially troubled debtor? *Carolin Corp.*, 886 F.2d at 701.

    b.  Meanwhile, the subjective bad faith prong examines whether the debtor intends to:

        i.  Reorganize or rehabilitate an existing business; or

        ii.  Preserve going concern value of a viable or existing business; but does not---

        iii.  Abuse the reorganization process by causing hardship to creditors by invoking Section 362 without an intention or ability to reorganize.  *Carolin Corp.*, 886 F.2d at 701.

---

[33] Or rather, reordered.

[34] The purpose of Chapter 11 is to assist a financially troubled business to return to a viable state.  *In re SGL*, 200 F.3d at 165-66.

Read this way, arguably both *Carolin* prongs presuppose financial distress, just as the Movants say.  And if one accepts the Movants' premise that Aldrich and Murray are not "financially distressed," these may in fact be bad faith filings.  All of which I say simply for the Fourth Circuit's consideration, if it elects to reconsider applicability of the *Carolin* Two-Prong Test in the case of a solvent, non-distressed Chapter 11 debtor.

For now, *Carolin* is controlling precedent.[35]  The Fourth Circuit recently, if obliquely, reiterated the applicability of the *Carolin* Two-Prong Test in a related appeal from *Bestwall*.  *In re Bestwall LLC*, 74 F.4th at 182.  That appeal involved the propriety of preliminary injunctions issued in favor of certain non-debtor third parties, not a dismissal motion.  *Id*. at 173. However, in responding to the arguments by the *Bestwall* Dissent that the subject matter jurisdiction over the bankruptcy case had been manufactured by the debtor, the Majority reaffirmed the Carolina test and distinguished it from the Third Circuit's "financial distress" standard:

> "Further, as the Third Circuit recognized in *LTL Management*, **this Court applies a more comprehensive standard to a request for dismissal of a bankruptcy petition for lack of good faith**; that is, **the complaining party must show both "subjective bad faith" and the "objective futility of any possible reorganization**.""

*Id*. at 182 (quoting *Carolin Corp*, 886 F.2d at 694)(emphasis added).  The panel ruling was subsequently endorsed by the full Fourth Circuit sitting *en banc*.  *See* Case No. 3:20-cv-103-RJC, Doc. No. 20.

Similarly, our District Court also confirmed the applicability of *Carolin* to Texas Two-Step debtors in yet another *Bestwall* appeal.  *Order of the U.S District Court*, Case No. 17-

---

[35] Even in *Premier Auto.*, the Fourth Circuit upheld dismissal of the case of a solvent debtor, but it applied *Carolin* to reach its conclusion.  *Premier Auto*., 492 F.3d at 280-82.  Importantly, the *Premier Auto*. panel noted that the debtor had "no unsecured creditors and few, if any, secured creditors." *Id*. at 280.  This would factually distinguish *Premier Auto* from the present cases; our debtors have 90,000 disputed asbestos claimants and will be subject to thousands of future demands.

31795, Doc. 3170 (Nov. 7, 2023).  This one arose from Judge Beyer's denial of a "bad faith filing" dismissal motion lodged by the ACC in that case.  *Id*. at p. 1.

Like in the present case, the *Bestwall* ACC argued that since Bestwall was solvent, and therefore factually different than the insolvent *Carolin*, a different dismissal standard should apply.  The Bestwall ACC argued that the Fourth Circuit should "have the opportunity to revisit the applicability of the *Carolin* standard."  *Id*. at p. 8.  In denying their request for leave to appeal, Judge Conrad quoted the aforementioned Fourth Circuit ruling, before reiterating its conclusion: "The Bankruptcy Court applied ***Carolin*, the binding law in this Circuit**, to the facts…."  *Id*. at p. 9 (emphasis added).

In short, since these motions were filed, both higher courts have stated that the *Carolin* Two-Prong Test applies to Chapter 11 bad faith dismissal motions, even those involving  solvent, and arguably financially non-distressed corporate debtors.  Those decisions bind this bankruptcy court.

   A.  The *Carolin* Test is not met

In a last gasp effort to prevail, the ACC argues that the *Carolin* "objective futility" prong is met here: there is "no hope of rehabilitation" for these Debtors.  *ACC's Motion to Dismiss*, Case No. 20-30608, Doc. 1756, ¶ 98.  It argues that "the Debtors cannot "establish likelihood of rehabilitation of a business that never operated in the first place."  *Id*. at ¶ 99 (quoting *In re Raintree Healthcare of Forsyth LLC*, No. 17-51237, 2018 WL 770367 at *9 (Bankr. M.D.N.C. Feb. 2018)).  The ACC posits there is "no going concern" here because Aldrich and Murray have no employees of their own, no vendors or suppliers, and apart from their small operating subsidiaries—which were themselves products of the Corporate Restructuring—no businesses to run.  *ACC's Motion to Dismiss*, Doc. 1756, ¶ 9.

Judge Beyer rejected this same argument in *Bestwall* on almost identical facts.

*Memorandum Opinion & Order Denying The Official Committee of Asbestos Claimants' Motion*

*for Dismissal*, Case No.17-31795, Doc. 891, p. 5 (July 29, 2019).  I agree with her conclusion.

Factually, these cases are even stronger than *Bestwall* in that Aldrich and Murray have reached

agreement with the largest claimant constituency, the Future Claims, on the terms of a plan.  *See*

*Debtor's Notice of Filing of Plan Support Agreement*, Case No. 20-30608, Doc. 832, ¶ 1 (Sep.

24, 2021).  The Debtors have funded that Plan without contribution under the Funding

Agreements.  And on the facts presented, there is no reason to doubt that if a deal were struck

with the ACC, Aldrich/Murray would have, or could, secure from its affiliates the wherewithal to

fund the Trust.  Meanwhile, each Debtor owns an operating subsidiary and has a business of

sorts--managing the tens of thousands of asbestos litigation claims against them.  S*ee*

*Declaration of Allen Tananbaum in support of Debtor's Objection.*, Case No. 2-30608, Doc.

1782 ¶¶ 6, 28-29 (June 1, 2023).

Legally, and more than 30 years after *Carolin* was decided, no reported case supports the

ACC's theory that objective futility exists due to the lack of a business to rehabilitate.  The court

in *HONX* rejected an argument much like the one the ACC now advances.  *In re HONX, INC.*,

No. 22-90035, 2022 WL 17984313, at *2-3 (Bankr. S.D. Tex. Dec. 28, 2022).  The *HONX*

"Committee suggest[ed] that cause exists to dismiss HONX's bankruptcy because it does not

intend to 'rehabilitate' per the language of § 1112."  *Id*. at *3.  But, as that court concluded, "[t]he

Committee's contention that HONX has no ongoing business[36] and therefore cannot be said to

have a goal of 'rehabilitation' misses the point.  There is no ongoing business requirement in the

Code."  *Id*.  (citing *Toibb v. Radloff*, 501 U.S. at 166).

---

[36] HONX's business activity consisted solely of defending itself against asbestos litigation stemming from its earlier operation of an oil refinery. *In re HONX, Inc.*, 2022 WL 17984313 at *1.

The cases on which the ACC relies are factually distinguishable from the facts presented. They typically involve single-asset, single-creditor debtors with no cash flow.  Many of the cases do not involve motions for dismissal on bad faith grounds.  By contrast, these Debtors seek to confirm a plan of reorganization that would pay tens of thousands of creditors hundreds of millions of dollars.

The facts presented in the current cases are quite like those in *Bestwall*.  The Fourth Circuit in *Bestwall* did not see any objective futility in such a debtor filing bankruptcy.  *Bestwall*, 71 F.4th at 182.  In upholding the preliminary injunction (and rejecting the Dissent's contentions about jurisdiction manufacturing) it not only confirmed that *Carolin* applied to such cases, but that the *Bestwall's* ACC had not shown the "objective futility of any possible reorganization." *Id.* (quoting *Carolin Corp.*, 886 F.2d at 694).

Like Judge Beyer, I conclude that Objective Futility prong has not been demonstrated by the Movants in these cases.  In its absence, the *Carolin* Test is unmet, and these cases are not subject to dismissal for a lack of good faith.

**V. "Cause" Does not Exist under 11 U.S.C. § 1112(b) to Dismiss these Cases.**

Alternatively, the ACC suggests "cause" exists to dismiss these cases under Section 1112(b) for four separate reasons:

    a) the "Texas Two-Step" (the corporate restructuring that created these debtors and the follow-on bankruptcies that Aldrich and Murray filed), is an improper, prejudicial manipulation of the bankruptcy process designed to delay and suppress recoveries for the asbestos creditors;

    b) the Debtors are using these chapter 11 cases to benefit insiders and affiliates, at the expense of asbestos claimants, thus breaching their fiduciary duties to act in those creditors' best interests; and

    c) these debtors are a modern iteration of the "new debtor syndrome," a tactic that courts have long recognized as cause for dismissal, and

   d)  "unreasonable delay" exists, as we are three years into these cases and the Debtors still have been unable to achieve their stated goal of fashioning a "final" and "fair" resolution of their asbestos liabilities that compensates victims in "full."

*See ACC's Motion to Dismiss*, Case No. 20-30608, Doc 1756, pp. 15-16.

A.  <u>The ACC's arguments about the propriety "Texas Two-Step" and the "New Debtor Syndrome" Fail.</u>

On the assumption that the *Carolin* dismissal standard applies only at the threshold of bankruptcy, Movants repeat their bad faith dismissal contentions, to wit—the "Texas Two-Step" is an improper, prejudicial manipulation of the bankruptcy process and the debtors are a new twist on the "new debtor syndrome" which the courts have long seen as a basic for dismissal. *ACC's Motion to Dismiss*, Doc 1756, p. 16 (citing 7 COLLIER ON BANKRUPTCY ¶ 1112.07[02] (16th ed. 2023)).

With these cases in chapter 11 for almost three years, the Movants say *Carolin* no longer applies. *ACC's Motion to Dismiss*, Doc. 1756, ¶67. The cases can be dismissed under Section 1112(b) for bad faith in the filing. *Id*; *see also Maune's Motion to Dismiss*, Doc. 1712 at pp. 18-19. There is some question about the applicability of *Carolin* in the post-filing period. However, I do not think Section 1112(b) permits the creditors a second bite at the apple to contest whether a case was <u>filed</u> in bad faith.

Section 1112(b) is the Bankruptcy Code statute providing for dismissal or conversion of a chapter 11 case. 11 U.S.C. § 1112(b). Its applicability throughout the Chapter 11 case is beyond question.

By contrast, the "bad faith filing" dismissal tests are judicially created appendages to Section 1112(b). The Bankruptcy Act contained two sections requiring "good faith" by a corporate reorganization petitioner. This fact was recognized in *Carolin*: "§ 541 had the explicit

provision that the judge's approval upon filing was conditioned upon his being "satisfied" that

the petition had been "filed in good faith . . . ." *Carolin*, 886 F.2d at 707 (Widner, J. dissenting).

Meanwhile, §546 of the Act "gave instances of lack of good faith as including creditors

acquiring claims for the purpose of filing the petition; adequate relief being available under

Chapter 11; the existence of a prior proceeding giving adequate relief; and being "unreasonable

to expect that a plan of reorganization can be effected." *Id*. Both § 541 and § 546 were repealed

and their good faith provisions were not reenacted when the Bankruptcy Code was adopted in

1978. *Id*.

    In his dissent, Judge Widener criticized the *Carolin* majority's Two-Prong dismissal test

and other like tests because they were judge-made standards not enacted in Section 1112. *Id*. at

707-08.

    The Widener view has been widely rejected. Most Circuits have felt that a "good faith

filing" requirement was implicit. Thus, all the Circuit decisions addressing the topic, have

required it in the filing of a bankruptcy case. *See e.g., Coastal Cable T.V., Inc.*, 709 F.2d, 762

(First Circuit); *Cohoes Indus. Terminal*, 931 F.2d 222 (Second Circuit); *LTL Management*, 64

F.4th 84 (Third Circuit); *Carolin*, 886 F.2d 693 (Fourth Circuit); *In re Antelope Technologies,

Inc.*, 431 Fed. Appx. 272 (5th Cir. 2011); *In re Charfoos*, 979 F.2d 390 (6th Cir. 1992); *Matter of

Madison Hotel Associates*, 749 F.2d 410 (7th Cir. 1984); *Cedar Shore Resort, Inc.*, 235 F.3d 375

(Eighth Circuit); *In re Marsch*, 36 F.3d 825 (9th Cir. 1994); *In re Colorado Trust Deed Funds,

Inc.*, 311 F.2d 288 (10th Cir. 1962); *In re Bal Harbour Club, Inc.*, 316 F.3d 1192 (11th Cir.

2003); *In re Lela & Co. Inc.*, 551 F.2d 399 (D.C. Cir. 1997).

    "Bad faith filing" tests like *Carolin* do not supplant Section 1112(b). Rather, they

augment the statute. This is clear from the *Carolin* holding. In framing the issue presented, the

*Carolin* majority specifically stated that it was determining whether a chapter 11 case should be dismissed ""**at the outset**" of the case" for bad faith.  *See Carolin*, 886 F.2d at 698 (emphasis added).  However, Section 1112(b) applies thereafter: "the court will be able to **consider other factors as they arise**, and to use its equitable powers to reach an appropriate result in individual cases."  *Carolin,* 886 F.2d at 699 (emphasis added).  In short, *Carolin* controls the petition; Section 1112(b) controls the case.

So, while I agree with Judge Beyer's conclusion in *Bestwall* that the good faith filing standard for dismissal in *Carolin* is ultimately supplanted at confirmation by the 1129(a)(3) good faith confirmation standard, I have my doubts that the *Carolin* Two-Prong test was meant to apply to events arising during the chapter 11 case.  Nor do I think that Section 1112(b) permits reexamination of the good faith of the bankruptcy filing itself under a different legal standard ("for cause").  The *Carolin* court obviously thought Section 1112(b) insufficient or insufficiently specific to deal with the problem of "bad faith" chapter 11 filings, and this is what its Two-Prong test measures.

As to the Movants' sundried arguments that the "Texas Two-Step" is a manipulation of the bankruptcy process—that it creates prejudicial delays, and that these Debtors are simply a modern take on the "new debtor syndrome,"—these are simply recast "bad faith filing" arguments.  Because I am not able to dismiss these cases under the *Carolin* test, I am foreclosed from doing so by simply re-terming these as "cause" for dismissal under Section 1112(b).  That which cannot be done directly cannot be done indirectly.  *Cummings v. Missouri*, 71 U.S. 277, 329 (1866).

B. <u>This Motion cannot decide whether the Debtors are breaching their fiduciary duties</u>

On the same factual basis, the ACC argues that by filing these cases and seeking to route the asbestos claims to a trust, the Debtors are breaching fiduciary duties owed to claimants. *ACC's Motion to Dismiss*, Doc. 1756, ¶ 84. Of course, the Debtors, Affiliates and FCR vehemently deny that assertion. *Debtor's Response*, Doc. 1813, p.28. However, I need not decide the question in the context of these Motions.

The ACC sought, and was granted, derivative standing to challenge the "Texas Two-Step" as envisioned by the Texas merger statutes.[37] *Order Granting Motion of the Official Committee of Asbestos Personal Injury Claimants for Entry of Standing*, Case No. 20-30608, Doc. 1121 (Apr. 14, 2022). The ACC responded by filing three separate adversary proceedings. One, *Committee v. Ingersoll-Rand Global Holding Company Limited*, et. al., Adv. No. 22-3028, asserts breaches of fiduciary duties against the officers and directors of the Debtors and their legal predecessors—the same contentions the ACC now advances under Section 1112. Since these issues are pending in the fiduciary duty action, it would be improper to decide them on the merits in a motion proceeding.

C. <u>The Debtors are not guilty of unreasonable delay</u>

Interwoven into each of ACC's three stated arguments under Section 1112, is a fourth argument: that "unreasonable delay" exists. *See e.g., ACC's Motion to Dismiss*, Case No. 20-30608, Doc. 1756, ¶¶ 72-74. For this, the ACC demands that the cases be dismissed.

---

[37] My colleague in *Bestwall* concluded that the Merger and the agreements arising from the same (the Funding Agreements) between the debtor and its affiliates were enforceable. *In re Bestwall LLC*, 605 B.R. at 49. I can reach make no such conclusion here, at least not at this point in time. The applicable Texas merger statutes demand that no prejudice befall creditors of a corporation undergoing a divisional merger. If prejudiced, these affected creditors are entitled to challenge the action, employing a panoply of traditional creditor remedies, including fraudulent transfer avoidance actions, alter ego actions, etc. *See* TEX. BUS. ORGS. CODE ANN. § 10.901. All of these remedies are being pursued by the ACC in these cases.

Here, the ACC properly notes that a chapter 11 debtor is obligated to prosecute its

bankruptcy case in an "expeditious manner." *Id*. ¶ 72 (quoting *In re Bacon*, 52 B.R. 52, 53

(Bankr. N.D. Iowa 1985); *see also In re Milford, Conn. Assocs*., 404 B.R. 699, 708 (D. Conn.

2009) (obligation "to pursue an expeditious reorganization of the estate.").  It further correctly

points out that cause to dismiss exists "where reorganization seems unlikely or unrealistic based

on the Debtor's track record as debtor-in-possession and where the risk of delay falls entirely on

the creditors. *ACC's Motion to Dismiss*, Doc. 1756, ¶ 72 (quoting *Milford, Conn Assocs.*, 404

BR at 708).  At three years in, the ACC argues there has been unreasonable delay.  Further, it

contends these cases were designed to delay and frustrate claimants until such time as they

"knuckle under" and agree to accept reduced settlements of their claims.  *ACC's Motion to

Dismiss*, Doc. 1756. pp. 38-42.  In the ACC's view, the Debtors have had more than enough time

such that it is proper to dismiss the cases.

There are several problems with the ACC's assertions.  The first is that contested

asbestos bankruptcy cases proceed at a much slower pace than other reorganization cases.  Most

Chapter 11 cases are either confirmed, dismissed, or converted in less than a year.  However, the

path to settlement and confirmation[38] in the typical contested asbestos bankruptcy case is far

longer.  I have heard estimates ranging from 4-10 years.  And for asbestos cases filed in this

judicial district, the path has been long.  The *Garlock* case took eight years to be confirmed,

*Kaiser Gypsum* case required four years to reach confirmation and is still on appeal, three years

later.  Those were both "traditional" asbestos cases.

Because the Texas Two-Step strategy is new and highly controversial, these Two-Step

asbestos cases may surpass those averages.  Asbestos claimants and their attorneys view these

---

[38] Given the supermajority voting requirements of Section 524(g), no asbestos cases have been confirmed without
the consent of the claimant constituencies.  11 U.S.C. § 524(g).

bankruptcies as a perversion of the bankruptcy system, prejudicial to claimants, and a threat to

the tort system.  They fervently believe that a solvent entity should not be permitted to divide

itself in two, file only a sliver of the organization in Chapter 11, and thereby deprive its

claimants of their legal actions and jury trial rights.  It is no surprise that the ACC and the

claimant law firms are not interested in negotiating an agreed plan.

　　　The ACC and the claimant law firms will not "go gentle into that good night."  Dylan

Thomas, *The Poems of Dylan Thomas* (New Directions Pub. 1971).  Rather, at every opportunity

they have sought to force dismissal of these cases.  They opposed the preliminary injunctions

that shield the non-Debtor Affiliates et. al. and permit the bankruptcy case to continue.  They

have sued to challenge and potentially unwind the divisional merger.  By these motions, they

would like to force an outright dismissal.  I appreciate their perspective and their concerns.

Obviously, using an artificially created subsidiary to obtain bankruptcy relief for a prosperous

non-debtor corporate conglomerate is on the far reaches of the Congressional bankruptcy power,

if within it at all.

　　　But this opposition is to the great frustration of the Debtors, the Affiliates, and the FCR.

They adamantly maintain that the purpose of these cases is to fully pay claimants.  They say they

simply wish to replace what they believe to be  an unworkable tort system process with a more

efficient trust mechanism.  The Debtors have negotiated with the FCR and funded such a Plan.

　　　A higher court than this will ultimately determine which side is correct.  However, under

Section 1112 (b), I cannot find that the Debtors have been dilatory in their prosecution of these

cases.  They have from the outset attempted to move these cases forward with dispatch; they

have filed an estimation motion, they are moving as quickly as possible towards a hearing,[39] and

---

[39] Given the complexity of the issues and the voluminous discovery involved, progress towards an estimation
hearing is measure in years, not months.

discovery is well underway.  The Debtors have attempted to engage the ACC, the law firms, and

the FCR in plan negotiations.  Their efforts succeeded with the FCR, but not with the ACC who

is unwilling to negotiate.  Thus, no progress has been made towards a plan.

Typically, unreasonable delay in the Section 1112 context implies dilatory behavior on

the part of the debtor in prosecuting his case.  *See e.g.*, *In re Jackson v. U.S., On Behalf of IRS*,

131 F.3d 134 (Table), 1997 WL 746763 at *4 (listing cases where Unreasonable Delay under §

1112 was found).  Often, that delay reflects a debtor with no viable reorganization options; one

that is simply squatting in bankruptcy, hoping for better days.  There is none of that present.

Here we are—admittedly—three years into the case, but it is because the parties have heartfelt

differences of opinion about the propriety of these cases and what should result from them.

Having those differences, we are obliged to litigate the issues as we are doing presently.  There

has been no unreasonable delay to be found in these cases.  Cause does not presently exist to

dismiss these cases under Section 1112(b).

## CONCLUSION

As explained above, there are no cases holding "financial distress" to be a constitutional

requirement for filing a Chapter 11 case, much less a "jurisdictional" prerequisite.  Like

solvency, "financial distress" may be a constitutional precondition to a debtor employing

bankruptcy powers that are premised on the existence of a limited fund.  However, it would

appear that two entities facing almost 90,000 pending actions with many more to follow fall

within the "subject of Bankruptcies" and are eligible to at least file these cases.

Further, these cases are not "bad faith" filings under the controlling *Carolin* test.  While

the Movants fear that *Carolin* has been extended beyond its facts and should not apply to cases

filed by solvent, non-distressed companies, both the Fourth Circuit and the U.S. District Court

have indicated in *Bestwall* that *Carolin* does in fact apply to the Texas Two-Step cases.  The

*Carolin* two-prong test requires a movant to demonstrate both objective futility and subjective

bad faith.  Aldrich and Murray were designed to meet the objective futility standard, and they do.

As objective futility cannot be found, the "bad faith" dismissal motions must be denied.

     As to the ACC's alternate theory that "cause" for dismissal exists under Section 1112(b),

there has been no unreasonable delay by Aldrich and Murray.  The Debtors have attempted to

move with dispatch.  Meanwhile, the breach of fiduciary duties to creditors issue is currently

being litigated in an adversary proceeding and cannot be decided on this motion.  Thus, the

motions to dismiss must be **DENIED**.

**SO ORDERED.**

**This Order has been signed electronically.**         **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**