FILED & JUDGMENT ENTERED
Christine F. Ramsey

September 25 2026

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

Lena M James
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| Aldrich Pump LLC, et. al.,[1] | ) | Case No. 20-30608 |
| Debtors. | ) | (Jointly Administered) |

**PHASE I ORDER ESTIMATING DEBTORS' AGGREGATE ASBESTOS-RELATED LIABILITY**

THIS MATTER is before the Court under § 502(c)(1) for estimation of the Debtors' aggregate asbestos-related liability based on the tort system extrapolation method, using the Debtors' settlement and verdict history. Pursuant to its Order Commencing Phase I, [Dkt. No. 3011],[2] the Court held a trial on this matter from August 10, 2026, through August 14, 2026, at which the parties presented their estimates of the Debtors' present and future asbestos-related liabilities—each using the tort system extrapolation method (the "Phase I Trial"). After considering all the

[1] The Debtors are the following entities (the last four digits of Debtors' taxpayer identification follow in parentheses) Aldrich Pump LLC (2290) and Murray Boiler LLC (0679). The Debtors' address is 800-E. Beaty Street, Davidson, North Carolina 28036.

[2] Unless otherwise indicated, docket citations herein are made in reference to Case No. 20-30608.

evidence admitted at the Phase I Trial, the Court estimates that the Debtors' total asbestos-related liability using the tort system extrapolation method is $742,500,000. The following constitutes the Court's findings of fact and conclusions of law with respect to the Phase I Trial under Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding under Federal Rule of Bankruptcy Procedure 9014.

## I. JURISDICTION

The United States District Court for the Western District of North Carolina has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). On April 14, 2014, the District Court entered its Amended Standing Order of Reference, referring all proceedings arising under title 11 and arising in or related to a case under title 11 to the bankruptcy judges for the Western District of North Carolina. Under 28 U.S.C. § 155(a), the Honorable Albert Diaz, Chief Judge of the United States Court of Appeals for the Fourth Circuit, assigned and designated the above-signed judge to this Court and to the above-captioned case, together with all associated adversary proceedings. [Dkt. No. 2363].

The Court has statutory and constitutional jurisdiction to enter a final order estimating current and future asbestos personal injury claims. "[E]stimations of the debtors' potential personal injury tort liabilities as an incident of the development of a plan of reorganization are core proceedings within the bankruptcy court's jurisdiction . . . ." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir. 1986); *see also* 28 U.S.C. § 157(b)(2)(B). And this Court has constitutional authority to enter a

final order estimating current and pending asbestos claims "without running afoul of the jurisdictional implications of *Stern v. Marshall*." *In re POC Props., LLC*, 580 B.R. 504, 509 (Bankr. E.D. Wisc. 2017) (citing *Stern v. Marshall*, 564 U.S. 462, 499 (2011)); *see also In re Rhodium Encore LLC*, No. 24-90448, 2025 WL 3017436, at *3 (Bankr. S.D. Tex. 2025); *In re J Publ'n Co.*, 660 B.R. 391, 398-99 (Bankr. N.D. Ill. 2024).

## II. BACKGROUND

### A. Corporate History

The Debtors in these consolidated bankruptcy cases are Aldrich Pump LLC and Murray Boiler LLC. Their predecessors are, respectively, the former Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company (a former New Jersey corporation) (collectively, "Old IRNJ"), and the former Trane U.S. Inc. ("Old Trane"). *Findings of Fact and Conclusions of Law* [Case No. 20-03041, Dkt. No. 308, ¶¶ 1-2].

The Debtors' predecessors and their subsidiary companies were, historically, manufacturers of climate control products for buildings, homes, and transportation. *Id*. Their corporate lineage stretches back to 1871, when Ingersoll Rock Drilling Company first opened its doors. *Id.* ¶ 28. By the early twentieth century, they had become global providers of industrial equipment and technology. *Id.* While Old Trane and Old IRNJ did not mine or use asbestos in manufacturing products, they did incorporate asbestos-containing components manufactured by third parties into

some of the industrial equipment they produced. *Id.* ¶ 30. These components are the source of the Debtors' asbestos-related liabilities.

Though both Old Trane and Old IRNJ had largely brought their use of asbestos-containing components to an end by the mid-1980s, that time period marked the beginning of what would become their decades-long experience defending against asbestos-related personal injury claims in the state tort system—an experience that continued up until the Debtors filed these case. *Id.* ¶¶ 31-36. Initially, Old IRNJ and Old Trane faced relatively few claims in the context of an asbestos litigation scene centered on larger asbestos manufacturers, commonly known as the "Big Dusties." *Id.* ¶¶ 33-34. But as those manufacturers began to exit the state court tort system by filing for bankruptcy protection, the number of claims brought against Old IRNJ and Old Trane in state court increased dramatically.[3] *Id.* Consequently, associated costs skyrocketed. *Id.* ¶ 35. Between 2015 and 2019, Old IRNJ and Old Trane spent nearly $100 million annually to defend and resolve asbestos claims. *Id.* In 2020, facing tens of thousands of claims with more likely to come, Old IRNJ and Old Trane sought the protections of bankruptcy. They did so, however, not by filing their own bankruptcy petitions, but by engaging in a series of transactions (the "2020 Corporate Restructuring") culminating in the creation of the Debtors—Aldrich and Murray—and the commencement of these consolidated bankruptcy cases. *Id.* ¶¶ 41-42.

[3] For example, by the late 2000s, over 2,500 mesothelioma claims were asserted against Old IRNJ and Old Trane, annually. Inclusive of claims involving lung cancer and other diseases, approximately 5,000 asbestos-related claims were asserted annually against Old IRNJ and Old Trane from 2015 to 2019. *Id.* ¶ 34.

The 2020 Corporate Restructuring, at heart, involved the utilization of Texas state law divisional mergers to separate the desirable assets and liabilities of Old IRNJ and Old Trane from the unwanted asbestos-related liability each faced. *Id.* ¶ 42. Simply put, each company divided itself into two new entities and, as permitted under Texas law, allocated substantially all valuable operating assets of its predecessor to one of the new entities while allocating all of its predecessor's asbestos liabilities to the other. *Id.* ¶¶ 2, 52-64. Old IRNJ became Trane Technologies Company LLC ("New TTC") and Aldrich; Old Trane became Trane U.S. Inc. ("New Trane") and Murray. *Id.* ¶ 2. The Debtors' 2020 Corporate Restructuring was facilitated by a series of intercompany funding and support agreements between the Debtors and related "Trane Enterprise" entities. *Id.* ¶¶ 47, 69-87. The divisional mergers allowed New TTC and New Trane to operate in the ordinary course of business—free, in theory, from the burden of asbestos liability—while Aldrich and Murray entered bankruptcy. *Id.* ¶ 42, 62. In this manner did Old IRNJ and Old Trane, no longer formally extant, attempt to peel away an expensive heritage of asbestos claims and funnel claimants seeking recovery into the cases now pending before the Court.

### B. Procedural History

The Debtors filed their respective bankruptcy petitions on June 18, 2020. [Dkt. No. 1]; [Case No. 20-30609, Dkt. No. 1]. Following motions by the Bankruptcy Administrator and the Debtors, respectively, the Court appointed the Official Committee of Asbestos Claimants ("ACC"), [Dkt. No. 147], and Joseph W. Grier, III

as the Future Claims Representative ("FCR"). [Dkt. No. 389]. The Debtors, the ACC, and the FCR make up the central constituencies involved in these cases and this estimation proceeding.

In these cases, the Debtors have stated an intention to resolve their asbestos liabilities through the consummation of a plan of reorganization that includes the establishment of a trust under § 524(g) of title 11 of the United States Code (the "Bankruptcy Code"). *Findings of Fact and Conclusions of Law* [Case No. 20-03041, Dkt. No. 308., ¶ 24]. In furtherance of that aim, the Debtors filed a Motion for Estimation of Prepetition Asbestos Claims, [Dkt. No. 833], alongside a Joint Plan of Reorganization proposing such a trust with initial cash funding of approximately $540 million in late 2021.[4] [Dkt. No. 831, §§ 1.1.65, 4.7.3]. On April 18, 2022, the Court entered an order (the "Estimation Order") granting the Debtors' Motion for Estimation but extending its scope to "all current and future asbestos personal injury claims . . . includ[ing] an estimation of mesothelioma claims plus the application of an agreed upon calculation for non-mesothelioma claims." *Order Authorizing Estimation of Asbestos Claims* [Dkt. No. 1127, ¶ 2]. In due course, the Court also entered a Case Management Order for the Estimation of Asbestos Claims, which set forth an initial schedule and procedures in anticipation of a

[4] The proposed initial funding amount purportedly reflects a negotiated settlement agreement between the Debtors, the FCR, and their related professionals in which the ACC and its professionals did not participate. [Dkt. No. 833, ¶ 10]. The Court later authorized the establishment of a qualified settlement fund ("QSF") in connection with the agreement contemplated by the Debtors and the FCR. [Dkt. No. 994].

contested estimation proceeding to occur at an indefinite future point. [Dkt. No. 1302].

Outside of the estimation context, the parties have litigated a swath of other matters in these cases. For over a year following the petition date, the Debtors pursued, and eventually obtained, a Preliminary Injunction Order from the Court extending protection from asbestos-related litigation to a large class of non-debtor affiliates. [Adv. Pro. 20-03041, Dkt. No. 307, 308]. In late 2021, the ACC commenced an adversary proceeding against the Debtors and their divisional merger counterparts under a theory of substantive consolidation. [Adv. Pro. No. 21-03029, Dkt. 1]. Months later, the Court granted the ACC derivative standing to pursue actions on behalf of the Debtors' estates, [Dkt. No. 1121], and the ACC commenced two additional adversary proceedings separately alleging fraudulent transfer and breach of fiduciary duty against various debtor-related entities.[5] Each of these ACC adversary proceedings remains in the discovery phase, though all are presently stayed for case management purposes. [Dkt. No. 3179; Adv. Pro. No. 22-03029, Dkt. No. 98].

In addition to initiating adversary proceedings both against and on behalf of the Debtors, the ACC moved to dismiss these bankruptcy cases entirely, as did a group of asbestos claimants represented by Maune Raichle Hartley French & Mudd ("MRHFM Claimants"). [Dkt. Nos. 1712, 1756]. The Court denied the ACC's and MRHFM Claimants' motions to dismiss the cases, [Dkt. No. 2047], and their

[5] *See* Adv. Pro. No. 22-03028, Dkt. No. 1; Adv. Pro. No. 22-03029, Dkt. No. 1.

prolonged efforts to obtain appellate review of that decision ended with the Court of Appeals for the Fourth Circuit's denial of their respective petitions for permission to appeal. [Dkt. No. 2208].[6] The Debtors also successfully defended against the MRHFM Claimants' request for relief from the automatic stay to pursue claims in state court. [Dkt. No. 2438]. Despite all this litigation, the status quo persisted in these cases.

By the end of 2025, more than four years since the commencement of these cases and nearly three years after the Court's order initiating estimation under § 502(c), no date for an estimation proceeding had been established, and virtually no further progress towards confirming a plan of reorganization had been made. The parties had, however, assembled and exchanged initial expert reports and reliance materials relating to estimation earlier that year.[7] Sensing an opportunity to advance these cases toward resolution, the FCR moved the Court for an order commencing the estimation trial based on the parties' expert reports and tort system values. [Dkt. No. 2941]. The FCR observed that though the parties' preferred estimation methods diverged significantly, each expert report contained a discrete liability estimate based on a tort system extrapolation of the Debtors' asbestos liabilities—a familiar estimation method in the context of asbestos

---

[6] Recently, the United States Supreme Court denied certiorari on an appeal from a Fourth Circuit decision on a related question regarding a Chapter 11 debtor's financial solvency. *See Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, 148 F.4th 233, 243 (4th Cir. 2025), *cert. denied sub nom. Comm. of Asbestos Claimants v. Bestwall LLC*, 225 L. Ed. 2d. 231 (June 1, 2026).

[7] The Court's *Second Amended Case Management Order for Estimation of Asbestos Claims* required the parties to exchange expert reports and reliance materials on or before September 15, 2025. [Dkt. No. 2656, ¶ 3].

bankruptcy history and the ACC's preferred method. [8] The FCR reasoned that moving forward with estimation based on the parties' common-ground tort system estimates, reserving alternative estimation methods for a later time, if necessary, might both bring the parties closer to a consensual resolution of these cases and obviate the need for years more of expensive discovery and litigation. *Id.* The Debtors and the ACC agreed that a phased estimation proceeding was feasible and carried the potential to greatly advance these cases, therefore, the Court granted the motion. *Id.* The order bifurcating this estimation proceeding provides for "(a) Phase I—where the Court [would] make a finding estimating the Debtors' liability for current and future asbestos claims by using the tort system extrapolation method, using the Debtors' settlement and verdict history, and [would] not address the Debtors' legal liability theory, and (b) Phase II—where the Court, if necessary, [would] hear evidence at a date to be determined concerning any alternative estimation methodologies set forth in the Initial Expert Reports, as appropriately supplemented, and not considered by the Court in Phase I." *Order Commencing Phase I of the Estimation Trial with Hearings based on the Tort System Extrapolation Method and the Parties' Expert Reports* [Dkt. No. 3011, ¶ 2].

## III. ESTIMATION UNDER § 502(c)

Section 502(c) of the Bankruptcy Code "expressly directs bankruptcy courts to 'estimate for purpose of allowance' the value of claims that are contingent or

[8] The Debtors prefer an estimation utilizing a "legal liability" theory as was done in *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 94 (Bankr. W.D.N.C. 2014), which entails more extensive discovery than the tort system extrapolation method. *See infra* note 13.

unliquidated, to avoid undue delay in the administration of a bankruptcy." *SummitBridge Nat'l Invs. III, LLC v. Faison*, 915 F.3d 288, 293 (4th Cir. 2019) (quoting 11 U.S.C. § 502(c)). A claim is defined in the Bankruptcy Code as a "right to payment," 11 U.S.C. § 101(5)(A), and "the 'basic federal rule' in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (quoting *Butner v. United States*, 440 U.S. 48, 57 (1979)). This basic rule has been applied in the context of § 502(c) estimation proceedings. *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721 (D. Del. 2005) (citing *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982)); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 94 (Bankr. W.D.N.C. 2014).

Here, within the context of a mass tort asbestos case, the Court will estimate the pending and future asbestos claims as of the Debtors' petition date and consider "how a claim would have been valued in the state court system had the debtor never entered bankruptcy." *In re Armstrong World Indus.*, 348 B.R. 111, 123 (Bankr. D. Del. 2006) (citing *Owens Corning*, 322 B.R. at 722 (estimating the total amount, as of the petition date, current asbestos claimants "could legitimately have claimed as compensation" and what future claims "would have been worth in the tort system as it existed on the petition date")).[9] While claim value is determined as of the

---

[9] The Court's estimation of pending and future asbestos claims under § 502(c) must look to the claims' value under state law, which is a fundamentally different task than "estimating the value which claimants might take in satisfaction of their claims through some bankruptcy mechanism such as a trust of the sort provided for at § 524(g)." *In re Eagle-Picher Indus.*, 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995). Valuing the asbestos claims against the Debtors based on the experience of other bankruptcy trusts "is simply not the same thing as estimating the value of future claims as of the filing date of the bankruptcy case," *id.* at 692, because those trusts are "not operating in the tort system—in which any estimation of [the Debtor's] future liability must assume that it will operate." *In re Armstrong World Indus.*, 348 B.R. at 131.

petition date under state law, the Bankruptcy Code does not—as numerous courts have observed—explain precisely *how* claims are to be estimated. *See, e.g.*, *Bittner*, 691 F.2d at 135; *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005); *In re Garlock Sealing Techs.*, 504 B.R. at 87; *Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global Inc.)*, 330 B.R. 133, 135 (D. Del. 2005). Given that lack of explicit guidance, many courts have concluded that "a bankruptcy court has discretion to determine the appropriate method of estimation in light of the particular circumstances of the bankruptcy case before it." *In re Garlock Sealing Techs.*, 504 B.R. at 93 (quoting *In re G-I holdings, Inc. ("G-I II")*, No. 01-30135, 2006 WL 2403531, at *2 (Bankr. D.N.J. 2006)); *see also Bittner*, 691 F.2d at 135; *In re Federal-Mogul Global, Inc.*, 330 B.R. at 155; *In re Trident Shipworks, Inc.*, 247 B.R. 513, 514 (Bankr. M.D.Fla. 2000); *In re Thomson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992). The Fourth Circuit observed in *In re A.H. Robins* Co. that § 502(c) "contemplates a full adjudication" that might incorporate tools such as epidemiological studies or a debtor's claims and settlement history to estimate aggregate liability. 880 F.2d at 720, 720 n.13.

Though estimating contingent or unliquidated mass tort claims in the aggregate allows a bankruptcy court to avoid "unduly delay[ing] the administration of the case," 11 U.S.C. § 502(c), estimating pending and future asbestos claims is an inexact science that defies "mathematical precision" or an "exact number." *In re Armstrong World Indus.*, 348 B.R. at 124; *see also Owens Corning*, 322 B.R.at 721 (observing that claims valuation involves "predictions which are themselves based

upon predictions and assumptions”). One court analogized estimating mass tort claims to determining the number of marbles in a jar—no matter the estimator’s skill, the estimate will not be more accurate than taking the marbles out and counting them one-by-one. *In re N. Am. Health Care, Inc.*, 544 B.R. 684, 689 (2016) (Bankr. C.D. Cal. 2016).

Though the Debtors, ACC, and the FCR retained numerous experts and dedicated countless hours to researching the Debtors’ current and future liability, in the end, “an estimation by definition, is an approximation.” *In re Federal-Mogul Global, Inc.*, 330 B.R. at 155. Estimation does not require “clairvoyan[ce]” or “certainty,” but is “merely the court’s best estimate for the purpose of permitting the case to go forward.” *In re Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) (quoting *In re Baldwin-United Corp*, 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985)).

In that spirit, estimation ideally should be accomplished quickly, efficiently, and fairly to facilitate the timely formulation and confirmation of a chapter 11 plan that will provide for prompt distribution to creditors. Here, while the Debtors and the FCR are, for the most part, in agreement as to the Debtors’ estimated asbestos liabilities, the ACC has bitterly contested virtually every issue presented in these cases, including the estimated amount of asbestos liabilities. The hope is that an estimate based on the ACC’s preferred method of valuation will inform the parties and advance mediation as contemplated by the Phase I estimation order.

## IV. THE ESTIMATION EXPERTS AND RULE 702

The Debtors, the ACC, and the FCR offered experts who estimated the Debtors' aggregate asbestos personal injury liability, including (1) mesothelioma claims pending but unpaid as of the petition date and (2) the present value of future mesothelioma claims that are expected to be filed after the petition date. Each side also offered rebuttal testimony challenging opposing experts' methodology and conclusions. Collectively, the Court heard from five experts with more than 100 years of asbestos-related valuation experience. Tr. 8/14/26 at 91.[10]

### A. Proposed Experts

To provide an affirmative opinion on current and future asbestos liability, the Debtors retained Dr. Charles H. Mullin, a Ph.D. economist and board chair at the Bates White economic consulting firm. Dr. Mullin, who specializes in econometrics and labor economics, has worked on mass tort forecasting since joining Bates White in 2003 and has run the firm's mass tort practice for more than a decade. Tr. 8/10/26 at 184-88. He has published numerous papers in peer-reviewed journals, primarily in the field of robust estimation techniques, and has provided expert testimony in other cases regarding mass tort liabilities. Tr. 8/10/26 at 185-86, 192. Dr. Mullin evaluated the Debtors' liability using a component-based tort system extrapolation, employing a version of the Nicholson model incidence curve to forecast future claims. He offered a preferred component-based range of $425 million to $550 million. Tr. 8/11/26 at 116-120; ALD-D5 at 75. He ultimately put

[10] The transcripts for the Phase I trial are found at Dkt. Nos. 3381 (Mon. Aug. 10), 3382 (Tue. Aug. 11), 3383 (Wed. Aug. 12), 3384 (Thur. Aug. 13), and 3385 (Fri. Aug. 14).

forward his "best" estimate of the Debtors' aggregate liability for present and future mesothelioma claims as $460 million, an opinion dictated by his view on the key assumptions integral to a component-based forecast for the Debtors. Tr. 8/10/26 at 209; Tr. 8/11/26 at 146. In addition to his affirmative estimate of the Debtors' asbestos liability, Dr. Mullin testified in rebuttal to the ACC's expert witness, Dr. Andrew Sackett. No party objected to Dr. Mullin's qualification as an expert at the trial.

The Debtors also presented rebuttal testimony from Dr. Denise Neumann Martin, who holds a Ph.D. in economics and specializes in microeconomics and statistics. Dr. Martin is a senior managing director at NERA Economic Consulting, has 35 years of experience in mass tort and product liability forecasting, has testified regarding asbestos forecasts in both state and federal court, and is the co-author of *Estimating Future Claims: Case Studies from Mass Torts and Product Liability* (Frederick C. Dunbar et. al. 1996). Dr. Martin was retained by the Debtors to explain her view of the accepted methodology for asbestos claims forecasting and to assess whether the approach taken by the ACC's expert, Dr. Sackett, was consistent with that methodology. Tr. 8/13/26 at 197-201. No party objected to Dr. Martin's qualification as an expert.

For an affirmative opinion and rebuttal opinion, the FCR retained David McKnight, a principal with the economic consulting firm Brattle Group. McKnight is a financial economist who holds an MBA and specializes in valuation, finance, and financial modeling. Between his 13 years at Brattle and his preceding

experience at NERA, McKnight has approximately 25 years of experience with mass tort forecasting. Tr. 8/11/26 at 241-44. McKnight regularly publishes on matters related to mass tort estimation as well as the tort system generally, and he has testified and supported outside experts in tort-related state and federal proceedings as well as arbitrations. Tr. 8/11/26 at 245, 247-48. McKnight evaluated the Debtors' liability by employing a competing-risk model after adopting the LAS and Bates White incidence curves for future claims. He corroborated that analysis with separate evaluations using Walker model and Hazard model claim forecasts. Tr. 8/11/26 at 297-98; Tr. 8/12/26 at 156-57. McKnight estimated the Debtors' aggregate liability for present and future mesothelioma claims using the tort system extrapolation method to be $535 million or $608 million, depending on whether the Court applies a trust-return or risk-free rate in adjusting liabilities from nominal to real dollar values. Tr. 8/12/26 at 134-35, 157-58. No party objected to McKnight's qualification as an expert.

For its affirmative expert testimony, the ACC put forward Dr. Andrew Sackett, the president of Legal Analysis Systems, Incorporated ("LAS"). Dr. Sackett is a former attorney who also holds a Ph.D. in history. He joined LAS in 2020, where he works on asbestos claims forecasting and liability estimation, supervising an interdisciplinary team of professionals from the fields of economics, statistics, computer programing, and public health. Tr. 8/10/26 at 8-10. Dr. Sackett has published a few articles on the interaction between asbestos bankruptcy trusts and the tort system but, until this trial, had not testified in an estimation proceeding.

Tr. 8/10/26 at 12. Dr. Sackett evaluated the Debtors' liability using a component-based forecast for present and future claims estimation, employing an updated Nicholson curve to forecast future claims. He estimated the Debtors' aggregate liability for present and future mesothelioma claims using the tort system extrapolation method to be approximately $1.82 billion. Tr. 8/10 at 46-48, 62-63.

The ACC presented rebuttal testimony from Yvette Austin, a senior managing director and chair of the global finance practice group at Compass Lexecon, an economic consulting firm. Austin holds an MBA in Finance, has over 30 years of experience in valuation, taught graduate-level courses on the subject, and has testified in numerous mass tort valuations. Tr. 8/12/26 at 212-16. The ACC did not retain Austin for an affirmative estimate of the Debtors' asbestos liability but instead tasked her with rebutting the affirmative opinions of Dr. Mullin and McKnight. Tr. 8/12/26 at 217; Tr. 8/13/26 at 33. No party objected to Austin's qualification as an expert.[11]

### B. Rule 702 Objection to Dr. Sackett's Qualification

The FCR and the Debtors objected to the qualification of Dr. Sackett as an expert witness at trial, arguing he lacks the academic credentials and professional experience to be a mass tort claims forecasting expert. Dr. Sackett, they contend, does not hold a degree in economics, finance, or statistics, has never testified as an

[11] In making its findings and conclusions, the Court considered all of the testimony provided by Austin. However, much of her testimony is of limited assistance in this proceeding because significant portions were directed toward rebutting parts of McKnight's initial report that had been outdated by his March 2026 report. Separately, the Court found much of Austin's testimony difficult to follow and, often, flatly evasive. For these reasons, the Court's discussion of her testimony in this order is sparing.

expert on the subject, and has limited experience mostly related to asbestos trusts rather than estimations under the Bankruptcy Code. Tr. 8/10/26 at 35, 41. Because the admissibility of Dr. Sackett's testimony impacts the evidence available to it, the Court first considers the FCR's and Debtors' objections to Dr. Sackett's qualifications before turning to the experts' estimation opinions.

Federal Rule of Evidence 702 governs the admissibility of expert evidence, providing that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2026).

Although the Court must perform its gatekeeping role under Rule 702, "ensur[ing] that the expert is qualified and that the expert's testimony is both relevant and reliable," the Court "is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (internal citation omitted). The Court must "decide whether the expert has 'sufficient specialized knowledge to assist the jurors in deciding particular issues in the case.'" *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012) (quoting

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)). "[A] witness' qualifications to render an expert opinion are also liberally judged by Rule 702," *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993), and a witness may qualify as an expert in a particular field through any one or more of the five bases enumerated in Rule 702—knowledge, skill, experience, training, or education. *Id.* (citing *Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir. 1986).

Dr. Sackett testified that he works "almost exclusively [on] asbestos claims, forecasting and liability estimation." Tr. 8/10/26 at 8. Although he is an attorney with a doctorate in history, Dr. Sackett maintains he has 15 years of experience in the field of asbestos claims estimation, beginning with his work on asbestos trusts as an attorney at the law firm of Caplin & Drysdale and then with his work at LAS since 2020, where he has dealt with approximately 25 bankruptcy or asbestos personal injury trusts. Tr. 8/10/26 at 9-11. In response to critiques that his academic credentials and publication history have no connection to mass tort forecasting, Dr. Sackett explained that he "was trained on the job, not through formal education," learning directly from estimation experts such as Dr. Mark Peterson, Tr. 8/10/26 at 11-13, 19, 37, a founder of LAS who has been recognized as an expert in numerous asbestos estimation proceedings. *See In re Federal-Mogul Global, Inc.*, 330 B.R. at 144.

Under Rule 702, the Court must "consider the proposed expert's full range of experience and training" and not "just his professional qualifications." *Belk, Inc.*,

679 F.3d at 162. Moreover, "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)); *see also Martin v. Fleissner GmbH*, 741 F.2d 61, 64 (4th Cir. 1984) (finding an expert's "lack of direct experience is not a sufficient basis to reject their testimony, but may affect the weight that testimony is given"). The Court is satisfied that Dr. Sackett has the necessary experience and training to qualify as an expert under Rule 702. Though Dr. Sackett is not an economist and has undertaken claims estimation primarily through his work with asbestos trusts rather than in the context of bankruptcy estimation proceedings, "witnesses need not have complete knowledge about the relevant field of specialized information to be of help to the trier of fact and thus qualified to testify as experts under Rule 702." 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.04(5) (2026). Dr. Sackett testified that he has "years of experience working on asbestos claims estimation, which is a similar process, whether it is in a bankruptcy or dealing with a trust." He further explained that, although most of his estimation-related work was with asbestos trusts, "the principles are the same . . . forecasting numbers of future claims and valuating those claims." Tr. 8/10/26 at 23, 36. Given the potential overlap in claims estimation technique, and his years of experience and training in estimating asbestos claims, the Court finds Dr. Sackett satisfies the liberal

standard for qualifying expert witnesses.[12] Accordingly, the Court will overrule the FCR and Debtors' objection to Dr. Sackett's qualifications, though his lack of specialization relative to the other admitted experts affects the weight of his testimony.

## V. EXPERT TESTIMONY

### A. Areas of Agreement on Liability Estimates

The testimony at the Phase I trial demonstrated that for purposes of estimating liabilities using the tort system extrapolation method, the experts agree on and employ the same standard formula, as well as several important variables within that formula. The experts collectively referred to this as the "traditional," "standard," or "accepted" framework for valuing mass torts. Tr. 8/10/26 at 40, 48, 229; Tr. 8/11/26 at 259; Tr. 8/13/26 at 204-05.

The framework involves three broad steps: Step 1 is estimating the total number of claims, which is the sum of claims pending as of the petition date and forecasted future claims; Step 2 provides a nominal value to those claims by multiplying that total by a resolution rate, pay rate, and average settlement value; Step 3 then produces the net present value of those claims by applying appropriate inflation and discount rates to that nominal value. Tr. 8/13/26 at 204-05; Tr. 8/11/26 at 259-60. This framework aligns with how most courts have approached asbestos

---

[12] The objecting parties' concerns regarding the degree of Dr. Sackett's specialized knowledge and expertise are matters left to the trier of fact's consideration. Both the FCR and the Debtors were able to engage in fulsome cross-examination of Dr. Sackett at the trial to expose any perceived gaps in his knowledge and analysis.

estimations, "us[ing] the debtor's pre-bankruptcy history of resolving claims through litigation and settlements to estimate claims in the subsequent bankruptcies." *In re Garlock Sealing Techs.*, 504 B.R. at 93 (citing *In re Specialty Prods. Holding Corp.*, No. BR 10-11779-JKF, 2013 WL 2177694, at *1 (Bankr. D. Del. 2013) and *In re Eagle-Picher Indus.*, 189 B.R. 681, 691 (Bankr. S.D. Ohio 1995)).[13] Along with this common framework for estimating the Debtors' mesothelioma liability, and for purposes of this Phase I estimation, the Court then adds an additional step, applying the parties' agreed upon formula or multiplier to the estimate for mesothelioma claims to account for non-mesothelioma liability.

*1. Step 1: Claim Count and Propensity to Sue*

The experts agree on several key aspects of Step 1, including the incidence curve and concomitant future claims count; the parties readily admit this level of

[13] Although most have looked to the debtor's tort system history in estimating current and future asbestos liabilities, courts have not always agreed on the appropriate data to include and whether "adjustments should be made to historical values." *In re Armstrong World Indus.*, 348 B.R. 111, 124 (D. Del. 2006) (quoting *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 723 (D. Del. 2005)). At least two courts departed from strict adherence to the historical volume of claims filings and settlement values. In *Owens Corning*, the court was unwilling to extrapolate the debtor's claims history into the future because "some of the past results have been skewed by factors which can and should be avoided in the future," noting that "adjustments should be made to historical values to account for these probable changes." *Owens Corning*, 322 B.R. at 722-23. And in *Garlock*, the court found the debtor's claims resolution history "an unreliable predictor of its true liability" due to plaintiff firms' improper withholding of exposure evidence, endorsing instead a "legal liability" approach that estimated the debtor's share of liability relative to other defendants. *In re Garlock Sealing Techs.*, 504 B.R. at 86, 94-95. Instead of relying on the historical settlement data, the estimate adopted in *Garlock* was derived from information provided in questionnaires sent to current asbestos claimants' law firms (PIQs), as well as data obtained from certain asbestos trusts and bankruptcy cases. *Id.* at 95. The *Garlock* court's reluctance to use historic claiming data, which it considered "stale and not accurate," necessitated a substantial, ground up approach to estimation, including extensive, time-consuming discovery and data analysis to obtain the "freshest and most reliable data available." *Id.* at 96. In these cases presently before the Court, the multi-year discovery process pertaining to the legal liability approach—which has expanded well beyond what was undertaken in *Garlock*—has undermined the basic purpose of estimation, that is, to avoid undue delay in the administration of a bankruptcy case.

agreement is unusual in contested estimation proceedings. Tr. 8/14/26 at 57-58, 96-97; 169-70. The total claims are derived from the formula:

[*Pending Claims*] + [*Future Claims (Future Incidence X filing rate)*]
= TOTAL MESOTHELIOMA CLAIMS

The number of pending mesothelioma claims, as of the petition date, is readily ascertainable from the Debtors' database. The database is a record of over 380,000 asbestos-related claims against the Debtors, including those resolved and still open, and includes demographic data—claimant name, age, residence, occupation—as well as claimants' medical information. Tr. 8/10/26 at 50-51. After eliminating duplicate claims, resolved claims, and claims marked for a non-mesothelioma disease, Tr. 8/10/26 at 50, the calculation of pending claims is straightforward: "you can go look at the data and add them up." Tr. 8/10/26 at 229-30. Before adjusting for claims marked with an "unknown" disease in the database, and certain off-complaint claims, which are points of dispute between the parties, *see infra* Section V.B.2, 3, Dr. Sackett identified 6,776 open mesothelioma claims, which generally aligns with the 6,816 claims identified by Dr. Mullin. Tr. 8/11/26 at 51-52; ALD-D5 at 49.

The formula for calculating future claims is essentially the same as that used for pending claims but with one key difference: there is no database or list of future claimants. Tr. 8/10/26 at 61-62. In the absence of such data, an estimate of future claims is the product of two factors, an incidence curve—projecting the medical cases of mesothelioma that will occur—and a filing rate, or "propensity to sue," that

reflects the historical percentage of mesothelioma patients who sued the Debtors. Tr. 8/10/26 at 62, 230.

The first factor, incidence curves, are illustrations of sophisticated methods of modeling an exposed population that combine epidemiology, industrial hygiene, labor economics, and statistics. Tr. 8/10/26 at 233, 238-39. This modeling is a critical variable for courts estimating future asbestos liabilities, with the Nicholson[14] approach the most frequently cited.[15] Here, all three of the affirmative experts used a variant of the Nicholson model at some point in their estimation process but with modifications to account for census and mortality data collected since the study's publication date in 1982. Tr. 8/10/26 at 62-63, 237-38. Though most mesothelioma

[14] Nicholson and his co-authors attempted to predict the number of people who would get asbestos related cancer from 1980 to 2030. *See* Nicholson, W.J., Perkel, G., & Selikoff, I.J., *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality – 1980–2030.* 3 AM. J. INDUS. MED. 259 (1982). The Nicholson approach, and its subsequent revisions, estimate the probability of asbestos disease by considering the population of individuals occupationally exposed to asbestos across several industries and then taking "into account differences in intensity of exposure in various occupations, and the resulting differential impact on incidence of disease." *In re Babcock & Wilcox Co.*, 274 B.R. 230, 239 (Bankr. E.D. La. 2002). The Nicholson curve has been subsequently confirmed by years of data, *see In re Armstrong World Indus.*, 348 B.R. at 126, and has been periodically updated to reflect that people are living longer and contracting mesothelioma at a higher rate than originally forecasted. *In re Specialty Prods.*, No. R 10-11779-JKF, 2013 WL 2177694 at *1 n.7, *15 (Bankr. D. Del. 2013).

[15] *See, e.g.*, *In re Federal-Mogul Global Inc.*, 330 B.R. at 159 (comparing expert testimony relying respectively on the Nicholson study curve, the National Cancer Institute's Surveillance, Epidemiology, and End Results (SEER) data, and an in-house model developed by one expert's private consulting company); *In re Armstrong World Indus.*, 348 B.R. at 130 (noting that all three expert predictions of future asbestos personal injury claims start with the Nicholson study); *In re Eagle-Picher Indus.*, 189 B.R. at 683 (observing that all but one of the experts recognized the Nicholson report as authoritative in estimating the number of future claims); *In re Garlock Sealing Techs.*, 504 B.R. at 96-97 (adopting expert estimate using Bates White incidence model, an updated version of the Nicholson model); *In re Specialty Prods.*, No. BR 10-11779-JKF, 2013 WL 2177694, at *1 (Bankr. D. Del. 2013) (observing that two experts used the Nicholson approach while the third averaged the Nicholson and Peto approaches); *Owens Corning*, 322 B.R. at 721 ("Epidemiological studies can give us some information about the likely occurrence of asbestos-related diseases in the population in the future . . . .").

claims against the Debtors arise from occupational exposure to asbestos-containing products, the experts also used at least one curve that factored in varying degrees of background mesothelioma incidence[16] to account for past claims against the Debtors from people who did not have occupational exposure. Tr. 8/10/26 at 240.

Dr. Mullin employed three different forecasts that vary in their incorporated rates of background mesothelioma: a low-end curve centered on occupational exposure that excludes any background mesothelioma diagnoses with no link to an asbestos-containing product ("Non-ACP" diagnoses); a preferred curve that adds an additional 10% from Non-ACP diagnoses, which he believes aligns better with the tort system data; and a higher curve that adds 20% from Non-ACP diagnoses. Tr. 8/10/26 at 240.[17] Dr. Sackett's LAS incidence curve aligns closely with Dr. Mullin's high-end 20% Non-ACP curve. Tr. 8/10/26 at 98, 244; Tr. 8/11/26 at 100. McKnight originally used the KPMG-Nicholson model in his September 2025 report, which is strictly based on occupational exposure;[18] however, in the interest of providing the Court with a more direct comparison for the Phase I trial, McKnight produced an

[16] The background rate of mesothelioma includes idiopathic mesothelioma—spontaneous development without exposure to asbestos—as well as mesothelioma arising from other sources of exposure to asbestos outside of direct employment in asbestos-related industries. Tr. 8/12/26 at 12-14.

[17] Use of Dr. Mullin's preferred 10% Non-ACP and his high-end 20% Non-ACP—and Dr. Sackett's curve—results in roughly a 6% difference to future claims. Tr. 8/10/26 at 245.

[18] The KPMG/Nicholson model is a forecast based on the population of occupationally exposed individuals in certain industries and does not include any background rate of mesothelioma from people who worked outside of those occupations. The KPMG/Nicholson curve has a much faster decay than the curves produced by Dr. Sackett or Dr. Mullin, generating a significantly lower number of potential claims. Tr. 8/11/26 at 265-66, 287-88.

additional forecast using Dr. Sackett's LAS curve but otherwise retaining his original methodology. Tr. 8/12/26 at 20, 30-31.[19]

The incidence curves are remarkably similar given the characteristics of the exposed population. As most of the claims against the Debtors derive from occupational exposure, and the Debtors ended the use of asbestos-containing products in the 1980s, nearly the entirety of the exposed population is near or past retirement age at this point. The shape or overall decline in the incidence curve, therefore, is driven primarily by general mortality rates of people 70 years and older. Tr. 8/10/26 at 234. As a result, the experts' incidence curves—particularly Dr. Sackett's LAS curve, which McKnight later adopted, and Mullin's high-end 20% non-ACP curve—follow similar tracks after controlling for the percentage of background mesothelioma diagnoses. The Court favors the LAS curve and Dr. Mullin's high-end curve given their similarities, the adoption of the LAS curve by McKnight, and the experts' agreement that individuals with background mesothelioma diagnoses were filing claims against the Debtors prepetition. Tr. 8/10/26 at 240; Tr. 8/12/26 at 134, 151-52.

The second variable, filing rate or propensity to sue, represents the percentage of forecasted mesothelioma diagnoses that lead to claims against the Debtors in the tort system. The rate is the historical number of claims filed against the Debtors relative to the total number of mesothelioma cases. Tr. 8/10/26 at 64-65.

---

[19] As part of her rebuttal of McKnight's KPMG/Nicholson curve, Austin calculated a curve that was "pretty close" to Dr. Sackett's and Dr. Mullin's high-end curve; it was closer still to Dr. Mullin's preferred 10% Non-ACP curve. Tr. 8/13/26 at 16, 109-10.

Given the time that tends to elapse between a claimant's mesothelioma diagnosis and their initiating a lawsuit, Dr. Sackett and Dr. Mullin employed a one-year gap when comparing the diagnosis dates and filing dates. Tr. 8/10/26 at 65, 232-33. Despite some distinctions in the treatment of "off-complaint" claims and unknown claims, *see infra* Section V.B.2, 3, the experts agreed on the basic approach to determining propensity to sue and the baseline filing rate. Tr. 8/10/26 at 233.

These points of agreement are ultimately reflected in the experts' future claims count. Dr. Mullin's high-end estimate for future claims using a 20% Non-ACP curve is around 38,258 while Dr. Sackett projects 38,276 using his Nicholson model—a difference of only 18 claims. Tr. 8/10/26 at 230, 234; ALD-D4 at 18. In using the LAS curve for his March 2026 report, McKnight arrived at a similar future claims count of around 38,000, noting, "when you look at these three forecasts, there's really quite a lot of agreement amongst the three experts in terms of what the number of claims – future claims is for the Debtors here." Tr. 8/12/26 at 17-18, 154-155.

*2. <u>Step 2: Calibration Period and Average Settlement Values</u>*

The second step of the experts' common framework involves the valuation of the pending and future claims, essentially asking how many of those filed claims are going to get paid and what amount they will receive. Tr. 8/13/26 at 205. To do so, the total claims generated in Step 1 are multiplied by three factors, as reflected in the formula:

[*Total Claims*] X [*Resolution Rate*] X [*Pay Rate*] X [*Average Settlement Value*] =
TOTAL MESOTHELIOMA LIABILITY

The parties agree on the basic formula but disagree on the proper implementation or calculation of the individual factors. Before considering those factors, however, it is important to highlight the parties' consensus on the appropriate calibration period, an unseen but critical aspect of calculating some of the factors in Step 2 as well as the propensity to sue or filing rate from Step 1. The calibration window is the historical period used to estimate the factors inputted into the formula or, in other words, "the period of history you are assuming is representative of what the future will be like." Tr. 8/11/26 at 11. The filing rate, pay rate, and average settlement value factors are then determined using data collected from the chosen calibration period.

Dr. Sackett utilized a three-year window from 2017 through 2019. Tr. 8/10/26 at 54-55. Given asbestos is a mature tort with a relatively stable set of average settlement values, McKnight chose a five-year calibration period to incorporate more data, including the only verdict against the Debtors. Tr. 8/11/26 at 295-96. Dr. Mullin considered and tested a three, five, and ten-year calibration period to assess the sensitivity of his claims estimates to that variable; after observing the same stability, Dr. Mullin noted his indifference between a three and five-year window. Tr. 8/10/26 at 252; Tr. 8/11/26 at 12.

The consensus among the three experts was that a more recent calibration period was preferable to an older window. McKnight noted five years "is about as long a calibration period [as] I would typically use." Tr. 8/11/26 at 295-96. While testing the sensitivity to a ten-year calibration period, Dr. Mullin noted that it is "a

long time ago, so you probably want to use the three or five-year window in this context." 8/11/26 at 11-12. Dr. Sackett selected a three-year period, believing that the Debtors' most recent history is the best guide to the future. Tr. 8/10/26 at 54-55. This common approach between the experts also aligns with guidance from caselaw that estimation "should be based upon settlement values for claims close to the filing date of the bankruptcy case." *In re Eagle-Picher Indus.*, 189 B.R. at 691; *In re Federal-Mogul Global, Inc.*, 330 B.R. at 157. For a mature asbestos tort with a stable history, the use of the three or five-year calibration period "almost makes no difference in the final calculation." Tr. 8/11/26 at 12. The three-year calibration period produces a slightly higher forecast than the five year-window, but with little overall effect on the final number, a difference of "less than five percent" in McKnight's view and "about 1 percent" according to Dr. Mullin. Tr. 8/10/26 at 252; Tr. 8/11/26 at 296-97.

Once the calibration period is determined, the total number of estimated mesothelioma claims from Step 1 is multiplied by the resolution rate, which reflects the percentage of total claims that are resolved, either through payment or dismissal, against the number of claims that never resolve. Tr. 8/13/26 at 219. The three affirmative experts share an understanding of the meaning of a resolution rate and its place in the common tort valuation framework but diverge in how that rate is implemented and reflected in their respective models[20] or, in Dr. Sackett's

[20] Dr. Mullin and Dr. Sackett used a component-based method, which separately estimates a resolution rate, whereas McKnight used a competing risk model that already incorporates the concept into calculating the probability of a filed claim getting paid. Tr. 8/12/26 at 39, 80-81.

case, whether the use of a resolution rate in this Phase I estimation is even helpful or statistically significant. Tr. 8/10/26 at 53-54, 246-47; Tr. 8/12/26 at 39, 80-81. *See infra* Section V.B.1.

The next factor is the payment rate, which addresses how many of the claims resolved during the calibration period received payment. Tr. 8/10/26 at 46, 52; Tr. 8/11/26 at 9. The parties agree on the importance of the payment rate to the overall formula and validity of a calibration period but diverge in the specifics of how the rate is calculated[21] and, more significantly, how best to account for "off-complaint" firms and whether excluding older claims is appropriate. Tr. 8/11/26 at 11-15; Tr. 8/12/26 at 131; *see infra* Section V.B.3, 4.

The final factor in Step 2 is the historical average mesothelioma settlement value, which is the average amount that paid claims received during the calibration period. Tr. 8/10/26 at 57. While the prior factors determine how many individuals are going to receive payment, this factor addresses "what size the check is going to be [to a claimant]." Tr. 8/10/26 at 251. This is another area in which the experts are in near-complete agreement on both the approach and the result. Dr. Sackett and Dr. Mullin both arrived at $56,000 for Aldrich claims and were within $1,000 for Murray ($93,000 for Dr. Sackett and $92,000 for Dr. Mullin). Tr. 8/11/26 at 16-17. McKnight's average settlement values, after accounting for off-complaint firms, are similar, with around $59,465 for Aldrich and $92,339 for Murray. Tr. 8/14/26 at 67;

[21] Dr. Mullin and Dr. Sackett's component-based analysis looks at payment rates as a percentage of claims *resolved*, while McKnight's competing risk model computes payments as a percentage of claims *filed*. Tr. 8/11/26 at 297-99.

Tr. 8/12/26 at 118. After multiplying the total mesothelioma claims from Step 1 by each of the computed three factors: resolution rate, pay rate, and average settlement value, the result is the nominal total mesothelioma liability, or the liability in dollars as of the time the forecast is being prepared.

*3. Step 3: Net Present Value Formula*

The third and final step of the experts' common framework takes the nominal total mesothelioma liability amount and applies two factors, the projected inflation rate and the discount rate, to determine net present value:

[*Total Mesothelioma Liability*] X [*Inflation*] ÷ [*Discount Rate*]
= NET PRESENT VALUE TOTAL MESOTHELIOMA LIABILITY

The first factor, inflation, looks to the future and considers whether value that is assigned to mesothelioma claims in today's dollars will increase over time and at what rate. The second factor then takes that amount and asks how much money would need to be invested at an appropriate discount rate to allow for the payment of those claims as they come due. Tr. 8/13/26 at 205, 227-28.

The experts agree on the concept of adjusting nominal payment streams to net present value using inflation and discount rates. Tr. 8/10/26 at 146-47, 159-60, 205; Tr. 8/11/26 at 259-60. This also accords with prior decisions estimating current and future asbestos liability. *See, e.g., In re Eagle-Picher Indus.*, 189 B.R. at 691; *In re Federal-Mogul Global Inc.*, 330 B.R. at 157; *In re Armstrong World Indus.*, 348 B.R. at 126 n.20; *In re Garlock Sealing Techs.*, 504 B.R at 88. There is an enormous divide between the experts, however, on the appropriate inputs for those two

factors, which in turn creates the greatest discrepancy in the overall liability estimates. *See infra* Section V.B.7.

*4. Gross-up for Non-Mesothelioma Liability*

The final additional step in determining the Debtors' total asbestos liability is to account for and value non-mesothelioma claims. The Estimation Order provided for the use of a simple formula or multiplier that would be applied to the Court's estimate of the Debtors' mesothelioma liability, [Dkt No. 1127], which is a technique that has been employed in multiple asbestos bankruptcy estimation proceedings to expedite and simplify the estimation process. *See, e.g.*, *In re Specialty Prods.*, No. BR 10-11779-JFK, 2013 WL 2177694, at *1 n.2 (Bankr. D. Del. 2013); *In re Bestwall LLC*, No. 17-31795, [Dkt. 1577] at 6 (Bankr. W.D.N.C. Jan. 19, 2021); *In re DBMP LLC*, No. 20-30080, [Dkt. 1239] at ¶ 4 (Bankr. W.D.N.C. Nov. 29, 2021).

Here, the parties have stipulated for purposes of Phase I only, that based on Debtors' historical ratio of mesothelioma versus non-mesothelioma claim payments from 2015-2020, approximately 82.7% of Aldrich's total liability and 80.6% of Murray's total liability represented mesothelioma claims. Therefore, the parties agreed on multipliers of 1.21 for Aldrich and 1.24 for Murray to be applied to the Court's estimate for mesothelioma claims to derive an estimate of the Debtors' total liability for all asbestos claims. [Dkt. No. 3349]. The Debtors and the FCR—but not the ACC—also agreed on the use of a single multiplier of 1.22 that could be applied to the combined mesothelioma liability of the Debtors.

### B. Points of Disagreement on Liability Estimates

While each expert followed the general methodology as discussed in section A, their implementation of that methodology varied. On one hand Dr. Mullin and Dr. Sackett employed component-based forecasts, estimating total liability by first evaluating individual claims groups and then adding those groups together. On the other hand, McKnight combined those individual pieces of liability into a multifactor analysis, making it more difficult to separate and compare his treatment of individual claims groups. Tr 8/10/26 at 212. Notwithstanding these implementation differences, the experts' testimony made clear that Dr. Mullin and McKnight are closely aligned in their view on most impactful estimation factors while Dr. Sackett is the outlier.

#### *1. Resolution Rate and Long Pendency Mesothelioma Claims*

As described above, the parties agree that there are approximately 6,800 pending mesothelioma claims. Of the approximately 6,800 pending mesothelioma claims, between 300 and 400 have been pending since before 2010, and another 425 to 450 were filed between 2010 and 2014. Tr. 8/11/26 at 53; ALD-D5 at 50. McKnight, Dr. Mullin, and Dr. Martin all consider the age of a claim critically informative and provided extensive testimony explaining their reasoning. Dr. Sackett viewed all of these pending claims as the same, regardless of age.

Within the context of asbestos litigation, a resolution rate addresses the theory that not every filed claim is resolved. When using a component-based model, unresolved claims may be accounted for by multiplying the total claims number by

the percentage of claims that are resolved. Tr. 8/11/26 at 297. In their respective component-based models, Dr. Mullin included a resolution rate while Dr. Sackett did not.

Dr. Mullin explained that based on his experience, across asbestos defendants, the percentage of unresolved claims is typically between 1% and 5%. Dr. Mullin reviewed the Debtors' database and found that, going back to the year 2003, 2% of claims remain unresolved and that percentage of unresolved claims remains constant through 2012. In his estimation, these are claims that will never resolve. Murray's data is not quite as consistently low, in part because it had such a small number of claims early on, but Murray also falls within the 1% and 5% range after 2003. Based on this data from the Debtors' database, Dr. Mullin concluded that the Debtors' experience a 2% abandonment rate, or 98% resolution rate. Tr. 8/10/26 at 246-47.

Dr. Mullin also reviewed the Debtors' payments on mesothelioma claims over the five-year period prior to the petition date and found that 99% of the Debtors' payments are for claims that had been filed within five years of the payment. Dr. Mullin indicated this finding was consistent with "almost every tort defendant." As a result, of the approximately 6,800 total pending mesothelioma claims, Dr. Mullin calculated the total payment on pending mesothelioma claims in the database filed within five years of the petition date and then added a 1% "gross up" to account for the historical average of the few long pendency claims that would receive payment. Tr. 8/11/26 at 54-56.

McKnight also stressed the importance of the date of the claim based on his review of the Debtors' database. He also found that claims were much more likely to be paid in the first five years from filing, and then they were "exceedingly unlikely to be paid after that." Tr. 8/11/26 at 298. Not including off-complaint claims, *see infra* Section V.B.3, his analysis of the claims showed the probability of payment of a claim after four years is less than 1%. Tr. 8/12/26 at 24. His competing risk model specifically considers the length of time a claim has been pending when predicting the probability of the claim being paid and, if paid, when it is most likely to be paid. Tr. 8/12/26 at 82-83. McKnight did not use a resolution rate because the competing risk model "essentially takes account of that" by computing payments as a percentage of claims filed rather than a percentage of claims resolved. Tr. 8/11/26 at 299.

In contrast, Dr. Sackett did not consider the age of a claim in his methodology and did not distinguish the approximately 850 claims filed before 2015 from those claims filed within five years of the petition date. Tr. 8/10/26 at 51-56; Tr. 8/11/26 at 56-58. Though Dr. Sackett did not use a resolution rate, he agreed that the tort system extrapolation methodology can consider that not all filed claims are resolved. Tr. 8/10/26 at 113. He explained that he did not include a resolution rate in his calculations because he had seen, in other contexts, that old claims do get resolved. He reasoned that the resolution rate can vary by year, as well as the mix of claims filed that year, so he did not consider it helpful. Dr. Sackett reached that conclusion not based on anything in the Debtors' claims database, but on his

"experience forecasting claims," primarily in the trust system. Tr. 8/10/26 at 120-21. He further argued that if he had included a resolution rate, it would only result in the exclusion of a "couple percent of claims," an amount he found not significant. Tr. 8/10/26 at 53-54.

Dr. Martin offered rebuttal testimony on Dr. Sackett's failure to use a resolution rate, describing his failure to do so as a foundational deviation from accepted methodology. Dr. Martin described the known phenomenon of stale pending claims, that is, those claims that have been pending for some time with no activity. She explained that one can determine the period of time it takes for a claim to become stale by looking at a specific defendant's database and calculating the time from filing a claim to resolution, year by year, until there is little resolution activity. Tr. 8/13/26 at 218-20. Here, instead of looking at the Debtors' database to determine the time from filing to resolution and identifying the number of years after which nothing happened, Dr. Sackett assumed that every claim would come to a resolution and "assigned zero claims to the abandoned bucket." In Dr. Martin's opinion, by not considering the possibility that some claims are abandoned and instead assuming every single claim would reach a resolution, Dr. Sackett assigned substantial value to stale, otherwise valueless claims and erroneously inflated his estimate. Tr. 8/13/26 at 222-23.

The Court finds Dr. Mullin and McKnight appropriately accounted for both stale claims and the failure of a small percentage of claims to resolve and agrees

with Dr. Martin that Dr. Sackett's failure to acknowledge that some claims are abandoned inflated his estimate.[22]

*2. Pending unknown disease claims*

For a significant number of claims in the Debtors' database, the disease of the claim is listed as unknown. Approximately 3,700 pending claims against Aldrich and 3,500 pending claims against Murray in the database do not identify a disease. The parties dispute how these unknown claims should be accounted for in estimation.

In his estimation, Dr. Sackett first identified the percentage of pending known disease claims that are designated as mesothelioma claims and then assumed that a similar percentage of pending unknown disease claims would likewise be mesothelioma. Doing so led him to recategorize an additional 1,108 pending unknown claims against Aldrich as mesothelioma claims and an additional 678 pending unknown claims against Murray as mesothelioma claims. Tr. 8/10/26 at 79. As with pending known mesothelioma claims, Dr. Sackett did not consider the filing date of any unknown claim in making his calculations. Nevertheless, Dr. Sackett conceded that the vast majority of claims filed in the early 2000s were nonmalignant cases (non-mesothelioma). TR. 8/10/26 at 128-30.

Both Dr. Mullin and Dr. Martin found fault with Dr. Sackett's reclassification of unknown disease claims to mesothelioma claims. As he did with pending

[22] Austin did not address Dr. Mullin's resolution rate or his treatment of long pendency claims in her rebuttal testimony, nor did she critique McKnight's consideration of the age of a claim in his analysis.

mesothelioma claims, Dr. Mullin reviewed unknown disease claims in the Debtors' database to consider the date each claim was filed. Of the roughly 7,000 pending unknown disease claims, he found that only 87 were filed within five years of the petition date while the rest were long pendency claims that would only account for 1% of the Debtors' payments. Tr. 8/11/26 at 58-60.

Dr. Mullin also considered the pending unknown disease claims in the context of the evolution of the claims mix in the Debtors' data. From the 1990s through 2006, nonmalignant claims far exceeded mesothelioma claims; by 2007, the Debtors' data tracks the larger asbestos tort system transition to the modern mesothelioma era, where the opposite is true. The vast majority of the unknown disease claims in the Debtors' database were filed during the nonmalignant era between 1993 and 2005. Tr. 8/11/26 at 60-61; Tr. 8/10/26 at 220-21.

Dr. Mullin provided further support for his contention that pending unknown disease claims are of minimal value by detailing the matching process he performed between the Aldrich and Murray claims databases and the public Garlock claims database.[23] Tr. 8/11 at 66-70. By comparing the disease categorization of the same

[23] The ACC objected to certain testimony of Dr. Mullin regarding his matching of the Debtors' unknown disease claims on the basis that it was not disclosed as required by Fed. R. Civ. P. 26(a)(2)(B), which requires timely disclosure via written report of a testifying expert's opinions and the facts or data considered in forming them. Tr. 8/11 at 62-64. Corresponding Fed. R. Civ. P. 37(c)(1) provides that information not disclosed as required by Rule 26(a) cannot be used at trial unless the lack of disclosure was justified or harmless. Having considered the testimony offered by Dr. Mullin and the parties' post-trial submissions on Rule 26 issues [Dkt. Nos. 3347, 3350], the Court will overrule the ACC's objection. The disclosure of Dr. Mullin's reliance materials, including his deduplicated claims database, the "Deduplicated claims data with reconciled group settlement info.dta" dataset, and a script demonstrating his matching process across the databases relevant here, is sufficient under Rule 26 to allow his testimony regarding the matching process he performed, including the basic arithmetical conclusions he derived from the resulting data (e.g., the number of claims matched and the percentage of those claims identified as mesothelioma claims), which was provided by Bates White. Dr. Mullin's testimony (in the same line of questioning) is also

claims across multiple databases, one can identify instances where a claim designated as an unknown disease claim in one database is designated a mesothelioma claim (or otherwise) in another. Matching pending unknown disease claims across databases in this way offers insight into the likelihood that any such claim from a given database is a mesothelioma claim, making it easier, in turn, to reliably estimate the value of that set of claims. Dr. Mullin testified—and Dr. Martin's testimony supports the notion—that attempting to match unknown disease claims across databases is part of the standard approach to estimating liability in this context. Tr. 8/11/26 at 68; Tr. 8/13/26 at 209.

By matching the Debtors' unknown disease claims across their respective databases and the public Garlock claims database (in addition to filed PIQs), Dr. Mullin was able to identify about half of the Debtors' roughly 140,000 total unknown disease claims by disease type, including about half of the approximately 7,000 pending unknown disease claims. He observed that about 95% of the claims that became identifiable by disease type after this matching process were non-malignant and that only about 2.4% were mesothelioma claims, both as to the total number of matched claims and the much smaller set of matched pending claims. These observations increased Dr. Mullin's confidence that the Debtors' pending

permissible, of course, to the extent he simply describes what Dr. Sackett did to account for unknown disease claims in his estimation. The critique Dr. Mullin makes of Dr. Sackett's conclusions in the portions of testimony subject to the objection reflects his assessment that Dr. Sackett overstated unknown disease claim values based on an imputation error and does not explicitly source any criticism to a matching process (or failure to implement a matching process), which might have caused his testimony to fall afoul of Rule 26. Finally, the inclusion of Dr. Mullin's matching testimony, even were it undisclosed, is harmless because it is only one of several significant reasons to doubt Dr. Sackett's evaluation of unknown disease claims. For these reasons, the ACC's objection to Dr. Mullin's testimony about matching unknown disease claims is overruled.

unknown disease claims are of minimal value because his matching process essentially reduced the total number of pending unknown disease claims for which estimation was necessary while simultaneously showing that those claims are very unlikely to be mesothelioma. Tr. 8/11/26 at 68-69.

While Dr. Sackett was aware that matching claims across databases to account for unknown disease claims has been done in previous instances of estimation—including by his own firm, LAS—he was not certain whether the data he relied on to evaluate unknown claims against the Debtors reflected a matching process. Tr. 8/10 at 133-34. In addressing Dr. Sackett's opinion on this issue, Dr. Martin explained that matching unknown disease claims across databases in the context of estimation is one way that experts have determined, generally, that such claims are unlikely to be mesothelioma claims. She observed that in every publicly available report she could find from LAS, it had used a matching method to reclassify unknown disease claims as known disease claims and found that only a very small percentage were mesothelioma claims. Her observation on that point is consistent with Dr. Mullin's testimony that less than 3% of the Debtors' pending unknown disease claims are likely to become mesothelioma claims. It strongly suggests that Dr. Sackett's decision to treat nearly 30% of pending unknown disease claims against Aldrich and 19% against Murray as mesothelioma claims resulted in a gross overestimation of the value of that group of claims. Tr. 8/13 at 208-17.

Dr. Martin also described the theory that claimants with mesothelioma are very likely to specify that disease in a complaint because it is the disease most

closely connected to asbestos, is highly fatal, and carries a higher dollar value than other diseases. There is evidentiary support for that theory in the form of claims-matching between defendants or asbestos trusts, as well as long-term monitoring of claim databases, which illustrate the gradual transition of claims from unknown to known diseases. Based on that evidence and her own experience working with asbestos defendants' databases, Dr. Martin concluded that claims initially labeled as an unknown disease almost never transition to, or later become identified as, mesothelioma claims. Tr. 8/13 at 207-09.

McKnight's view of unknown disease claims was consistent with Dr. Mullin and Dr. Martin. He reviewed those claims and observed that they were very old. In his experience, long-pending unknown disease claims will not be mesothelioma claims. Therefore, McKnight treated the unknown disease claims as non-mesothelioma claims, which would be accounted for by the multiplier. Tr. 8/11/26 at 302-03.

The Court finds Dr. Mullin's, Dr. Martin's, and McKnight's testimony on pending unknown disease claims highly persuasive. By overlooking key features of that claim set, such as the high proportion of long-pending claims and their relationship with historical trends in the claims mix, Dr. Sackett significantly overstates their probable value.

3. *Tolled/Off-Complaint/Administrative Claims*

Prior to bankruptcy, the Debtors entered into administrative settlement agreements with three law firms that provided for the resolution of pending and

future asbestos claims from claimants represented by those firms through an administrative procedure rather than a complaint filed in the tort system (taking them "off-complaint"). These agreements provided for an "annual settlement payment limitation," in other words, a yearly cap, of the amount to be paid to the firms to satisfy claims held by each law firm's clients. Payments under the agreements were made as each firm submitted individual claims through the administrative process. As part of these agreements, the statute of limitations for the individual claims was tolled for their duration, without the need to file a complaint. ALD-D6; ALD-D7. Claims presented to the Debtors for payment under these agreements, 80% of which came from "law firm #3,"[24] appear in the Debtors' database as paid claims. However, claims held by clients of off-complaint firms that were not presented to the Debtors for payment under the agreements are not reflected in the database. Tr. 8/10/26 at 84; Tr. 8/11/26 at 78-79. The experts diverge in their opinions on the proper treatment of claims connected to these administrative agreements, especially those for which a PIQ was filed but which were not presented to the Debtors for payment and are therefore not in the database.

In his testimony, McKnight described the impact of these administrative agreements on the Debtors' historical data. When a firm enters into such an agreement, the number of its clients' claims the Debtor ultimately pays stays about

[24] The Court entered a stipulated order prior to the Phase I Trial that required the parties to use anonymous identifiers for certain identifying information during the trial. [Dkt. No. 3265].

the same, but since the firm stops filing all its claims as it had previously done in the traditional tort system, the filing rate, payment rate, and propensity to sue from those firms will not be indicative of what would have occurred without the agreement. Tr. 8/11/26 at 291-93. Wary of the data distortions the off-complaint claims cause, McKnight excluded them from his claim forecast analysis. Instead, he calculated a forecast only for "on-complaint" claims and then applied a multiplier of 1.6 to account for the dollars being paid to off-complaint firms based on the Debtors' historical ratio between payments to on-complaint and off-complaint firms. Tr. 8/12/26 at 89, 167-68.

Austin took issue with McKnight's use of a multiplier, which imputes the behavior of the on-complaint claims onto the off-complaint claims rather than modeling the off-complaint claims on their own trend. Tr. 8/12/26 at 171; Tr. 8/13/26 at 68-69. She believed the use of a fixed 1.6 multiplier was inappropriate given McKnight's calculation that on-complaint claim values were decreasing while, under her own assessment, off-complaint claim values were "fairly steady" or "slightly increasing." Tr. 8/13/26 at 62-64. Austin did not address, however, why the off-complaint and on-complaint settlements would not be similarly impacted by their shared claimant pool's advancing age and declining exposure levels.

For his part, Dr. Sackett theorized that the administrative agreements left a pool of tolled, unfiled claims against the Debtors that were viable for future compensation. Specifically looking at law firm #3, Dr. Sackett suspected, given that it came very close to hitting the payment cap under its administrative agreement

each year, there were additional mesothelioma claims it did not file. In other words, had law firm #3 not reached its annual limit, it would have filed more administrative claims for payment. Instead, it simply held those claims. As further evidence in support of his theory, he noted that prior to entering the agreement, law firm #3 filed about 12% of the mesothelioma claims against the Debtors, but once the agreement was in effect, it filed only 4% (through the administrative, off-complaint process), an 8% decline. Tr. 8/10/26 at 83-84.

To confirm his theory that law firm #3 did not submit all claims it believed should be paid to the Debtors for payment, Dr. Sackett reviewed the PIQs submitted by law firm #3 for pending claims. He found that it had submitted 806 PIQs for pending Aldrich claims and 944 PIQs for pending Murray claims that were not in the Debtors' database because they were off-complaint, or "tolled claims." Dr. Sackett counted these PIQs, as well as others submitted by individuals not appearing in the Debtors' database, as additional pending claims. He then estimated their value by applying the same payment rate he used for on-complaint database claims. Tr. 8/10/26 at 140-43; Tr. 8/11/26 at 82. Accounting for off-complaint claims in this way increased Dr. Sackett's pending and future claim counts by approximately 10% and his estimate of the Debtors' liability by $128.5 million. Tr. 8/10/26 at 84-86; Tr. 8/11/26 at 93-94.

Again, consistent with most of his calculations, Dr. Sackett did not consider the age of the PIQ claims in his calculations, though he agreed that some of them were from before 2010, which was prior to any administrative settlement

agreements and not covered by any tolling provision. Tr. 8/10/26 at 139-41. Dr. Sackett also agreed that prior to the agreements, a percentage of claims filed by law firm #3 were dismissed, though he did not know what percentage of claims. He nevertheless maintained that firms submitted PIQs only for claims they think have value, perhaps to support his treatment of unsubmitted off-complaint claims as compensable at the same rate and amount as on-complaint claims. Tr. 8/10/26 at 144-45. When this view was challenged with the suggestion that law firm #3's submission of PIQs for settled claims showed it did "not do a lot of filtering," Dr. Sackett merely stated, "you know, people make mistakes." Tr. 8/10/26 at 145.

Dr. Mullin prepared both an affirmative opinion on the off-complaint claims and rebuttal to Dr. Sackett's treatment of off-complaint claims. In doing so, he reviewed the dismissal rate for claims filed by law firm #3 over a three-year period prior to its administrative agreement with the Debtors and found that in the tort system, 36.2% of its claims resulted in settlement and 63.8% in dismissal. Diverging slightly from Dr. Sackett, he calculated that law firm #3 filed 13.8% of the mesothelioma claims against the Debtors prior to its administrative agreement. This led Dr. Mullin to observe that, prior to its agreement, claims filed by law firm #3 and later settled accounted for about 5% of total claims against the Debtors, while those later dismissed accounted for roughly 8%. Dr. Mullin then concluded that the 8% decline in filed claims following the administrative agreement between the Debtors and law firm #3 simply reflects the historical tort system dismissal rate for law firm #3's claims—claims that would have been dismissed in the tort system

were now simply missing from the database by function of the agreement. Tr. 8/11/26 at 80-83. In other words, the numbers reflect the administrative agreement working as planned: "[t]he compensable claims get presented and paid each year, the noncompensable claims go unfiled, and the percentage of unfiled claims corresponds almost perfectly to the percentage of claims that before the agreement resulted in dismissals." Tr. 8/11/26 at 83. Like Dr. Sackett, Dr. Mullin also reviewed the PIQs filed in these cases, observing that law firm #3 filed almost half of them despite filing just 14% of total claims prior to the agreements.[25] He noted that while some law firms appeared to filter their inventory of pending claims and file PIQs only for those they believed were compensable, law firm #3 appeared to file PIQs for virtually every claim they had handled, including dismissed and already-paid claims. Tr. 8/11/26 at 88-89.

[25] The ACC objected to certain testimony of Dr. Mullin regarding his analysis of Law Firm #3's PIQ filtering on the basis that it was not disclosed as required by Fed. R. Civ. P. 26(a)(2)(B), which requires timely disclosure via written report of a testifying expert's opinions and the facts or data considered in forming them. Tr. 8/11/26 at 86-88. Having considered the testimony offered by Dr. Mullin and the parties' post-trial submissions on Rule 26 issues, [Dkt. No. 3347], the Court will overrule the ACC's objection. Dr. Mullin's evaluation of PIQs in relation to off-complaint claims and the opinions he develops therefrom are thoroughly discussed in his corrected initial report, including his observations regarding the PIQ "filtering" differences between various firms. *See* Corrected Initial Expert Report of Charles H. Mullin, Ph.D. (Sept. 15, 2025) at Appendix E. They were also discussed during his deposition. *See* Mullin Dep. at 257:15–258:13. Even if this disclosure were somehow technically insufficient under Rule 26 as rebuttal testimony because of its absence from Dr. Mullin's rebuttal report, nearly all of it would still stand as affirmative opinion testimony based on his corrected initial report. This is, of course, because Dr. Mullin was retained by the Debtors as both an affirmative and rebuttal expert witness in this proceeding. Finally, to the degree that some small portion of Dr. Mullin's discussion of PIQs to rebut Dr. Sackett's testimony might not have been adequately disclosed, the Court finds that lack of disclosure to be harmless. The gist of Dr. Mullin's criticism of Dr. Sackett's treatment of unknown claims is clear from the reports and was known by the ACC months in advance of trial. Dr. Mullin's deposition testimony provided further clarity on his analysis of PIQ filtering. And, importantly, excluding Dr. Mullin's limited testimony about law firm #3's purported failure to filter claims would not impact the Court's general assessment of the inadequacy of Dr. Sackett's analysis of off-complaint claims. Therefore, the ACC's objection is overruled.

The Court has concerns about Dr. Sackett's treatment of PIQs for off-complaint claims in his calculations. His theory that law firm #3 would hold back hundreds of valid mesothelioma claims entitled to payment over years because it had reached the annual cap in its administrative agreement with the Debtors defies common sense and suggests law firm #3 entered into an agreement that conflicted with its clients' interests. Further, his failure to even consider law firm #3's dismissal rate prior to its agreement or the age of the firm's PIQ claims in the context of valuing the off-complaint claims reflects his more rudimentary approach to estimation. Thus, the Court finds the very impetus for his theory that the unfiled claims are of equal value to filed claims, that is, the fact that firms spent up to their annual cap each year and the reduction in claims by law firm #3 from 12% of the total to 4% of the total after it entered into the administrative settlement agreement, to be flawed. The Court instead finds that the approaches of McKnight and Dr. Mullin more accurately assess the current and future value of the off-complaint claims for purposes of estimation. Though distinct, each approach accounts for the distortions in the data created by the administrative agreements by making reasonable assumptions and drawing appropriate inferences based on information available in the Debtors' claims database and PIQs.

*4. <u>Payment Rate/Data Truncation</u>*

Despite the parties' general agreement regarding the reasonableness of a three-year calibration period, Dr. Sackett made a related analytical choice that

noticeably boosted his payment rate. According to McKnight and Dr. Mullin, that approach was both erroneous and statistically significant.

Dr. Mullin calculated pay rates, not including the off-complaint claims, for ten, five, and three-year calibration periods on a law firm by law firm basis, as the rates vary significantly. Tr. 8/11/26 at 13. His pay rate is calculated as the percentage of claims resolved in that calendar year that received payment. Tr. 8/11/26 at 10. Using a three-year calibration period, which aligned with Dr. Sackett, Dr. Mullin found a 38% pay rate for Aldrich and a 16% pay rate for Murray. He found a 1% difference for Murray using a five-year calibration period, but Aldrich remained the same. Tr. 8/11/26 at 12-13.

Dr. Sackett calculated a cumulative payment rate of 49.3% for Aldrich during his same three-year calibration period from 2017-2019 and a 21.4% rate for Murray. Like Dr. Mullin, Dr. Sackett first calculated the percentage of claims resolved during the three-year calibration period, but, critically, he omitted any claim that was filed *before* 2013. Tr. 8/10/26 at 54-56. This decision, which in statistical terms is known as data truncation, was significant; had Dr. Sackett used same calibration period but included claims filed prior to 2013, the payment rate would have been 45.6% for Aldrich and 19.5% for Murray. Dr. Sackett's use of a truncated data set has a significant impact; his payment rate is approximately 7.5% more than it should have been for Aldrich and approximately 20% more for Murray. Tr. 8/11/26 at 74-75. Dr. Sackett 's stated rationale for excluding the claims filed prior to 2013 was that the "tort system changes over time" and he wanted to ensure "the

settlements that [he] was using were the . . . closest in time to the pending claims and the future claims." He could not identify any data in the Debtors' history supporting this methodology, instead pointing to a vaguely described "understanding of potential changes in the tort system." Tr. 8/10/26 at 55-56; 123-24.

The difference in percentages is even greater in comparison to McKnight's payment rate. Like Dr. Sackett, McKnight calculated the payment rate for claims filed from 2013 to 2020 and found that the overall payment rate, excluding off-complaint claims, was 35.4%. But because he used a competing risk model that looks at the probability of a filed claim getting paid, rather than a component-based forecast, the truncation effect is not at issue.[26] As part of his rebuttal of Dr. Sackett's opinion, McKnight noted the truncation error or bias in Dr. Sackett's payment rate, the result of excluding pre-2013 filings in component-based forecast. Tr. 8/12/26 at 81-82.

Initially, the Court observes that all settlements the Debtors reached with claimants from 2017 to 2019 are equivalently occurring within the calibration period, regardless of when the claim was initially filed. Dr. Sackett was unable to articulate a reason why two settlements occurring in 2019—with one claim filed in 2012 and another in 2013—should be treated in such a strikingly different fashion. Dr. Sackett's approach also lacks consistency with his other analytical choices as

[26] McKnight used a period from 2014 to 2020 in his September 2025 report but, in his March 2026 report, extended the period to 2013 to better conform with Dr. Sackett's calibration period for his payment rate. Tr. 8/12/26 at 22. Nevertheless, McKnight noted that there are some attributes that are not comparable to other experts because of the implementation differences. Tr. 8/12/26 at 26.

well his own testimony. By truncating the data, he calculated a pay rate based only on more recent claims, but he then applied it to any claims filed prior to 2013. He also refused to concede that older claims are less likely to be paid, while simultaneously excluding pre-2013 claims from his payment rate calculation due to ill-defined "changes over time." Tr. 8/10/26 at 55, 120-22. Lastly, the Court notes that Dr. Sackett's data truncation bias is particularly troubling given that he makes efforts to include a large number of claims from pre-2013 in his total number of pending mesothelioma claims, including (1) long pendency claims, (2) unknown disease claims, and (3) "tolled" or off-complaint claims.

*5. Verdicts*

Over the course of decades of asbestos litigation including approximately 50,000 filed claims, all claims against the Debtors have either settled, been dismissed, or remain unresolved save for one resulting in a $7 million jury verdict against Aldrich in 2016, which, according to the Debtors' database, was ultimately resolved and paid in late 2017. Tr. 8/10/26 at 71. Dr. Mullin, McKnight, and Dr. Martin explained that, because the payment on the verdict is in the Debtors' database, along with any subsequent impact on settlements values, the possibility of future verdicts is accounted for in the post-verdict settlement data. Tr. 8/11/26 at 43; Tr. 8/12/26 at 85-86; Tr. 8/13/26 at 225. In fact, McKnight specifically used a five-year calibration period to capture the 2016 verdict, opining that was an appropriate way to estimate the likelihood and value of future verdicts based on the Debtors' database. 8/12/26 at 85-86. The Court agrees.

Dr. Sackett testified that, in his opinion, the existence of the verdict in the database suggested a change in the Debtors' tort system history. He considered his experience at asbestos litigation conferences and opined that once there is a verdict, other firms see it and are aware of it. Though recognizing that four years had since passed without a subsequent verdict, he nevertheless assumed that the Debtors would be liable for six future verdicts, three for Aldrich and three for Murray. As for the amounts of the forecasted verdicts, Dr. Sackett relied on the average mesothelioma verdict against other defendants over the last three postpetition years, 2023 through 2025, which he calculated to be $15.3 million. Tr. 8/10/26 at 71-73, 106-08.

Dr. Mullin rebutted Dr. Sackett's opinion, pointing out that one verdict out of the 50,000 claims in the past forecasts a 75% chance of one verdict in the remaining 38,000 future claims. He also took issue with the dollar amount of the projected verdicts, noting Dr. Sackett's source publication is based almost entirely upon high-end verdicts and does not account for downward adjustments—such as offsets and apportionment between multiple defendants—that markedly reduce the amount ultimately paid to claimants. Tr. 8/11/26 at 44-46.

Dr. Martin similarly disagreed with Dr. Sackett's opinion, pointing out that it departed from accepted methodology and the tort system experience by layering on six hypothetical verdicts, and explaining that settlement amounts embed verdict risk because the parties determine the settlement amount by a cost benefit analysis. As part of her analysis, she also reviewed all publicly available LAS reports and

found they all used average settlement values, not hypothetical future verdicts, to estimate liability for pending and future claims, unlike Dr. Sackett. Tr. 8/13/26 224-26. Dr. Sackett was also not aware of any reports in which LAS calculated verdicts separately in a tort system extrapolation. Tr. 8/10/26 at 111-112.

During Dr. Sackett's testimony, the Debtors and FCR objected on the basis that his testimony regarding jury verdicts was not a Phase I issue because it was not based on tort system extrapolation. Tr. 8/10/26 at 69-70. The Court overruled that objection, interpreting the scope of Phase I broadly and finding that Dr. Sackett did tether his opinion on future verdicts to the payment of the one verdict in the database. Tr. 8/11/26 at 6-7. However, upon review of the record, the Court will exercise its gatekeeping role under Rule 702 and exclude Dr. Sackett's opinion about future verdicts against the Debtors on the basis that the testimony is not the product of the application of reliable principles and methods to the facts. Fed. R. Evid. 702.[27] "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) (citation

[27] Though the FCR joined the Debtors in arguing that Dr. Sackett's estimate of six additional verdicts was beyond the scope of Phase I, the FCR's objection—particularly counsel's remark that "we can't imagine verdicts"—can also be framed as a reliability challenge under Rule 702(c). Tr. 8/10/26 at 70. Regardless, the Court can consider the admissibility of expert testimony sua sponte "so long as the court has an adequate record on which to base its ruling," *Miller v. Baker Implement Co.*, 439 F.3d 473 (8th Cir. 2006), and "if the materials before the court make it clear that the proffered testimony is unreliable, exclusion of the testimony is appropriate even in the absence of an evidentiary hearing." 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.02(6)(c) (2026); *see also Koehler v. Infosys Techs. Ltd.*, 181 F.4th 769, 778 (7th Cir. 2026). The ACC presented Dr. Sackett's full testimony on his six projected verdicts, in the face of objections and strenuous cross-examination, ensuring the Court has more than an adequate record on which to assess the reliability of Dr. Sackett's opinion.

omitted). As described above, Murray does not have a single verdict in its tort system history, and Aldrich has just one, with their combined history of 50,000 claims, yet Dr. Sackett projected six verdicts among the 38,000 forecasted future claims. While the basis for this forecast is technically the verdict in the Debtors' database, the Court can discern no reliable statistical and economic principles and methods applied to the facts here.

Dr. Sackett described the 2016 verdict as "a change in the tort system" that would make it "more likely that [plaintiffs' firms] would try for that in the future." Tr. 8/10/26 at 71, 105. The Court has carefully reviewed the record, and in forming his opinion, Dr. Sackett did not rely on any facts or data in the Debtors' tort system history after the 2016 verdict to support his assertion that the verdict caused a change in the tort system, nor did he point to any specific experience he has had with another defendant, or even observed in the course of his work, that exemplifies the trend he predicts. And to the extent that Dr. Sackett's conclusion was based on his prior experience as an asbestos litigation attorney, he failed to "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee's note).

Although "Rule 702 is flexible . . . [that] flexibility does not eliminate the requirement that the expert reliably connect her principles and methods to the facts of the case." *Near v. Enerco Grp., Inc.*, 182 F.4th 341, 362 (4th Cir. 2026) (citing

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993)). The ACC failed to show by a preponderance of the evidence that Dr. Sackett's estimate of six additional verdicts is the product of reliable principles and methods; therefore, the Court will exclude his opinion as to the verdicts. Alternatively, even if the testimony were not excluded, the Court would give it no weight, as the number of hypothetical verdicts was purely speculative, the forecasted amounts were not based on the Debtors' settlement and verdict history, and any heightened risk of an adverse verdict would be accounted for in the average settlement value.

6. *Average Settlement Value Trend (Future Projection)*

The parties dispute whether average settlement values are declining or remaining flat over time. Based on his three-year calibration period, Dr. Sackett concluded that the Debtors' average settlement values are stable. Tr. 8/10/26 at 147.

Dr. Mullin gave extensive testimony on factors that affect average settlement rates over time, which, while very helpful in gaining a deeper understanding of the subject matter, the Court will only describe briefly here. He described, as it is generally known, prices rise over time due to inflation. At the same time, the average asbestos claimant is getting older, which reduces the value of their claim, as the average settlement value is largely compensation for pain and suffering and lost life. Lastly, as time goes by, the average asbestos claimant has had fewer years of occupational exposure to asbestos-containing gaskets, further reducing the value of the claim against the defendant. Tr. 8/11/26 at 20. Dr. Mullin reviewed the Debtors' data to ascertain whether these factors applied specifically to them and

found that the average age of a paid claimant has risen over time from being in their late 60s in the early 2000s, to nearly 75 years old presently. Dr. Mullin reviewed each Debtor's average settlement value over the last 14 years and observed that for Murray, the trend line shows a decline over time averaging about $10,000 every four years. Tr. 8/11/26 at 35. As for Aldrich, the average settlement value either declined slightly or remained flat, reflecting the impact of the verdict. Dr. Mullin calculated alternate total estimates using either a declining trend line or a flat trend line, conceding that the decline is small for Aldrich. Tr. 8/11/26 at 35-41.

McKnight's regression analyses further confirmed the prevailing impact of claimant age on settlement values, what he characterized as "the well-known fact in these mass tort litigations that age – as claimants get older, they tend to get paid less." Tr. 8/12/26 at 119-20. Given the fixed, aging population of individuals exposed to the Debtors' asbestos-containing products and finding that other variables such as a claimant's state or law firm were unlikely to change with a mature tort like asbestos, McKnight found that "for every year older a claim[ant] gets . . . their average settlement values go down by about 1 percentage point." Tr. 8/12/26 at 122.

Austin critiqued McKnight's opinion because he only controlled for age when he performed his regression analysis looking at claim value when there were multiple variables in the data that could affect claim value. Tr. 8/12/26 at 248-49. The Court found McKnight's explanation as to why he purposefully controlled for age—because he knew age would change over time while there was no reason to

believe the other variables (such as venue and law firm) would change—to be helpful and persuasive.

7. *Discount Rate*

All experts agree that a discount rate must be applied to the forecasted liability to account for the fact that claims will be paid out over 40 years into the future. Dr. Mullin and McKnight agree that the discount rate with the appropriate trust rate of return should be 6.11%[28] or, if using a risk-free rate of return, 4.5%. There was extensive testimony by all experts on whether to use a trust rate of return or a risk-free rate, with compelling arguments on both sides. But, given the context and circumstances presented here, as Dr. Mullin recognized when he alluded to public policy choices, Tr. 8/11/26 at 112, and Austin effectively discussed in some detail during her testimony,[29] the Court agrees with Judge Hodges' decision in *Garlock* on this point and finds the long-term risk-free rates appropriate. *In re Garlock Sealing Techs*, 504 B.R. at 97; *see also In re Federal-Mogul Global, Inc.*, 330 B.R. at 163-64; *In re Eagle-Picher Indus.*, 189 B.R. at 692.

---

[28] Dr. Mullin adjusted the trust rate of return he used in his affirmative report down slightly to match McKnight's proposed trust rate of return, testifying that McKnight's opinion was based on a "full-fledged" portfolio analysis for purposes of simplicity and because it was "arguably preferable." Tr. 8/11/26 at 111.

[29] Austin questioned the methodology used by McKnight and Dr. Mullin in deriving the trust return rate, noting it was unclear how the sampled trusts were selected, why other trusts were excluded, and why McKnight looked at the expected return for certain asset classes held by the trusts, rather than the actual returns on investment. More significantly, Austin questioned whether prospective trust returns are a relevant metric for determining the appropriate discount rate in this Phase I estimation, where future asbestos claims are valued as if they remained in the tort system and where no hypothetical trust yet exists. Tr. 8/12/26 at 234-238.

In calculating his proposed risk-free rate, McKnight took the yield curve as of June 2025, when the discount rate on 10-year Treasuries was 4.5%, which was equal to the 100-year average rate of return and indicative of what he considered a normal interest rate environment. He used the full yield curve to account for a lower discount rate for liabilities coming due in a short period of time and an increased rate for liabilities into the future. For an inflation rate, McKnight used the 2% inflation rate targeted by the Federal Reserve. Tr. 8/11/26 284-86; Tr. 8/12/26 at 70. In his range of estimates, Dr. Mullin also includes projections using the same 4.5% risk-free rate of return. Tr. 8/11/26 at 107-112, 169-70. McKnight clarified the distinction between discounting something to the petition date, meaning the date to which one discounts, and choosing the appropriate rate for that discounting. He noted that, over any long period of time in the U.S. economy, interest rates are higher than inflation rates.

Dr. Sackett calculated his proposed discount rate for a period through 2059 by using a blended rate of inflation of 3.25%—derived from the average of the Consumer Price Index (CPI), the Medical Care CPI, and the Employment Cost Index from 2020-2025—and a 1% risk-free rate of return, which is a blend of the rates as of June 2020 on spot 3-month, 10-year, and 30-year United States Treasury yields. The combination of these two variables left Dr. Sackett with a net discount rate of negative 2.2%. Tr. 8/10/26 at 89-90, 163.

Dr. Sackett is not an economist and did not choose the rate in consultation with an economist at LAS. He explained that he used the spot rates because he was

valuing the claims from the perspective of June 2020, the petition date. Dr. Sackett did not provide a meaningful explanation for why he felt it appropriate to use postpetition data to calculate an inflation rate but not to calculate a discount rate. Dr. Sackett's testimony also reflects that he did not consider the changing characteristics of the claims over time, though he agreed that as time passes, the claimants are both getting older and there are "more years" between the claimants and the time when asbestos left the marketplace. Tr. 8/10/26 at 149. And though he was unable to identify any economic period where negative real interest rates persisted for over thirty years, Dr. Sackett applied a negative 2.2% discount rate to his projection of future asbestos claim values, believing that a negative rate was "not unprecedented" and that this specific situation should not be compared to "the entire American economy." Tr. 8/10/26 at 90, 149, 161-163.

McKnight critiqued Dr. Sackett for using the spot rate at the petition date, which was during the COVID-19 crisis and a historically low interest rate environment, explaining it not a useful metric to find the discount rate for a series of liabilities extending many years into the future. He took issue with Dr. Sackett's inflation rate as well, which was based on the actual inflation rate in the U.S. using post-petition data (as opposed to the prepetition data for the discount rate). Lastly, he challenged Dr. Sackett's use of a historically low-interest rate prepetition and high inflation caused by supply chain disruptions postpetition, to calculate a negative discount rate that he then assumes will persist for the next 50 years. Tr. 8/12/26 at 70-73.

Dr. Martin offered extensive rebuttal testimony addressing Dr. Sackett's calculation of a discount rate. Echoing McKnight, she distinguished between the date to which a liability is discounted, i.e., the petition date, and the rate for that discounting. 8/13/26 at 240. In her view, because these are long-tailed asbestos liabilities, Dr. Sackett should have looked at two factors to determine the appropriate inflation: (1) what is the correct average rate of inflation over the life of the liability and (2) whether there would be changes in the characteristics of the claims over time. 8/13/26 at 230. As to the correct average rate of inflation, Dr. Martin took issue with Dr. Sackett blending CPI with Medical Care CPI and Employment Cost Index, both of which are higher than CPI. She pointed out that medical expenses are embedded in CPI, and medical costs are not a significant driver of claim value. Tr. 8/13/26 at 236. If Dr. Sackett had used CPI, his inflation rate would have been 2.3% and in line with the Federal Reserve's target rate.

Dr. Martin also found that Dr. Sackett failed to analyze historical trends or the impact of the changing claims mix. Dr. Martin reasoned that the dispute between the parties regarding average settlement value is whether the claims are flat or declining. In either case, the fact that claim values are not increasing is evidence that something is tempering the effects of inflation. And as both Dr. Mullin and McKnight discussed at length, the average age of a claimant is increasing over time, and claim values decrease with age. 8/13/26 at 234-38.[30]

[30] The ACC objected to the admission of Dr. Martin's testimony that the value of claims decreases with claimant age on the basis that it was not disclosed in her rebuttal report as required by Fed. R. Civ. P. 26(a). Tr. 8/13 at 232. Having considered the testimony offered by Dr. Martin and the parties' post-trial submissions on Rule 26 issues [Dkt. Nos. 3347, 3350], the Court will overrule the ACC's

As with Dr. Sackett's choice of inflation rate, Dr. Martin found Dr. Sackett similarly deviated from the accepted method of selecting a discount rate that reflects economic expectations over the 40-year life of these long-tailed liabilities. She emphasized the discount rate should embed similar expectations and be consistent with the chosen inflation rate. In Dr. Martin's opinion, Dr. Sackett's decision to base his discount rate on the daily Treasury yields on the petition date in June 2020 was not appropriate, as rates were extraordinarily low and not expected to persist. Tr. 8/13/26 at 242. Like McKnight, Dr. Martin took issue with Dr. Sackett's assumption that aberrant rates would persist for 40 years and noted that Congressional Budget Office projections from 2020, both before and after June 2020, rates to be up to 2% by 2025.[31] Tr. 8/13/26 at 247.

McKnight's and Dr. Martin's familiarity and depth of understanding of the subject matter were apparent during their testimony, and the Court found their critiques of Dr. Sackett both credible and reliable. In pairing an exceptionally low interest rate from the COVID-19 pandemic—what McKnight described as the

objection. While the ACC accurately observes that Dr. Martin's rebuttal report does not contain her opinion that an aging claimant population entails decreasing average claim values over time, the Court declines to exclude her testimony on the matter, finding the nondisclosure harmless. Dr. Martin's opinion about the effect of an aging claimant population on average claim values over time was part of her deposition testimony months before trial. *See* Deposition of Denise Neumann Martin, Ph.D. (May 5, 2026) at 136:10–137:8. Additionally, Dr. Martin was just one of three credible expert economists to identify this relationship between claimant population age and claim values over time. Both Dr. Mullin and McKnight provided robust testimony on the impact of claimant age on inflation rates and opined, as Dr. Martin did, that the average age of claimants against the Debtors increases over time, which has the effect of decreasing average claim value. Tr. 8/11 at 21-24; Tr. 8/12 at 119-23. Dr. Sackett did not account for this relationship in choosing an inflation rate. Consequently, the exclusion of Dr. Martin's testimony on the issue would have minimal impact on the Court's overall assessment of an appropriate discount rate. Therefore, the ACC's objection is overruled.

[31] Rates recovered more quickly than projected in 2020 and were up to 4% by 2023.

lowest rate in the U.S. economy over the last 100 years—with the relatively high inflation rates in recent years, Dr. Sackett derives and then forecasts a long-term negative real discount rate, which Dr. Martin characterizes as “unrealistic” and “impossible.” Tr. 8/11/26 at 285; Tr. 8/13/26 at 255.

Dr. Sackett’s calculation, as he himself concedes, runs counter to the basic economic principle of the time value of money, the idea that “a dollar today is worth more than a dollar in the future.” Tr. 8/10/26 at 164. Given the analytical flaws in Dr. Sackett’s methodology and results, the Court declines to apply his aberrational negative real discount rate. The Court is left then with the 4.5% risk-free rate proposed by McKnight and Dr. Mullin, which it finds to be a reliable discount rate in calculating the present value of the Debtors’ asbestos liabilities for purposes of estimation.

## VI. CONCLUSION

As discussed above, there is, for the most part, a consensus among the experts on the standard framework for asbestos claims estimation. Many common areas of disagreement in this context—the appropriate incidence curve, future claim counts, recent average settlement values, and the calibration period—are either uncontested or do not result in a statistically significant distinction. Despite this rare agreement, the experts stridently disagree at times on the proper inputs for the standard framework as well as specific modeling decisions, echoing prior courts’ observations that “relatively minor variations in underlying assumptions can skew

the end result enormously." *In re Armstrong World Indus.*, 348 B.R. at 133 (quoting *Owens Corning*, 322 B.R. at 721).

After reviewing the trial testimony and evidence, the Court finds Dr. Sackett made several dubious methodological choices, which predictably move his overall and individual component estimates beyond where the Debtors' history and accepted economic principles would suggest. It is difficult to discern whether Dr. Sackett's analytical choices represent a genuine failure to understand the nuances of claims estimation or, alternatively, are the product of some ulterior objective. Dr. Sackett made assumptions that were not supported by the Debtors' claim history, presuming that every claim would resolve, for instance, and disregarded trends apparent in the Debtors' database, such as the increasing age of the average claimant. Dr. Sackett also engaged frequently in what could be characterized as temporal disregard: taking a disease mix from the modern era and imposing it on unknown disease claims from decades ago; giving the same value to a claim that has been pending since 2009 as a claim filed in 2018; and generating a negative real discount rate by combining a historically anomalous, prepetition spot rate from 2020 with actual postpetition inflation through 2025. These issues, along with his frequent inability either to fully explain the basis for his opinion or to defend his conclusions, lead the Court to conclude that his opinion should be given little, if any, weight.

Conversely, the Court finds the estimates of Dr. Mullin and McKnight using a higher 20% non-ACP curve and a 4.5% risk-free discount rate are both highly

persuasive and firmly supported by the Debtors' claim and payment history. McKnight offers a recommendation of $608 million net present value, using his model but inputting the forecasted claims number from Dr. Sackett's LAS incidence curve. The high end of Dr. Mullin's preferred estimated range of net present liability, also using the 20% non-ACP curve that corresponds with that of LAS and assuming average settlement values for Aldrich remain flat into the future, is $550 million. Tr. 8/11/26 at 117-21; ALD-D5 at 75. And despite employing different methodologies that make direct comparisons challenging, Dr. Mullin's forecasts generate similar ranges to McKnight's competing risk model. Tr. 8/10/26 at 205-09, 211-13; ALD-D3 at 7-8. The two experts arriving in the same general place, despite operating independently and with different tools and approaches, confirms the overall reasonableness of their respective estimates. It was apparent during the trial that each considered the other's opinion both competent and well-founded, and the Debtors did not offer rebuttal testimony to contradict or call into doubt the FCR's proposed estimate. Though the Court finds, for the reasons articulated above, that the risk-free rate is the more appropriate discount rate given the purpose of this estimation and the current stage of the bankruptcy proceeding, it otherwise finds McKnight's and Dr. Mullin's conclusions persuasive, well-reasoned, and supported by statistical and econometric principles.

The Court is mindful that "each interested party can be expected to have selected an expert whose opinions will advance the cause of that party." *See Owens Corning*, 322 B.R. at 721; *In re Federal-Mogul Global, Inc.*, 330 B.R. at 156. But the

experts' potential partiality can provide some assistance here in choosing between the comparable estimates of Dr. Mullin and McKnight. In light of the trust funding already agreed to by the Debtors, there is no question sufficient funds will be available to cover the current claimants;[32] the critical question concerns the asbestos liability for *future* claimants years from now. A future claimants' representative "serves the interests of his constituents, the future claimants," *In re Imerys Talc. Am., Inc.*, 38 F.4th 361, 377-78 (3d Cir. 2022), and "must perform fiduciary-like duties in his or her very special role of negotiating for individuals who will be required to participate in a claim-resolution procedure (the trust via the channeling injunction) that they had no say about." *In re Fairbanks Co.*, 601 B.R. 831, 838 (Bankr. N.D. Ga. 2019). With that in mind, though the estimates provided by McKnight and Dr. Mullin are generally comparable and, in the abstract, equally sound, the Court will give more weight to the slightly higher estimate offered by the FCR's expert, McKnight. The FCR in these cases has decades of relevant experience and is the only party specifically charged with representing the interests of future asbestos claimants, who stand to lose the most if the eventual trust is insufficiently funded. Further, given the uncertainty inherent to estimation, resolving that

[32] Although the FCR remains free to assert whatever position he believes is appropriate in estimation, *see* Amendment No. 1 To Plan Support Agreement [Dkt. No. 2721, Ex. B], he agreed with the Debtors on a proposed plan years ago with a section 524(g) trust funded in the amount of $545 million, with no less than $125 million available to pay current asbestos claimants. [Dkt. No. 833, at ¶¶ 10-12]. The QSF approved by this Court—and already funded by the Debtors—provided $270 million toward that proposed funding amount. [Dkt. Nos. 994; 2378 at 38]. By comparison, under the high end of Dr. Mullin's preferred range, current claims are valued at no more than $115 million. Tr. 8/11/26 at 113-15; ALD-D5 at 74-75.

uncertainty in favor of the higher amount is appropriate under the circumstances of these cases.

Therefore, under 11 U.S.C. § 502(c), after carefully considering the evidence, as well as the purpose and limitations of the estimation process, the Court finds the best estimate of the Debtors' liabilities for mesothelioma claims using the tort system extrapolation method as provided by the Court's Phase I order to be $608 million net present value. The Court then applies the stipulated multiplier of 1.21 for Aldrich and 1.24 for Murray to value the non-mesothelioma asbestos personal injury claims, resulting in a total estimated liability for purposes of Phase I of this estimation proceeding of $742,500,000.[33]

**SO ORDERED**.

This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order.

United States Bankruptcy Court

[33] McKnight's final recommendation of $608 million did not include a breakdown of the total liability between Aldrich and Murray, and the parties could not agree on a single multiplier to use across both Debtors. [Dkt. No. 3349]. Therefore, the Court has compared the experts' calculations for the relative share of liability held by Aldrich and Murray—particularly Dr. Sackett's LAS curve-derived proportion, which was the same curve used by McKnight—and estimates the ratio to be 63% for Aldrich ($463,478,400) to 37% for Murray ($278,950,400). Applying the 1.21 multiplier for Aldrich and 1.24 for Murray to those respective amounts yields a total liability figure of $742,428,800, which the Court will round up to $742,500,000.